Stuart C. Plunkett (SBN 187971)
stuart.plunkett@bakerbotts.com
Peter K. Huston (SBN 150058)
peter.huston@bakerbotts.com
BAKER BOTTS LLP
101 California Street, Suite 3600
San Francisco, California 94111
Telephone: (415) 291-6200

Theresa A. Sutton (SBN 211857)
theresa.sutton@bakerbotts.com
Kathryn S. Christopherson (SBN 322289)
kathryn.christopherson@bakerbotts.com
BAKER BOTTS LLP
1001 Page Mill Road, Bldg. 1, Suite 200
Palo Alto, California 94304
Telephone: (650) 739-7500

*Counsel for Plaintiffs Francine Shulman,
Iron Angel, LLC, and 3F, Inc.*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| FRANCINE SHULMAN; IRON ANGEL, LLC; 3F, INC., <br><br> Plaintiffs, <br><br> v. <br><br> TODD KAPLAN; MEDICAL INVESTOR HOLDINGS LLC dba VERTICAL COMPANIES; VERTICAL WELLNESS, INC.; CHARLES HOUGHTON; MATT KAPLAN; DREW MILBURN; COURTNEY DORNE; SMOKE WALLIN; ROBERT SCOTT KAPLAN aka ROBERT SCOTT; ELYSE KAPLAN; JEFF SILVER; IRON ANGEL II, LLC; NCAMBA9, INC., and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 2:19-CV-05413 <br><br> **COMPLAINT FOR VIOLATION OF RICO, RICO CONSPIRACY, FRAUD, NEGLIGENT MISREPRESENTATION, BREACH OF CONTRACT, BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING, VIOLATION OF CALIFORNIA BUSINESS & PROFESSSIONS CODE §§ 17200 & 17500, VIOLATION OF THE LANHAM ACT, COMMON-LAW UNFAIR COMPETITION, INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS, INTENTIONAL INTERFERENCE WITH PROSPECTIVE** |

BAKER BOTTS L.L.P.

**ECONOMIC ADVANTAGE, INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS, ELDER FINANCIAL ABUSE, ASSISTANCE OF ELDER FINANCIAL ABUSE, BREACH OF FIDUCIARY DUTY BY ATTORNEY, MALICIOUS PROSECUTION, RESCISSION, AND CONSTRUCTIVE TRUST**

**JURY TRIAL DEMANDED**

BAKER BOTTS L.L.P.

COMPLAINT

CASE NO. 2:19-CV-05413

1
2

**TABLE OF CONTENTS**

<u>Page</u>

3   I.   INTRODUCTION ................................................................ 1

4   II.   PARTIES ........................................................................... 10

5   A.   Plaintiffs ................................................................. 10

6   B.   Defendants ............................................................... 10

7   III.   JURISDICTION AND VENUE ....................................... 13

    IV.   FACTUAL ALLEGATIONS ............................................ 17

8
9   A.   Ms. Shulman Accumulates Rights to Valuable Assets, Including Iron Angel, Sisters, and Wellsprings ................................ 17

10
11   B.   Ms. Shulman, Looking for a Business Partner, Meets Todd Kaplan and Enters Cultivation Agreement and Branding Agreement ............................................................... 21

12
13   C.   The Parties Agree to the Same Business Arrangement for Cannabis Operations on Wellsprings, and Defendants Implement the Most Damaging of their Fraudulent Schemes ............................ 32

14
15   D.   Defendants, Directed by Kaplan and Houghton, Execute on a Plan to Oust Ms. Shulman from Iron Angel ................................ 40

16
17   E.   Defendants Engage in Fraud to Exclude Ms. Shulman from Operator Licensing .................................................... 43

18   F.   Defendants' Breaches of the Cultivation Agreement and Wellsprings Agreement Continue and Escalate ................................ 46

19
20   G.   Defendants Attempt to Manipulate Ms. Shulman Into Voluntarily Forfeiting Her Rights .................................................. 51

21   H.   Defendants' Actions Force Termination of Cultivation Agreement and Cause Loss of Wellsprings .................................... 55

22
23   I.   Kaplan Retaliates and Maliciously Files Suit Against Ms. Shulman, Following Through on Promise to "Bury" Her in Litigation ................................................................ 57

24
25   J.   Defendants' Conduct Caused Substantial Financial and Other Harm ..................................................................... 61

26   K.   Ms. Shulman Is Not Defendants' Only Victim ................. 64

27
28

BAKER BOTTS L.L.P.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER BOTTS L.L.P.

V.    CLAIMS FOR RELIEF.................................................................................. 69

**COUNT I**:  Violation of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(c) and 1964(c)) (All Plaintiffs Against Todd Kaplan, Charles Houghton, and Vertical) ............69

**COUNT II**:  Violation of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(d) and 1964(c)) (All Plaintiffs Against All Defendants)....................................................85

**COUNT III**:  Fraud — Intentional Misrepresentation (All Plaintiffs Against Todd Kaplan, Charles Houghton, Courtney Dorne, and Vertical) ....................................................................86

**COUNT IV**:  Fraud — Concealment (All Plaintiffs Against Todd Kaplan, Charles Houghton, Courtney Dorne, and Vertical)........................90

**COUNT V**:  Negligent Misrepresentation (All Plaintiffs Against Todd Kaplan, Charles Houghton, Courtney Dorne, and Vertical)........................94

**COUNT VI**:  Breach of Contract — Cultivation Agreement (All Plaintiffs Against Todd Kaplan, NCAMBA9, and Vertical) ..............98

**COUNT VII**:   Breach of Oral Contract — Wellsprings Agreement (Ms. Shulman Against Todd Kaplan, NCAMBA9, and Vertical)............100

**COUNT VIII**:  Breach of Oral Contract — Branding Agreement (Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan, and Vertical).......101

**COUNT IX**:  Breach of Implied Covenant of Good Faith and Fair Dealing — Cultivation Agreement (Ms. Shulman Against NCAMBA9 and Vertical) ................................................................103

**COUNT X**:  Breach of Implied Covenant of Good Faith and Fair Dealing — Wellsprings Agreement (Ms. Shulman Against Todd Kaplan, NCAMBA9, and Vertical) ..................................................104

**COUNT XI**:  Breach of Implied Covenant of Good Faith and Fair Dealing — Branding Agreement (Ms. Shulman and Iron Angel, LLC Against Todd Kaplan and Vertical) ..........................................104

**COUNT XII**:  Unfair Competition — Bus. & Prof. Code § 17200 (Ms. Shulman Against Todd Kaplan, Iron Angel II, LLC, and Vertical) … ....................................................................................105

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

BAKER BOTTS L.L.P.

**COUNT XIII**:  False Advertising in Violation of California Business & Professions Code § 17500, et seq. (Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan, Iron Angel II, LLC, and Vertical) ...............110

**COUNT XIV**:  Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) Trademark Infringement (Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan, Iron Angel II, LLC, and Vertical) ................................................................111

**COUNT XV**:  False Advertising in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) (Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan, Iron Angel II, and Vertical) ...................................112

**COUNT XVI**:  Unfair Competition in Violation of California Common Law (Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan, Iron Angel II, LLC, and Vertical) ................................................................113

**COUNT XVII**:  Intentional Interference with Contractual Relations (Ms. Shulman Against Todd Kaplan and Vertical)....................................114

**COUNT XVIII**:  Intentional Interference with Prospective Economic Advantage (Ms. Shulman Against Todd Kaplan and Vertical) ................115

**COUNT XIX**:   Intentional Infliction of Emotional Distress (Ms. Shulman Against Todd Kaplan, Matt Kaplan, Drew Milburn, Robert Scott, Courtney Dorne, and Vertical).............................................116

**COUNT XX**:  Elder Financial Abuse Pursuant to Cal. Welf. & Inst. Code § 15610.30 (Ms. Shulman Against Todd Kaplan, Iron Angel II, LLC, and Vertical) ................................................................117

**COUNT XXI**:  Assistance of Elder Financial Abuse Pursuant to Cal. Welf. & Inst. Code §15610.30 (Ms. Shulman Against Charles Houghton) ................................................119

**COUNT XXII**:  Breach of Fiduciary Duty by Attorney (Ms. Shulman Against Charles Houghton)........................................................120

**COUNT XXIII**:  Malicious Prosecution/Wrongful Use of Civil Proceedings (Ms. Shulman Against Todd Kaplan, Matt Kaplan, Elyse Kaplan, Iron Angel II, LLC, and Vertical)......................................121

iii

**COUNT XXIV**:  Rescission of Iron Angel Lease Due to Fraud in the Inducement (Ms. Shulman Against Todd Kaplan and Iron Angel II, LLC) ......................................................................................123

**COUNT XXV**:  Constructive Trust (Ms. Shulman Against Vertical Wellness) ......................................................................................125

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1       Plaintiffs Francine Shulman, individually and as Trustee of the Shulman

2   Family Trust Dated December 24, 2001, Iron Angel, LLC, and 3F, Inc. file this

3   Complaint against Defendants Todd Kaplan, Medical Investor Holdings LLC dba

4   Vertical Companies ("Vertical"), Vertical Wellness, Inc., Charles Houghton, Matt

5   Kaplan, Drew Milburn, Courtney Dorne, Smoke Wallin, Robert Scott Kaplan,

6   Elyse Kaplan, Jeff Silver, Iron Angel II, LLC, and NCAMBA9, Inc., and allege as

7   follows:

## I.    INTRODUCTION

8

9       1.    Defendant Todd Kaplan and his enterprise defrauded Plaintiff

10   Francine Shulman and her companies out of their interest in a cannabis cultivation

11   operation that Defendants admit would have been one of the "largest in the world

12   in 2019" (Exhibit A hereto).[1] Ms. Shulman's damages, without considering

13   exemplary and punitive damages, run into the tens of millions of dollars. While the

14   scope and extent of the fraud inflicted on Ms. Shulman is far greater, her

15   experience fits neatly into a larger pattern of fraud that Defendants have visited on

16   many other victims.

17       2.    Ms. Shulman has been a farmer in Santa Barbara County for over

18   twenty years. In 1996, she purchased Apple Creek Ranch—a 50-acre apple

19   orchard in in the Santa Rita Hills wine appellation. It was there that she studied

20   and mastered organic farming practices, and her business grew rapidly as a result.

21   She expanded the orchard to produce fifteen apple varieties and other high-quality,

22   unique organic fruits and vegetables. Ms. Shulman's customers—including dozens

23   of restaurants and patrons at numerous farmer's markets—lauded her

24   comprehensive farming knowledge and ability to grow unusual and challenging

25   varieties. Over time, her business expanded to include the cultivation of gourds,

26   which Ms. Shulman—described by one newspaper as an "artistic force"—hand-

27   painted, lacquered, and sold internationally. Beginning in 2011, she further

28

[1] Exhibit A is an excerpt from Defendants' website as of May 2019.

developed Apple Creek Ranch into a wedding venue and event space in addition to a working farm.

3.     Through her hard work and dedication to ethical, sustainable business practices, Ms. Shulman forged deep relationships with her neighbors and the broader agricultural community—a community that is often skeptical of outsiders. She fostered and maintained valuable relationships with customers, suppliers, and other business owners. These relationships were based on trust, and they proved invaluable over the years to her farming business.

4.     In the Santa Rita Hills and adjacent communities, Ms. Shulman— "Frannie" to her family and friends—was far more than a talented farmer. She was a respected leader revered for her kindness and generosity. She mentored young women; she provided safe and positive jobs to local teenagers and hard-to-employ individuals; she brought Southern California school children to her farm to dirty their hands and learn farming techniques; she donated thousands of pounds of apples and produce to local schools and shelters; and over the years, she provided hundreds of meals to those in need. Now 66 years old, a mother and grandmother, Ms. Shulman has spent 20 years boosting the community around her, giving more and taking less, sacrificing so others could succeed. She found tranquility in this— a peaceful respite from personal tragedies she has experienced over the years, including the sudden loss of one of her three sons.

5.     But nowhere did she envision that tranquility more than on a stunning, rugged property not far from Apple Creek Ranch in Santa Rita Hills, a property ideal for multiple uses, including cultivation. Ms. Shulman saw the "for sale" sign at 5930 Santa Rosa Road, Lompoc, California, while riding past on her beloved Harley Davidson, nicknamed "Iron Angel," in early 2014. She arranged to lease the 1,100-acre property and ultimately purchased it in December 2014 with the goal of cultivating produce and medical cannabis and ultimately building a wellness retreat. She named the property after her motorcycle. Iron Angel Ranch

BAKER BOTTS L.L.P.

was perfectly situated for a farming operation requiring security, located far from any major highway, accessible by one road, through a single gate, with the cultivable acreage located in the most private and secure area of the property. After purchasing the ranch, Ms. Shulman invested in critical infrastructure— including a well, irrigation, power, and roads—and began farming organic produce and cannabis, always ensuring compliance with State and County medical cannabis laws and regulations. In 2017, Ms. Shulman's grow generated almost $3,000,000 in revenue cultivating on just four acres.

6.     Just as Ms. Shulman was perfecting her knowledge of cannabis cultivation in the Santa Rita Hills appellation, favorable changes in the law dramatically changed the value of her business. The County of Santa Barbara passed regulations in January 2016 favoring local farmers like Ms. Shulman, who had existing medical cannabis grows. And in November 2016, California voters approved Proposition 64, the Adult Use of Marijuana Act, permitting the sale of cannabis for recreational use as of January 1, 2018. These changes fundamentally altered the cannabis business and positioned farmers like Ms. Shulman to transform modest, albeit highly generative, cannabis grows into large-scale cannabis cultivation, manufacturing and processing operations.

7.     Ms. Shulman saw the enormous potential and positioned herself to expand onto adjacent properties with even greater cultivable acreage than on Iron Angel. By July 2017, she had leased a property at 5000 Santa Rosa Road, Lompoc, California, from Divine Mercy, Inc., a tax-exempt religious organization operated by Sister Jean Marie Kirby (the property is referred to as "Sisters"). Sisters had more than five-times the cultivable acreage of Iron Angel with an option for further expansion. She was also in discussions with neighbors Russell ("Rusty") and Susan Lugli, who had sold her Iron Angel, to buy 6500 Santa Rosa Road (known as "Wellsprings"). Iron Angel was once part of Wellsprings and together

1    had been a 1,500-acre ranch with by far the most cultivable acreage on

2    Wellsprings.

 

10          8.     With Iron Angel already in operation, Sisters under lease, and a

11   purchase agreement on Wellsprings, Ms. Shulman's foresight placed her in a most

12   unlikely position—once an Apple farmer, now on the ground floor of an

13   agricultural revolution in California, situated on some of the most desirable land

14   for cannabis cultivation in the middle of Santa Barbara County, which, like no

15   other agricultural county in the State, understood the transformative power of the

16   cannabis business on its communities. And this was all happening in her backyard,

17   near the very fields where she had perfected her farming skills, in the place where

18   she was known and trusted, and in the community where she had built a valuable

19   network of business connections.

20          9.     By Spring 2017, Ms. Shulman recognized that she needed a business

21   partner, someone with the capital to invest in her business to achieve its full

22   potential and someone with even greater industry experience and knowledge to

23   help guide her through the changing regulatory landscape. She was exceptionally

24   well-positioned to attract such a partner, and if she were able to find the right one,

25   the sky was the limit. But Ms. Shulman was also uniquely vulnerable. She was in

26   control of land that could produce tens of millions of dollars in crops in a short

27   amount of time, in a burgeoning industry that was attracting investors of all types,

28   legitimate and otherwise. And Ms. Shulman's past business dealings had been far

BAKER BOTTS L.L.P.

1    more modest, built largely on trust. For these reasons, in June 2017, poised atop

2    this century's version of a Sutter's Mill, Ms. Shulman really was a sitting duck.

3        10.    That month, Ms. Shulman was introduced to Defendant Todd Kaplan.

4    Instantly aware of the value of her assets, fully attuned to her vulnerabilities,

5    already determined to strike it rich in cannabis at anyone's expense, and desperate

6    for a picturesque centerpiece for marketing materials used to steer funds to his

7    own enterprise, Kaplan was the worst thing that could have happened to

8    Ms. Shulman. For Kaplan's part, he saw Iron Angel, Sisters, and Wellsprings as

9    the ultimate source for Vertical's aspirations of a "global" supply chain.

10        11.    Preliminarily, Kaplan is an admitted felon. A federal grand jury

11   indicted him for health care fraud, conspiracy to commit money laundering, illegal

12   kickbacks, and attempts to evade taxes. He pleaded guilty in 2007 to the tax

13   charge. Fortunately for Kaplan, the government did not pursue the other 133

14   counts against him after the court suppressed evidence from the search of Kaplan's

15   business, finding that the warrant was vague and overbroad. The government

16   described his plea agreement as "extremely generous."

17        12.    But Ms. Shulman was not so lucky. She quickly became a victim of a

18   fraudulent scheme, perpetrated by Kaplan and the other members of his enterprise,

19   to steal Ms. Shulman's business and take for itself millions of dollars in profits, to

20   oust her from her property, and to steal money and property from her and her

21   family. Like many con artists working their mark, Kaplan exhibited a cloying

22   charm in the beginning. He and other members of his enterprise repeatedly told

23   Ms. Shulman she was "family," lavishing her with praise and gratitude in glowing

24   terms, such as thanking her for letting them be part of her "dream." But then when

25   she was viewed as standing in the way of Kaplan's illegal goals—indeed, when

26   she so much as stood her ground under the contracts in place—Kaplan turned on a

27   dime, becoming the raging "tyrant" and "bully" known so well to those who have

28   worked with him. Kaplan screamed—literally, screamed, as loud as a person could

scream—at Ms. Shulman on numerous occasions, and he and other Defendants oscillated from calling Ms. Shulman "family" and saying how much they "loved" her to calling her a "fucking bitch," an "old lady who should stay behind her fence," "lazy," and "stupid," among many other horrendous epithets.

13.     Kaplan and his crew threatened and intimidated Ms. Shulman, inflicting emotional pain and suffering on her. Kaplan threatened to "bury" her in litigation if she had the nerve to fight back. Indeed, Ms. Shulman had been warned of the consequences of not agreeing to Kaplan's demands. In 2019, after the business relationship was terminated, Kaplan and other Defendants violated the terms of a temporary restraining order for the specific purpose of harassing and intimidating Ms. Shulman on her own property, menacingly parking a car outside of her house all night with two men in it. When their lawyer explained to them that they were not permitted to park a car on the property, they moved the car even closer to the house; and they did this night after night. In another illustrative moment, following a court conference in May 2019, Kaplan and his brother, Robert Scott Kaplan, intimidatingly followed Ms. Shulman on the highway, cutting in and out of traffic to stay next to her car, ultimately forcing her off the road to avoid an accident; and then when she did exit, Kaplan revealed exactly who he is by making an obscene gesture at Ms. Shulman from the passenger seat of Robert's jeep.

14.     Kaplan and Defendants defrauded Ms. Shulman from day one. To state just a few examples, Kaplan lied about his criminal history, telling her and others that he was innocent of the charges—a claim he makes publicly on his website. He concealed from Ms. Shulman that, in fact, he had sworn under oath to a federal judge in open court that he was guilty of the felony he pleaded to (or he concealed that he had perjured himself in court that day to get the "generous" plea deal). Either way, he lied about it. Kaplan represented that his company managed a cannabis dispensary in Studio City and that it was one of the places where he

1   would be distributing her products, concealing from her that in fact he had been

2   locked out of the dispensary and sued by its owner for fraud and breach of

3   contract. The owner of the dispensary alleged that Kaplan had attempted to

4   execute on a secret plan to take over ownership of the small business. Kaplan also

5   misrepresented the status of a cannabis facility his company had in Needles,

6   California, on the Arizona border, representing that it was a state-of-the art facility

7   with significant production taking place at the time. In fact, the facility was in

8   shambles and continued to be in shambles during the parties' business dealings.

9        15.    Kaplan and other Defendants would ultimately lie to investors and

10   others, claiming they owned Iron Angel and Wellsprings, prominently featuring

11   the properties in their marketing materials—even after they had been evicted. They

12   used the term "Santa Rita" to refer to Iron Angel and Wellsprings, and,

13   misrepresenting their interests in these 1,500 acres, they claim to have raised at

14   least $65 million in investment funds. Astoundingly, as of June 2019, Vertical's

15   website prominently featured pictures of "The Ranch," described as "1,500 Acres"

16   of "Large Scale Cultivation" in "Santa Barbara County Wine Country." Of course,

17   Defendants had long ago been evicted from the property represented to the world

18   as their own. The picture of "The Ranch" shows the substantial cultivation

19   operations on Wellsprings that Ms. Shulman was entitled to, but which Defendants

20   had already harvested, dissasembled, and removed from the property.



BAKER BOTTS L.L.P.

16.     At the time of filing of this Complaint, Defendants had begun to expand the fraudulent use the photograph of the Wellsprings operation, which was already defunct as the result of their wrongful conduct. The below image appears on the website for Vertical CR (Costa Rica):



17.     In negotiating the business deal to operate a cannabis cultivation with Ms. Shulman on Iron Angel, Sisters, and Wellsprings, Kaplan and members of his enterprise outright misrepresented their experience in the cannabis business and their ability to fund operations—two of the most essential terms of the arrangement to Ms. Shulman. Almost immediately after inking the deal, Kaplan worked with Defendant Charles Houghton, in-house counsel for Kaplan's business, to devise and implement a plan to defraud Ms. Shulman out of her land and her business. Houghton also acted as legal adviser to Ms. Shulman, pretending to have her best interest in mind. In fact, working with Kaplan, Houghton conned Ms. Shulman into signing a "lease" on Iron Angel, saying it was "not important" and solely for regulatory purposes. Then, following through on threats to "bury" Ms. Shulman in litigation, Kaplan sued Ms. Shulman, arguing that the lease meant Kaplan's enterprise could oust Ms. Shulman from her own land. Houghton also

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1   assisted Kaplan to illegally manipulate the regulatory system to steal from

2   Ms. Shulman the legal rights to run her business. The pattern of illegal

3   racketeering activity goes well beyond these examples and are set forth in detail in

4   this Complaint.

5       18.   That this is the conduct of an illegal racketeering enterprise is clear

6   not only from the pattern of activity directed at Ms. Shulman, but also by

7   strikingly similar conduct by Kaplan and his enterprise directed at other victims,

8   both here in California and as far away as Costa Rica, as set forth herein. As just

9   one example, Kaplan, Houghton, and other Defendants engaged in the same

10  unlawful behavior with Mr. and Mrs. Lugli, owners of Wellsprings, employing the

11  same tactics—referring to them as family, cajoling them into signing a supposedly

12  "unimportant" contract, later threatening to bury them in litigation (ultimately

13  filing a $30 million claim against them), and lying to them about the status of

14  Kaplan's cannabis business. But most striking of all is the pattern of elder abuse

15  by Kaplan and Houghton. Rusty and Susan Lugli, like Ms. Shulman, are seniors;

16  Mr. Lugli is in his eighties and Mrs. Lugli in her late seventies. Mr. and Mrs. Lugli

17  are also burn victims, having been seriously injured and permanently disfigured in

18  a fire years ago. Kaplan had been hounding them to sign the "unimportant"

19  contract that would later form the basis for his $30 million claim against them, and

20  finally got the signatures he so desperately wanted—by tracking them on a visit to

21  Cedar Sinai Burn Center in Los Angeles where they go regularly for treatments to

22  their wounds.

23      19.   There isn't much Kaplan wouldn't do to enrich himself at the expense

24  of others, which explains why his own son calls him "the greediest person in the

25  world."

26

27

28

## II.    PARTIES

### A.    Plaintiffs

20.    Plaintiff Francine Shulman is an individual and, at all relevant times, a resident of the County of Santa Barbara.

21.    Plaintiff Iron Angel, LLC is a California Limited Liability Company with its principal place of business in Lompoc, California. Iron Angel, LLC is owned and operated by Ms. Shulman and has been registered with the California Secretary of State since January 10, 2018.

22.    Plaintiff 3F, Inc. is a California nonprofit mutual benefit corporation with its principal place of business in Lompoc, California. 3F, Inc. is owned and operated by Ms. Shulman and has been registered with the California Secretary of State since May 26, 2016.

### B.    Defendants

23.    Defendant Todd Kaplan is an individual residing in Los Angeles County, California. At all relevant times, Kaplan was doing business in California, including in the County of Santa Barbara. Kaplan is the founder and CEO of Defendant Vertical, owner of Defendants NCAMBA9, Inc. and Iron Angel II, LLC. At all relevant times, Kaplan was acting as the agent or employee of those entities and acting within the scope of his agency or employment.

24.    Defendant Medical Investor Holdings LLC, dba Vertical Companies ("Vertical") is a California limited liability company that is majority owned and controlled by and through Defendant Kaplan, its CEO and founder. Vertical was registered with the California Secretary of State on June 22, 2016.

25.    Vertical Wellness, Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California. Vertical Wellness was incorporated in the State of Delaware on January 11, 2019, and it was registered with the California Secretary of State on March 11, 2019.

BAKER BOTTS L.L.P.

26.     Defendant Charles Houghton was at all times relevant herein an individual residing in California. Houghton is an attorney licensed to practice in Colorado. He is a regulatory advisor to Vertical and was, at all times relevant, counsel to Vertical. Houghton returned to his home state of Colorado in 2018 and continues to advise Kaplan and Vertical.

27.     Defendant Matthew Kaplan is an individual residing in Los Angeles County. He is the son of Todd Kaplan and Director of Operations at Vertical. At all relevant times, he was acting as the agent or employee of Vertical and acting within the scope of his agency or employment.

28.     Defendant Drew Milburn is an individual residing in Los Angeles County. He is Chief Operating Officer of Vertical and at all relevant times was acting as the agent or employee of Vertical and acting within the scope of his agency or employment.

29.     Courtney Dorne is an individual residing in Los Angeles County. She is the President, Vertical Brands and, at all relevant times, was acting as the agent or employee of Vertical and acting within the scope of her agency or employment.

30.     Defendant Smoke Wallin is an individual residing in Los Angeles County. He is President of Vertical and President and CEO of Vertical Wellness and, at all relevant times, was acting as the agent or employee of Vertical and acting within the scope of his agency or employment.

31.     Defendant Robert Scott Kaplan (aka Robert Scott) is an individual residing in Los Angeles County. He is the brother of Todd Kaplan, father of Elyse Kaplan, and Chief Technology Officer of Vertical. At all relevant times, he was acting as the agent or employee of Vertical and acting within the scope of his agency or employment.

32.     Defendant Elyse Kaplan is an individual residing in Los Angeles County and Corporate Counsel at Vertical. At all relevant times, she was acting as

1   the agent or employee of Vertical and acting within the scope of her agency or

2   employment.

3       33.    Defendant Jeff Silver is an individual residing in Los Angeles County

4   and Vertical's former Chief Financial Officer and now its strategic advisor. At all

5   relevant times, he was acting as the agent or employee of Vertical and acting

6   within the scope of his agency or employment.

7       34.    Defendant Iron Angel II, LLC, is, and was at all relevant times, a

8   California limited liability company owned and controlled by and through

9   Defendant Todd Kaplan. Iron Angel II, LLC, was registered with the California

10  Secretary of State on or about January 10, 2018.

11      35.    Defendant NCAMBA9, Inc. is a California nonprofit mutual benefit

12  corporation owned and controlled by and through its President, Defendant

13  Todd Kaplan. Defendant Kaplan incorporated NCAMBA9 in August 2016.

14      36.    Plaintiffs do not know the true names and capacities, whether

15  individual, corporate, associate or otherwise, of defendants sued herein as Does 1

16  through 10, inclusive, and therefore sue these Defendants by such fictitious names.

17  Plaintiffs will amend this Complaint to allege the true names and capacities when

18  ascertained.

19      37.    Plaintiffs are informed and believe, and thereupon allege, that each of

20  the fictitiously named Defendants is responsible in some manner for the

21  occurrences and damages herein alleged, and that Plaintiffs' injuries as herein

22  alleged were proximately caused by the actions and omissions of such fictitiously

23  named Defendants.

24      38.    Plaintiffs are informed and believe, and thereupon allege, that at all

25  times herein mentioned, each of the Defendants were the agents and employees of

26  each of the remaining Defendants, and, in doing the things hereinafter alleged,

27  were acting within the course and scope of such agency and employment.

28

BAKER BOTTS L.L.P.

## III.   JURISDICTION AND VENUE

39.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 (federal question jurisdiction), and 18 U.S.C. § 1964 (RICO), and 15 U.S.C. § 1125 (trademark infringement and false advertising), 28 U.S. Code § 1338 (trademarks and unfair competition), and 28 U.S.C. § 1367 (supplemental jurisdiction) conferring jurisdiction over state-law claims that are so related to Plaintiffs' federal law claims that they form part of the same case or controversy under Article III of the United States Constitution.

40.     Defendants are subject to personal jurisdiction in the Central District of California because most of them are residents of this District and because they have committed torts and caused tortious injury in this District by acts committed both inside and outside this District. Defendants also regularly solicit business in this District, and Defendants have engaged in a persistent course of conduct in this District.

41.     Defendant Todd Kaplan is subject to personal jurisdiction in the Central District of California because, (1) he currently works and resides, and at all relevant times worked and resided, within the District, (2) he has purposely availed himself of the benefits of California, (3) the controversy is related to and arises out of his acts committed within the District, (4) his torts and acts caused injury within this District, and (5) the assertion of personal jurisdiction over him comports with fair play and substantial justice.

42.     Defendant Vertical is subject to personal jurisdiction in the Central District of California because, (1) it is currently, and at all relevant times, was a California limited liability corporation headquartered within the District, (2) it purposely availed itself of the benefits of California, (3) the controversy is related to and arises out of Vertical's acts (4) Vertical's torts and acts caused injury within this District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

BAKER BOTTS L.L.P.

43.     Defendant Vertical Wellness, Inc. is subject to personal jurisdiction in the Central District of California because (1) it is currently, and at all relevant times, was headquartered within the District, (2) until on or about March 2019 it was a division, or other unincorporated affiliate, of Defendant Vertical (3) it has purposely availed itself of the benefits of California, (4) it has held or used funds misappropriated from Plaintiffs within the District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

44.     Defendant Charles Houghton is subject to personal jurisdiction in the Central District of California because, (1) until on or about July 2018, he worked and resided within the District employed as counsel to Defendant Vertical (wherein Houghton executed, and filed with the California Secretary of State, documents to register Plaintiff Iron Angel, LLC, and Defendant Iron Angel II, LLC, to conduct business in the State of California) and gave legal advice to Kaplan's businesses regarding California business practices, (2) he is currently listed as Vertical's Regulatory Advisor and thus continues to have contact with, and continues to do business in, California in furtherance of Defendants' ongoing unlawful behavior (3) he has purposely availed himself of the benefits of California, (4) the controversy is related to and arises out of his acts committed within the District, including his intentional and negligent misrepresentations and fraudulent concealments regarding the lease for Iron Angel Ranch; the assistance he gave to Kaplan in appropriating Ms. Shulman's property by inducing her through legal advice holding himself out as Ms. Shulman's attorney, inducing her to sign the lease through fraud, giving Plaintiffs legal advice regarding their business, the California licenses he alleged Plaintiffs needed to procure, and the supporting documents he fraudulently induced Ms. Shulman to sign for county and state licenses, (5) Houghton's torts and acts caused injury within this District, Houghton's purported position as Ms. Shulman's attorney when in actuality he had a conflict of interest in his position as both attorney for Kaplan's business and

1   Ms. Shulman,  and (5) the assertion of personal jurisdiction comports with fair

2   play and substantial justice.

3     45. Defendant Matt Kaplan is subject to personal jurisdiction in the

4   Central District of California because, (1) he currently resides, and at all relevant

5   times resided, within the District, (2) he has purposely availed himself of the

6   benefits of California, (3) the controversy is related to and arises out of his acts

7   committed within the District, (4) his torts and acts caused injury within this

8   District, and (5) the assertion of personal jurisdiction over him comports with fair

9   play and substantial justice.

10    46. Defendant Drew Milburn is subject to personal jurisdiction in the

11  Central District of California because, (1) he currently resides, and at all relevant

12  times resided, within the District, (2) he has purposely availed himself of the

13  benefits of California, (3) the controversy is related to and arises out of his acts

14  committed within the District, (4) his torts and acts caused injury within this

15  District, and (5) the assertion of personal jurisdiction comports with fair play and

16  substantial justice.

17    47. Defendant Courtney Dorne is subject to personal jurisdiction in the

18  Central District of California because, (1) she currently resides, and at all relevant

19  times resided, within the District, (2) she has purposely availed herself of the

20  benefits of California, (3) the controversy is related to and arises out of her acts

21  committed within the District, (4) her torts and acts caused injury within this

22  District, and (5) the assertion of personal jurisdiction comports with fair play and

23  substantial justice.

24    48. Defendant Smoke Wallin is subject to personal jurisdiction in the

25  Central District of California because, (1) he currently resides, and at all relevant

26  times resided, within the District, (2) he has purposely availed himself of the

27  benefits of California, (3) the controversy is related to and arises out of his acts

28  committed within the District, (4) his torts and acts caused injury within this

BAKER BOTTS L.L.P.

District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

49.     Defendant Robert Scott is subject to personal jurisdiction in the Central District of California because, (1) he currently resides, and at all relevant times resided, within the District, (2) he has purposely availed himself of the benefits of California, (3) the controversy is related to and arises out of his acts committed within the District, (4) his torts and acts caused injury within this District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

50.     Defendant Elyse Kaplan is subject to personal jurisdiction in the Central District of California because, (1) she currently resides, and at all relevant times resided, within the District, (2) she has purposely availed herself of the benefits of California, (3) the controversy is related to and arises out of her acts committed within the District, (4) her torts and acts caused injury within this District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

51.     Defendant Jeff Silver is subject to personal jurisdiction in the Central District of California because, (1) he currently resides, and at all relevant times resided, within the District, (2) he has purposely availed himself of the benefits of California, (3) the controversy is related to and arises out of his acts committed within the District, (4) his torts and acts caused injury within this District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

52.     Defendant Iron Angel II, LLC is subject to personal jurisdiction in the Central District of California because (1) it is currently, and at all relevant times, was a California limited liability corporation headquartered within the District, (2) it has purposely availed itself of the benefits of California, (3) the controversy is related to and arises out of Iron Angel II's acts (4) Iron Angel II's torts and acts

BAKER BOTTS L.L.P.

caused injury within this District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

53.     Defendant NCAMBA9, Inc. is subject to personal jurisdiction in the Central District of California because (1) it is currently, and at all relevant times, was a California non-profit mutual benefit corporation headquartered within the District, (2) it has purposely availed itself of the benefits of California, (3) the controversy is related to and arises out of Vertical's acts (4) Vertical's torts and acts caused injury within this District, and (5) the assertion of personal jurisdiction comports with fair play and substantial justice.

54.     Venue for this action is proper in this District pursuant to 28 U.S.C. §§ 1391 and 18 U.S.C. §1965, because a significant portion of the Defendants' unlawful activities have occurred in this District, Defendant Vertical maintains its headquarters in this District, most of the individual Defendants work and reside in this District, and the ends of justice require that Defendants be brought before this Court.

## IV.   FACTUAL ALLEGATIONS

55.     In addition to the factual allegations made in the foregoing Introduction, Plaintiffs allege the following.

### A.   Ms. Shulman Accumulates Rights to Valuable Assets, Including Iron Angel, Sisters, and Wellsprings

56.     After operating a farm on Apple Creek Ranch since 1996, Ms. Shulman turned her focus to Iron Angel, where she saw the possibility of establishing a medical cannabis business. In March 2014, Ms. Shulman began leasing Iron Angel from Rusty and Susan Lugli. At that time, she moved into the house already built on the property. On December 1, 2014, Ms. Shulman purchased Iron Angel from Mr. and Mrs. Lugli.[2] Once on the property, she quickly

---

[2] Her friends, Kim and Barbara Marienthal, hold a 30% interest in the land. Title to the property is held by Kim L. Marienthal and Barbara M. Marienthal, Trustees of

BAKER BOTTS L.L.P.

developed the necessary infrastructure for cultivation, including irrigation and roads, and she prepared certain acreage on the property for cultivation. In approximately August 2014, not long after moving onto the property, and pursuant to the Compassionate Use Act of 1996, Ms. Shulman began to farm medical cannabis. At the time, under California Health & Safety Code, patients and caregivers were authorized to "collectively or cooperatively" cultivate medical marijuana through organizations that facilitated the collaborative efforts of its members. To comply with this legal requirement, Ms. Shulman formed and joined collectives, including 3F, Inc. She also grew organic produce on Iron Angel, including beans, corn, tomatoes, lettuce, beets, carrots, pumpkins, raspberries, and hundreds of apple trees.

57.     From the beginning, Ms. Shulman and her collectives complied with all local and state laws and regulations. Ms. Shulman started with a one-acre grow in 2014, which yielded approximately 2,000 pounds of cannabis and sold for about $1,300 per pound. She reinvested and expanded her grow each year. Ms. Shulman became more experienced farming on Iron Angel and choosing the most productive and lucrative varieties for the property's characteristics, dramatically increasing her yield per acre each year. By 2017, she cultivated four acres on Iron Angel and had installed the necessary infrastructure and hired the right people to help run the operation. Under Ms. Shulman's management, the 2017 plants were huge. The first 5,000 pounds of cannabis cultivated left the ranch on October 11, 2017. Though cannabis prices can fluctuate wildly, Ms. Shulman's crops garnered approximately $650 per pound in 2017, bringing revenue to almost $3 million.

58.     In November 2016, the Adult Use of Marijuana Act passed. Under the Act, beginning January 1, 2018, California residents were to be permitted to sell

the Kim L. Marienthal and Barbara M Marienthal 2003 Trust, under trust instrument dated April 17, 2003; and Barry Shulman and Francine Shulman, Trustees of the Shulman Family Trust, under trust dated December 24, 2001.

BAKER BOTTS L.L.P.

1  marijuana for recreational use. When the Act passed, Ms. Shulman saw an

2  opportunity to substantially grow her business. To do that, she began exploring the

3  possibility of expanding onto adjoining properties that were even more favorable

4  for cannabis cultivation than Iron Angel, in part because they had more cultivable

5  acreage.

6          59.    On July 1, 2017, after two months of negotiations and before any

7  agreement with Kaplan, Ms. Shulman signed a deal with Divine Mercy, Inc., to

8  lease up to 40 acres of cultivable, neighboring land (referred to as "Sisters").

9  Divine Mercy is a religious organization operated by President and Chief

10 Operating Officer, Sister Jean Marie Kirby. The lease authorized Ms. Shulman,

11 through her company Emerald Sky, to grow, cultivate, manufacture, market, and

12 distribute agricultural products, including cannabis and derivative products, on and

13 from Sisters. Sisters' terrain was flat and very conducive to farming, with much

14 more cultivable acreage than on Iron Angel.

15         60.    In September 2017, Ms. Shulman and Kaplan cultivated six acres on

16 Sisters. A second grow on approximately eight acres began in early 2018. In

17 June 2018, after two successful harvests, and at Kaplan's insistence, Houghton

18 instructed Ms. Shulman to discontinue operations on Sisters. Matt Kaplan drafted

19 an email to CDFA to deactivate Ms. Shulman's licenses, which prompted the

20 CDFA to question the deactivation. Houghton wrote: "Unless somebody has a

21 better suggestion, I would suggest that we inform CDFA that the reason for the

22 deactivation is that we are still planning how to use available financial resources,

23 and rather than commit to time and cost of applying for these licenses, we have

24 decided to forego these licenses until plans are finalized." A portion of Sisters was

25 on a riverbed and thus could not be cultivated, but Sister Kirby had given the

26 parties the option of moving the grow to a different, useable part of the property.

27 Rather than invest the resources to continue harvesting on Sisters, as they were

28 required to do under the Cultivation Agreement, Defendants instead stripped

BAKER BOTTS L.L.P.

COMPLAINT                                    19                          CASE NO. 2:19-CV-05413

1   Ms. Shulman of her rights to cultivate on the land. Houghton directed the

2   deactivation of Ms. Shulman's licenses to operate, rendering Sisters unusable for

3   lawfully cultivating cannabis. Houghton also took over negotiations and

4   discussions regarding Ms. Shulman's lease on Sisters. Kaplan made the decision to

5   abandon Sisters as part of the overall scheme to rid Ms. Shulman of her licenses,

6   move the business entirely to Wellsprings, and ultimately to take control of

7   Wellsprings and remove Ms. Shulman from the business entirely.

8       61.    Just after July 4, 2017, and shortly after she had signed the lease for

9   Sisters, Ms. Shulman was negotiating with Mr. and Mrs. Lugli—her neighbors and

10  friends who had sold Iron Angel to her—for the purchase of Wellsprings Ranch,

11  located at 6500 Santa Rosa Road, Buellton, California. Wellsprings is 402 acres

12  and was once part of Iron Angel, together comprising an approximately 1,500-acre

13  ranch with most of the cultivable acreage on Wellsprings. Wellsprings has all the

14  same security advantages of Iron Angel—far from any major highway and

15  accessible by a single road—but it is flatter than Iron Angel and has a minimum of

16  100 cultivable acreage—about ten-times that of Iron Angel. Wellsprings was thus

17  a valuable asset that could support a large-scale commercial cannabis operation.

18      62.    By July 7, 2017, Ms. Shulman had reached an agreement in principal

19  with the Lugli's to purchase the property subject to finalizing the terms of a sale in

20  a written agreement. Ms. Shulman and the Lugli Family Trust ("Lugli Trust")

21  entered into a Purchase and Sale Agreement and Joint Escrow Instructions (the

22  "Wellsprings Purchase Agreement"), effective July 15, 2017, for the purchase

23  price of $7.5 million. The Wellsprings Purchase Agreement required Ms. Shulman

24  to make four installment payments towards the Purchase Price of Wellsprings

25  Ranch. The first installment was deemed a nonrefundable deposit, in the amount of

26  $50,000, due on July 15, 2017. The second installment in the amount of $500,000

27  was due and payable within thirty days after the execution of the Wellsprings

28  Purchase Agreement; the third installment in the amount of $500,000,00 was due

BAKER BOTTS L.L.P.

within 90 days. The remaining balance of $6,450,000.00 was due on January 15, 2018—the close of escrow date. The first two payments were timely made.

63.     Determined to get her cannabis business up and running on Wellsprings as early as possible, Ms. Shulman also negotiated a lease of Wellsprings, so she could take immediate possession of the property and begin preparing the fields for cultivation. On July 22, 2017, the Lugli Trust, on the one hand, and Ms. Shulman and her company, Emerald Sky Agricultural Acquisition, on the other, executed the Wellsprings Ranch Land Lease. The lease entitled Ms. Shulman to use Wellsprings for farming operations. The lease payment was due at the end of the leasing period, or January 15, 2018, and the parties agreed the lease payment would be deducted from the purchase price for Wellsprings. Ms. Shulman quickly began work on Wellsprings—including plowing the fields herself—and later moved into an existing residence on the property.

**B.     Ms. Shulman, Looking for a Business Partner, Meets Todd Kaplan and Enters Cultivation Agreement and Branding Agreement**

64.     In June 2017, recognizing the potential for exponential growth, Ms. Shulman began looking for an investor and business partner—one with the funds needed to expand the business and the knowledge and experience to guide the business through the changing and complex regulatory scheme for cannabis operations in California. Ms. Shulman, her son Brandon Shulman, and their attorney began a search for a suitable investor and partner. Brandon and their attorney both identified interested investors. But, it was Defendant Courtney Dorne—a trusted childhood friend of Ms. Shulman's daughter-in-law and a President at Vertical—who introduced Ms. Shulman to Todd Kaplan and Defendants. While working hard to convince Ms. Shulman that she should trust Kaplan and partner with him, Ms. Dorne leveraged her friendship with a member of the Shulman family, writing that she "cherished" the relationship and would take her friendship with Brandon's wife "to the grave." She promised to "navigate

BAKER BOTTS L.L.P.

1    the waters together" with Ms. Shulman and led the Shulmans to believe that

2    Kaplan was, in her words, "an amazing man."

3        65.    In June 2017, after several phone conversations with Brandon,

4    Ms. Dorne invited him and Ms. Shulman to meet Kaplan and other Defendants at

5    Vertical's offices in Agoura Hills, California. Ms. Dorne misrepresented Vertical

6    as a "huge" cannabis company. She also misrepresented to Brandon that Vertical

7    was a financially stable company and that it had existing indoor cultivation, large-

8    scale manufacturing, many brand partners, and dispensaries. She touted that

9    Vertical had significant experience in the cannabis industry and had in-house

10   counsel with local regulatory expertise.

11       66.    On June 23, 2017, Ms. Shulman and Brandon drove to Agoura Hills,

12   where Ms. Dorne introduced her to Kaplan, Mr. Silver, Robert Scott, Mr. Milburn,

13   Houghton, and Dr. Donald Davidson. During this meeting, Kaplan spent an hour

14   selling Vertical to Ms. Shulman and Brandon. Kaplan promoted his Needles,

15   California, facility as a "state-of-the-art" manufacturing facility—the crown jewel

16   of Vertical's operations—extolling its ongoing, indoor cannabis production.

17   Kaplan ran down a list of 15 different brands with which Vertical claimed to have

18   partnered; he told Ms. Shulman about his partnerships with a dispensary and with

19   Dr. Donald Davidson; he talked about revenue streams and growth of the cannabis

20   industry; he promised to take Vertical global and lauded his multistate operations,

21   including those in Colorado and Arizona. Kaplan told Ms. Shulman that Vertical

22   hoped to bring her into the "family," promoting the "Iron Angel" brand and

23   growing cannabis with her. Ms. Shulman was sold on Kaplan's vision, but she

24   would ultimately learn that his promises were built on falsehoods. She would later

25   learn that Needles had little more than four walls and no competent help,

26   Vertical's partnerships were fabricated, and there was no revenue stream.

27

28

67.     At this meeting, Kaplan invited Ms. Shulman to look him up on the Internet. He said he had had some trouble with the government, but it was the government's fault and he was not guilty.

68.     On June 26, 2017, Ms. Shulman and Brandon arranged to have Ms. Dorne and Kaplan visit Iron Angel. Ms. Dorne claimed that Vertical was "in the process" of purchasing a million square foot indoor grow space in Monterey, California (a purchase that never actually happened, if in fact it was ever "in the process") and would thus be driving near Iron Angel. Ms. Dorne, Kaplan, Houghton, Mr. Milburn, and Mr. Silver arrived at Iron Angel that day. They spent two to three hours touring Iron Angel in Kubotas. Ms. Shulman told Kaplan she was looking for a partner to invest in her business. Ms. Shulman was explicit with Kaplan that she was in the process of looking for other investors and that if she did not enter into a contract with him and his company, she would pursue other opportunities. Ms. Shulman was in fact pursuing other opportunities, including obtaining financing from her son and from some of his friends and colleagues, who are also physicians, as well as from other local contacts who had expressed interest in the cannabis business.

69.     Drew Milburn and Mr. Scott also met with Ms. Shulman at Iron Angel during the second week of July 2017. Ms. Shulman gave Mr. Milburn and Mr. Scott a tour of Sisters. They discussed the proposed 50-50 split for all Santa Barbara properties and any new business that developed, and Mr. Milburn acknowledged that was the agreement Kaplan and Vertical wished to strike. Regarding manufacturing on-site at Iron Angel, Mr. Milburn explained that Co2 equipment at the Needles facility (or then-stored ethanol extraction equipment) would be shipped to Iron Angel and used for manufacturing on that property. Mr. Milburn also stated that he was the "operations guy" and said he would live near the property to manage cannabis operations from the beginning of the contractual relationship. Mr. Milburn told Ms. Shulman that he and Robert Scott

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

were looking for homes in the area where they could live. Mr. Milburn's close proximity to Iron Angel was important to Ms. Shulman and, as she told Kaplan, one of the key ingredients to the business relationship.

70.     A few days later, around the third week in July 2017, Mr. Milburn returned to visit Ms. Shulman, who gave him a tour of Wellsprings Ranch and talked to him about her expansion plans. Mr. Milburn asked many questions regarding the property and its potential and, by the end of the afternoon, he told Ms. Shulman that he fully believed in her vision and would support the acquisition of Wellsprings. Mr. Milburn returned to Vertical and gave Kaplan the "thumbs up" on expanding the Iron Angel deal.

71.     Kaplan was highly motivated to close a deal with Ms. Shulman. He understood the inherent value of the properties she had secured rights to and the potential for a large and highly profitable cannabis business on those properties. Kaplan also knew that Ms. Shulman had an existing, thriving medical cannabis farm, as well as extensive farming experience, local community contacts, and, most importantly, the support of the County to continue her business operations.

72.     Kaplan was equally aware of Ms. Shulman's vulnerabilities. He believed she was unsophisticated, and he knew her prior business dealings had been much smaller in scale. He was aware of vulnerabilities caused by her age, her trusting nature, personal tragedies in her life, and her admitted unfamiliarity with the details of the new cannabis regulatory scheme. Kaplan, utilizing tactics well-known to psychologists who have studied con men, zeroed in on Ms. Shulman's desires and then laid an emotional foundation of trust by repeatedly displaying empathy and developing a rapport with Ms. Shulman. He also knew that Ms. Shulman had little ability to investigate Kaplan's company, Vertical, the other members of his enterprise, or his business history, including his past criminal conduct and criminal indictments.

73.     Recognizing the key attributes that were important to Ms. Shulman in selecting a business partner—financing, operations, distribution, branding, manufacturing, and regulatory expertise—Kaplan misrepresented his and his company's experience in the cannabis business and misrepresented the financial status of his company and his ability to fund a cannabis operation. Kaplan claimed that Defendants had extensive experience in cannabis cultivation and production in California. He claimed they were experts in cannabis operations. He falsely claimed expertise in cannabis laws and regulations in California and misled Ms. Shulman into believing that Defendants could expertly guide the business through regulatory and licensing procedures. With regard to available capital to invest in the business, Kaplan assured Ms. Shulman that she would never have to worry about the finances. He stated that he had numerous investors lining up to provide cash and that he had substantial personal resources that were also available to the business. Early on in the relationship when Ms. Shulman expressed concern about Kaplan's financial resources, he told her that a group from Mexico City had agreed to a $150 million investment. The money never arrived, despite Kaplan's repeated assurances that it was forthcoming. Kaplan told Ms. Shulman that the money was stuck in the bank in Florida, that Kaplan could see the money in the account but that the bank would not release it. Kaplan continued the ruse by telling Ms. Shulman she would be "the first to know when the [funding] goes through" and that "we'll be able to do everything, once we get the money." On May 4, 2018, Kaplan wrote to Ms. Shulman that "everyone keeps saying [the money] is coming." Of course, it never came.

74.     The general plan for the business provided that Vertical would pay operational expenses and manage day-to-day operations in exchange for the use of Ms. Shulman's farmland, a share of crops existing at the time of the partnership (with a defined split), contacts, and the ability to cultivate by piggybacking on Ms. Shulman's legal nonconforming use licenses. As confirmed by Kaplan, the

BAKER BOTTS L.L.P.

parties would work "together" to obtain county and state licenses (under the new regulations), launch brands based on Ms. Shulman's Iron Angel name, and manage the overall business operations. Vertical would also ensure on-site manufacturing, including on-site extraction. Vertical and Ms. Shulman were to share net profits from Iron Angel and Sisters equally. Kaplan also included a provision that gave him an option to purchase 42.5% "tenant in common interest" in Iron Angel.

75.     From the beginning of the business, Kaplan told Ms. Shulman that "Iron Angel" was to be one of Vertical's top five brands, generating $8 million of revenue in the first year. Kaplan told Ms. Shulman that would mean $4 million in her pocket. On information and belief, Ms. Shulman signed a contract for branding services, but Vertical retained the only copy. As part of the agreement, Kaplan falsely promised that Vertical would develop the Iron Angel brand for Ms. Shulman and the business and that Vertical would bear the costs for doing so. In exchange, Kaplan asked Ms. Shulman to be the spokesperson. In November 2017, Vertical arranged for a photo shoot of Ms. Shulman, sending her first for professional hair and make-up work prior to the shoot. Later, Vertical also commissioned a video showing Ms. Shulman riding her Harley Davidson, after which the Iron Angel brand splashed across the screen. This video (pictured below) remains on Vertical's website, long after the parties' business relationship terminated.



76.    In furtherance of Kaplan's scheme, Defendants directed two Vertical employees to mislead Ms. Shulman into believing that branding efforts would include, at least, (a) "seeding" insertions about Iron Angel into new product reviews and podcasts focusing on women, seniors, and wellness; (b) creating a website, promotional, social media and a media kit focused on Iron Angel; (c) creating packaging for single pre-roll and vape pen; (d) creating promotional items, such as tee shirts, caps, and stickers; and (e) developing the Iron Angel logo. Vertical then engaged in a start-and-stop effort over several months, prompting Ms. Shulman to make several inquiries into the status of her Iron Angel brand creation. Vertical (through Defendant Smoke Wallin) led Ms. Shulman on by sending vague assurances that he wanted to meet with Ms. Shulman, including in an April 11, 2018, email message where Mr. Wallin told Ms. Shulman he would "absolutely" have a "phone conversation about the branding of Iron Angel," and then later he wrote to her to "get [branding efforts] moving," noting that "the team [would send her] a full picture of the plan." On September 4, 2018, Mr. Wallin sent an email message letting Ms. Shulman know Vertical had "put together an Iron Angel brand overview with a monthly timeline up to brand launch early 2019 and would love to walk [her] through it." On October 12, 2018, Mr. Wallin sent a

BAKER BOTTS L.L.P.

1  letter to Ms. Shulman, purporting also to be meant for all "Vertical Brand

2  Partners," which promised dedicated staff for Ms. Shulman's marketing efforts.

3  The "Brand Manager" also wrote, in November 2018, to confirm that he would

4  send Ms. Shulman "budgets, marketing strategy, and calendar/timeline." Then, in

5  December 2018, dissatisfied with the lack of movement on the Iron Angel brand,

6  Ms. Shulman expressed to Mr. Wallin that she would engage a different agency to

7  help her develop her brand. Mr. Wallin insisted that such a move would be a

8  mistake and that Ms. Shulman should leave her brand in Vertical's hands. But the

9  project did not progress as promised. By February 1, 2019, Ms. Shulman's

10  frustration with the lack of attention to her branding efforts prompted her to email

11  Vertical to say, "It's strange to not be hearing anything back from you. . . we'd

12  really like an update on where we are with Iron Angel." She received no response.

13      77.    With regard to cultivation, Ms. Shulman relied on Kaplan's

14  misrepresentations of fact and fraudulent omissions, ultimately agreeing to work

15  with Kaplan, Vertical, and other Defendants. The parties negotiated a written

16  agreement to work together on cultivation operations on Iron Angel and Sisters.

17  Ms. Dorne helped broker the deal. But while telling the Shulmans she loved and

18  cherished them, she was working behind the scenes with Kaplan to ensure that the

19  Shulmans entered into a business arrangement on Kaplan's terms. For example,

20  when a draft agreement did not give Kaplan any rights to ownership of the land at

21  Iron Angel, she sent the Shulmans an alarming message of "big problems" because

22  Kaplan was "unbelievably upset." Taking advantage of their friendship and hiding

23  her true loyalty, Ms. Dorne successfully pressured Ms. Shulman into entering into

24  an agreement on Vertical's terms.

25      78.    Ultimately, the parties entered into a Reciprocal Membership and

26  Cultivation Agreement (the "Cultivation Agreement") (attached hereto as

27  Exhibit B). The Cultivation Agreement has a blank line for the specific date it was

28  "made and entered" in "July __, 2017"—*i.e.* the "Effective Date"—but Kaplan did

1   not return the fully executed agreement until August 2, 2017, making that the

2   Effective Date. Kaplan signed the Cultivation Agreement on behalf of an entity

3   that he formed and for which he acted as CEO, NCAMBA9, but Kaplan, Vertical,

4   and other Defendants were the intended beneficiaries. NCAMBA9 was authorized

5   to use a management company to manage operations under the Cultivation

6   Agreement. NCAMBA9 immediately turned management over to Vertical and

7   Kaplan.

8        79.    Ms. Shulman signed the agreement as Trustee of The Shulman

9   Family Trust, The Kim L. Marienthal and Barbara N. Marienthal 2003 Trust, and

10   the collectives she formed—The Sweet Ambergris Collective, 3F, Inc., and

11   Emerald Sky, LLC. At the time the parties entered into the Cultivation Agreement,

12   California permitted only nonprofit mutual benefit corporations or collectives to

13   cultivate cannabis for patients with prescriptions from their doctors (though that

14   would change in January 2018).

15        80.    After executing the Cultivation Agreement, Kaplan whispered in

16   Ms. Shulman's ear that he never asks for permission to do something. He said, "I

17   just do it, and, if necessary, ask for forgiveness." He told Ms. Shulman that he

18   pays little attention to what he signs. He would later live up to this warning.

19        81.    Pursuant to the Cultivation Agreement, NCAMBA9 was required to

20   manage Cultivation Operations, which included "all activities relating to the

21   cultivation of Cannabis on the Properties, the distribution of product to collective

22   members and the manufacture of products therefrom." This included:

23        site planning and preparation; construction of permanent or

24        temporary structures of any sort and on-going maintenance

25        thereof; provision for utilities and water to the fields and

26        facilities used for cultivation; installation of utilities lines,

27        retention and management of all workers and labor necessary

28        for the cultivation . . . .

BAKER BOTTS L.L.P.

82.     NCAMBA9 was required to ensure that Ms. Shulman was to "be actively engaged in the Cultivation Operations" and that the parties would "use good faith efforts to coordinate their respective activities to achieve the best agricultural results practicable." Separately, NCAMBA9 was required to use its "Best Efforts to manage the Cultivation Operations in the most efficient and effective manner possible under the circumstances."

83.     According to the Cultivation Agreement, NCAMBA9 was "solely responsible for timely paying all Operational Expenses with respect to the Cultivation Operations." Operational Expenses are "all costs stemming from or relating to the Cultivation Operation," including "the mortgage expense, property taxes and assessments and insurance" for Iron Angel and Sisters. NCAMBA9 was also required to "keep and maintain detailed expense and accounting records of all expenses and revenue stemming from its activities . . . [and then] provide the collectives with a quarterly P&L and related financial information [on operations] and make payments to the Collective quarterly . . . ."

84.     Except with respect to specific exceptions for crops already in the ground, Ms. Shulman and NCAMBA9 agreed to split Net Income equally. Net Income included gross revenue from sales of cannabis and cannabis derivatives cultivated on Iron Angel and Sisters, less Operational Expenses. The parties agreed that salaries and expenses for "Representatives" that NCAMBA9 "employs or retains," such as officers, directors, attorneys, and advisors, could not be included in Net Income—meaning that NCAMBA9 could not deduct these expenses as Operational Expenses.

85.     Before the ink had even dried on Kaplan's signature on the Cultivation Agreement, it became clear that he and Defendants had defrauded Ms. Shulman. Despite repeated representations prior to signing the Agreement, Kaplan and his company did not have the necessary resources to even begin operations on Iron Angel and Sisters. Thus, even though she had entered the

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1   Agreement for the specific purpose of obtaining funding from a business partner,

2   Ms. Shulman had to continue to fund operations on the properties for several

3   months. Defendants thus forced Ms. Shulman to spend the remainder of her life

4   savings of approximately $320,000 to pay for operational expenses, including

5   cultivation supplies, insurance, equipment rentals, irrigation supplies, agricultural

6   labor costs, and lease payments at Sisters. Defendants agreed to pay Ms. Shulman

7   $10,000 a month to help reimburse her, but even that has never been fully paid. In

8   sum, within days after entering into a business contract with a supposedly

9   experienced and well-financed company, Ms. Shulman found herself defrauded of

10  her life savings, with only vague assurances that she might get paid back in the

11  years ahead. And unbeknownst to Ms. Shulman, Kaplan and Vertical were

12  hurriedly seeking other sources of funding to make up the deficit, including from

13  Dr. Davidson.

14      86.    Nor were Defendants prepared to operate the business, as they had

15  promised to do. Mr. Milburn never moved to the properties to act as Operations

16  Manager, despite repeated promises, and no one else with any relevant experience

17  whatsoever showed up. Thus, Ms. Shulman and her son Brandon (a full-time

18  physician) had no choice but to step in and run operations on all three properties.

19  Brandon became the de facto Operations Manager. He managed expenses, placed

20  orders, worked with Houghton on licensing, negotiated contracts for farm labor

21  and cattle, worked with the County on compliance issues, and sourced materials.

22  Vertical offered little assistance by way of bringing two employees who had no

23  farm, agriculture, ranch, or flower grow experience. In fact, within two months,

24  one of the workers was fired because of his inexperience.

25      87.    Also, unbeknownst to Ms. Shulman, immediately after entering into

26  the Cultivation Agreement and the related agreement on Wellsprings described

27  below, on August 8, 2017, Kaplan borrowed $250,000 from Dr. Davidson to give

28  him some of the funds Kaplan needed to perform on the contracts with

1   Ms. Shulman. Neither Kaplan nor any Defendant told Ms. Shulman that Kaplan

2   was borrowing money from third parties to fund operations on Iron Angel, Sisters,

3   and Wellsprings.

4       **C.    The Parties Agree to the Same Business Arrangement for
             Cannabis Operations on Wellsprings, and Defendants Implement
5            the Most Damaging of their Fraudulent Schemes**

6       88.    Although the written Cultivation Agreement applied only to Iron

7   Angel and Sisters, Kaplan and Vertical ultimately decided to partner with

8   Ms. Shulman to extend the cannabis business to Wellsprings. Accordingly, the

9   parties—Ms. Shulman, Todd Kaplan, Vertical, and the collectives—entered into

10  an oral contract on the same operational and financial terms as the Cultivation

11  Agreement—most importantly, that NCAMBA9/Vertical was responsible for

12  managing cannabis operations, subject to Ms. Shulman's active participation, and

13  that profits would be split 50/50, on the same terms as the profit split on the other

14  properties set forth in the Cultivation Agreement. The parties entered into this

15  contract (the "Wellsprings Agreement") on July 21, 2017.

16      89.    Ms. Shulman was explicit with Kaplan that she intended to purchase

17  Wellsprings and conduct cannabis operations there regardless of whether he and

18  Defendants decided to enter into an arrangement on the same operational and

19  financial terms as the Cultivation Agreement. Ms. Shulman was in fact pursuing

20  other potential business partners, including those described above. And with the

21  Wellsprings Purchase Agreement and lease in place, she had time to find an

22  appropriate partner if Kaplan was not interested.

23      90.    Defendants' true intentions were unknown to Ms. Shulman at the

24  time she entered into the Wellsprings Agreement, and they remained unknown to

25  her during most of the performance of the contract. Kaplan and Defendants were

26  aware that Wellsprings had by far the most cultivable acreage of the three

27  properties and the most ideal topography for both cultivation and cannabis

28  processing and distribution. They wanted Wellsprings for themselves, but it was

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1    Ms. Shulman who had the relationship with Mr. Lugli and it was Ms. Shulman

2    who had the Wellsprings Purchase Agreement and the lease. Ms. Shulman also

3    had the ability to find other investors if Kaplan declined. It was in these

4    circumstances that Kaplan and his enterprise hatched a plan to defraud

5    Ms. Shulman of her interests in Wellsprings. Defendants would enter into the

6    Wellsprings Agreement, agreeing to close on the sale, manage operations, and split

7    profits with Ms. Shulman, but Defendants would work on a parallel track to strip

8    Ms. Shulman of her rights. They would provide her with legal representation using

9    their own lawyer; they would negotiate directly with Mr. Lugli, cutting her

10   completely out; they would commence cannabis operations, producing millions of

11   dollars in revenue during the first harvest alone, but never paying Ms. Shulman a

12   dime; they would negotiate separately with Mr. and Mrs. Lugli to invest in

13   Vertical; they would lie to investors and others about their true interest in

14   Wellsprings (which, jointly with Iron Angel, they called "Santa Rita") and use the

15   property as the centerpiece of their color brochures to steer tens of millions of

16   dollars in investments into their enterprise, even after they had been evicted from

17   Wellsprings; they would delay and delay to provide sufficient time to harvest all

18   the cannabis; they would ultimately never close on the property; and then, in a

19   final act revealing the fraudulent intentions held during the entire relationship,

20   after failing to close on the deal for Wellsprings that would have made

21   Ms. Shulman an owner, they immediately returned to Mr. Lugli to make their own,

22   separate offer to purchase the property for themselves. Indeed, they made two such

23   offers. But by that point, Mr. Lugli had learned enough about Kaplan and

24   Vertical—and had been directly threatened by Kaplan—and thus said no.

25   Mr. Lugli's attorney informed Mr. Kaplan that his efforts to unwind the original

26   offer by Ms. Shulman in order to make his own offer was illegal. True to form,

27   Kaplan then sued Mr. Lugli for $30 million.

28

91.     Defendant Houghton was key to the implementation of the fraudulent scheme perpetrated on Ms. Shulman to steal her interest in Wellsprings. On July 19, 2017, Kaplan instructed Ms. Shulman to contact Houghton to discuss Wellsprings and, specifically, to let Houghton know that she was not already represented by counsel so that Houghton could serve as her legal adviser. Ms. Shulman confirmed she was not represented, and from that point forward, Houghton worked with Defendants to implement a fraudulent course of conduct to wrest control of Wellsprings from Ms. Shulman and to take for Kaplan's enterprise the tens of millions of dollars in profits that were expected from cannabis operations on Wellsprings—by far the most valuable and lucrative of the three properties. Acting as attorney for both Kaplan and Ms. Shulman, Houghton deceived Ms. Shulman into believing he was looking out for her best interest—a fraudulent act in clear breach of his fiduciary duties and one that he would employ with Ms. Shulman and her family throughout their dealings with Defendants.

92.     After entering into the Wellsprings Agreement, Kaplan and Vertical began managing operations on Wellsprings, but then quickly confessed that they did not have the financial resources to close escrow by January 2018. Had Ms. Shulman had a different business partner with the funds to close, she would have been an owner of Wellsprings as of January 2018.

93.     Kaplan, who was not a party to the Wellsprings Purchase Agreement, contacted Mr. Lugli directly, purportedly on behalf of Ms. Shulman and "the team," to seek a one-year extension of close of escrow. In an undated, typed letter in mid-November 2017, Kaplan wrote to Mr. Lugli and noted that "it is in our collective best interests to make this proposed change, for the benefit of all involved." As an incentive for extending escrow, and without notice to Ms. Shulman or with her consent, Kaplan promised to pay Mr. and Mrs. Lugli, in addition to the Wellsprings purchase price, "2 acres of projected cannabis profits [from Wellsprings Ranch] during 2019, 2020, 2021," which Kaplan estimated to

be $6 million. Kaplan also negotiated an extension on Ms. Shulman's Wellsprings lease, extending it to coincide with the new close of escrow on January 15, 2019. In other words, short of funds despite his express representations, Kaplan was already giving away Ms. Shulman's interest in the business to buy himself time more to live up to the promises Defendants had made.

94.    These various arrangements were set forth in documents prepared by Houghton for Ms. Shulman's signature on November 20, 2017, including an Amendment to Purchase and Sale Agreement and Joint Escrow Instructions ("Wellsprings Purchase Agreement Amendment"), extending the close of escrow until January 15, 2019, and a document titled "Agreement" providing that Mr. and Mrs. Lugli would receive net income for two acres of cannabis grown on Wellsprings. Had Kaplan and Vertical been able to fund a timely close on the property, the "Agreement" would never have been proposed.

95.    Also, on November 20, 2017, Kaplan, supported by Houghton, defrauded Ms. Shulman into assigning her rights to Wellsprings to Kaplan without any consideration, so that at close of escrow Kaplan would be a joint owner of the property. Houghton, at Kaplan's direction, drafted the agreements. Houghton then presented the agreement to Ms. Shulman, causing her to sign away half of her rights in Wellsprings. Houghton, affirming his representation of Ms. Shulman and Kaplan's business venture, sent the drafts to Mr. Lugli and noted that he had copied his "clients" (Ms. Shulman and Brandon Shulman) on the email.

96.    Following execution of the November 20, 2017 agreements, substantial operations on Wellsprings continued, with Ms. Shulman and Brandon Shulman managing operations. They oversaw the cultivation of 16 acres of cannabis on Wellsprings in 2018, with the first plants placed in the ground on August 20, 2018. The harvest began in November 2018 and continued up until, and even after, the date on which Defendants were evicted from the property.

Baker Botts L.L.P.

97.    Though Kaplan had promised to send an experienced grower to manage Wellsprings operations, competent help never arrived. Instead, Kaplan hired two young men who had run a small clone business in San Diego, but neither of whom had any farming, agriculture or cannabis cultivation experience. Mr. Milburn had promised repeatedly to join the team at Wellsprings as Operations Manager, a promise Ms. Shulman had relied on in agreeing to partner with Kaplan. Mr. Milburn made only a few sporadic visits and ultimately announced he had been "recalled to manage Vertical's strategic growth." Kaplan then sent his son, Matt, to manage Wellsprings, but Matt had no cannabis experience and no farming or agricultural experience whatsoever. Instead of managing operations, which he was never qualified to do, Matt spent his time implementing his father's and Vertical's plans to defraud Ms. Shulman and potential investors in Vertical. Matt spent a significant amount of his time giving tours to scores of investors around Wellsprings and Iron Angel, fraudulently telling them that Vertical owned the property and the acres of cannabis growing on them. When he was not giving tours, Matt used Ms. Shulman and Brandon to educate him on the basics of cannabis and the farming industry and to introduce him to the local community and Ms. Shulman's vendors. Later, Ms. Shulman caught Matt coordinating the illegal transport of cannabis off the property and hiding product so Vertical could artificially lower production numbers and defraud Ms. Shulman of her share of the profits. Initially, Matt feigned appreciation for being welcome in Ms. Shulman's family and business, but he showed his true colors and intentions when he began to verbally abuse Ms. Shulman and her family (including telling Ms. Shulman he hopes she rots on the Wellsprings property, that she's stupid, and that everyone dislikes her). Matt also took to physically assaulting Ms. Shulman's son, Randall Shulman and vandalizing Ms. Shulman's property. On information and belief, Defendants, including

BAKER BOTTS L.L.P.

1  Matt Kaplan, caused and assisted in illegal "black market" sales of cannabis from

2  operations at Wellsprings, Iron Angel, and Sisters.

3      98.    Although Kaplan and Vertical made various deposit payments to the

4  Lugli Trust to stave off any eviction before they could entrench themselves on the

5  property and cultivate the valuable cannabis growing on 16 acres, Kaplan

6  ultimately failed to deliver the monies required to close on the property on

7  January 15, 2019, or on February 25, 2019, after the contractual cure period. After

8  failing to fund the closing that would have made Ms. Shulman an owner, Kaplan

9  returned—twice—to make offers to Mr. Lugli to purchase the property without

10  Ms. Shulman. Mr. Lugli rejected these offers, terminated the Wellsprings Purchase

11  Agreement, and evicted Kaplan and Defendants from the property.

12      99.    A key reason Defendants paid the Lugli Trust just enough to remain

13  on the property until they could make their own offer to purchase Wellsprings

14  without Ms. Shulman was the importance of Wellsprings to Vertical's marketing

15  and fundraising efforts. Once operations were underway and of more than 40 acres

16  of hoop houses had been set up on Wellsprings, Defendants photographed the

17  property. One of those photos (included as Exhibit A hereto) has been the

18  centerpiece of Vertical's marketing and investment campaign ever since, and it has

19  been featured prominently on Vertical's website and other social media—even

20  after Vertical's rights to Wellsprings were terminated. And Kaplan's marketing

21  campaign was not just photographic. He and Defendants frequently brought

22  potential investors to Wellsprings and Iron Angel to tour the properties, but he

23  never included Ms. Shulman in most of those meetings or discussions or even

24  notified her that such tours would occur or the purpose of those tours. During the

25  tours, Matt Kaplan and Smoke Wallin lied to potential investors, telling them that

26  Vertical owned the 1,500 acres that comprised Wellsprings and Iron Angel.

27      100.   Defendants coined their own name for the collective properties,

28  misleadingly repackaging them for investors and potential business partners as

BAKER BOTTS L.L.P.

"Santa Rita" or "The Ranch." Their ability to portray to investors that they owned the land and had all rights to the cannabis business was key to their fundraising and their desire to go public and strike it rich. In fact, Vertical obtained tens of millions of dollars in investments based on these misrepresentations about Wellsprings and Iron Angel. On information and belief, Defendants never told actual or potential investors about Ms. Shulman's (a) ownership of Iron Angel, (b) rights to Wellsprings, including the lease and purchase, or (c) right to 50 percent of net income on the properties. Vertical's website and marketing materials also contain numerous other misrepresentations to investors, including identifying brands and partnerships to which Vertical had no rights.

101.   During the course of performance of the Wellsprings Agreement, Kaplan worked hard to convince Mr. and Mrs. Lugli to invest in Vertical by entering into a subscription agreement, which really amounted to making a loan to Kaplan. Kaplan used familiar tactics, referring to the Luglis as "family" (as he did Ms. Shulman) and offering them a "special investment opportunity" by misrepresenting the true financial condition of Vertical. He convinced Mr. Lugli to sign the subscription agreement, promising that Vertical would go public in 2019 and that Lugli would make a significant profit. In fact, Mr. Lugli later learned that Kaplan had made substantial misrepresentations to lure him into making Kaplan a loan via a subscription agreement. Mr. Lugli learned that Vertical was severely undercapitalized and indebted and that all of its alleged "investors" were actually lenders. Kaplan had hoped to entice Mr. Lugli to invest in Vertical so that Kaplan could apply Mr. Lugli's "investment" towards the purchase price of Wellsprings. Mr. Lugli ultimately did not pay money to Vertical, having concluded that Kaplan lied to him about the subscription agreement.

102.   Kaplan's failure to close on Wellsprings deprived Ms. Shulman of ownership of a property that could only substantially increase in value given the cannabis revolution taking place in Santa Barbara County. It also deprived

Ms. Shulman of profits that were expected to be generated on the property in the years ahead—future profits that Defendants had already calculated and reported to its investors and potential investors. In an October 2018 interview, Matt Kaplan announced that the 20 acres under cultivation at that time would grow five-fold by Spring 2019; he also said Vertical was considering using the properties for cabins or other accommodations for tourists. Vertical's website as late as June 2019 boasted that "Vertical's Santa Rita Hills Outdoor Grow will be one of the largest in the world in 2019." (Exhibit A hereto).

103.    With regard to the cannabis cultivated on Wellsprings before Defendants were evicted, Ms. Shulman has never been paid her 50 percent of the net income due under the Wellsprings Agreement. Nor have Defendants ever followed through on other obligations, including: accounting for the costs of operations and revenue on sales, bringing a competent operations manager to the property to oversee cultivation activities (such as planning and preparation, workforce management, legal product transport and distribution), obtaining appropriate cultivation licenses from the County and State (such as land use permits and cultivation licenses), working cooperatively with Ms. Shulman to obtain such permits and licenses (and not fraudulently preventing her from obtaining valid licenses), maintaining proper insurance coverage, using best efforts to manage Cultivation Operations in the most efficient and effective manner, actively engaging Ms. Shulman in the Cultivation Operations, using good faith efforts to achieve the best agricultural results practicable (such as providing for proper drying and processing facilities, maintaining proper temperatures in the greenhouse to permit plants to flourish, caring for plants to avoid mold and pest infestation, and properly addressing failed testing requirements), complying with all laws and regulations associated with cultivating, processing, and selling cannabis (such as legally transporting cannabis off the property in code-compliant vehicles and distributing only to licensed entities).

104.   In addition, Kaplan misrepresented, in breach of the Agreement, that Vertical had substantial experience and expertise with the laws and requirements of cultivating cannabis in California and could and would perform all of its duties and responsibilities in accordance with state and local laws; that it had sufficient capital reserves to timely pay all Operational Expenses; that it had all licenses, consents, and authorizations to perform its duties and obligations under the Agreement. Vertical further failed to provide financial documents on a quarterly basis, with detail of Operational Expenses. In fact, according to Mr. Silver, Vertical prepared two sets of financial records, thereby breaching the Wellsprings Agreement by failing to prepare financial reports and other documents without untrue statements of material fact or omissions of material facts necessary to ensure such statements were not misleading.

**D.   Defendants, Directed by Kaplan and Houghton, Execute on a Plan to Oust Ms. Shulman from Iron Angel**

105.   The Cultivation Agreement provided that Defendants were to conduct cannabis operations, including cultivation and manufacturing, on the Iron Angel property. But if the Agreement were terminated by either party, Defendants would have no further rights to Iron Angel and Ms. Shulman would, of course, be free to do whatever she wanted with her own property—including continuing to use that property for cannabis cultivation. This, of course, was a big problem for Kaplan, because it meant he would always have to split profits on Iron Angel with Ms. Shulman. Defendants devised a plan to steal Iron Angel from Ms. Shulman and take for their enterprise all of the profits from cannabis cultivation on the property. Again, Houghton was key to this plan.

106.   Houghton was acting as attorney for the business regarding licensing, which meant he was providing legal advice to Kaplan and Vertical and to Ms. Shulman and Brandon Shulman regarding cannabis regulatory requirements. Houghton held himself out as attorney for the entire venture and he had

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1  specifically referred to Ms. Shulman and Brandon Shulman as his "clients."
2  Indeed, Houghton exchanged hundreds, possibly thousands, of communications
3  with Ms. Shulman and Brandon Shulman concerning the Wellsprings property
4  purchase and regulatory requirements. The Shulmans relied on Houghton's legal
5  advice and believed, wrongly, that Houghton was acting in their best interest. It
6  was in this context that Houghton approached the Shulmans on January 14, 2018,
7  telling them that they needed to sign an agreement to lease the Iron Angel property
8  to Iron Angel II, LLC—an entity Houghton had registered with the California
9  Secretary of State just four days earlier, naming Kaplan the sole manager. The
10  entity was purportedly set up to be the licensed cannabis operator, given changes
11  in the law that meant collectives were no longer necessary. With regard to the
12  name, it was Kaplan's idea to use Ms. Shulman's trademark, "Iron Angel," as the
13  name for the LLC as part of the overall "branding" for the business venture. In
14  reality, his intent was to steal it from Ms. Shulman, along with the goodwill she
15  had generated using the Iron Angel mark.

16      107.  In a January 14, 2018, email from Houghton to Ms. Shulman and
17  Brandon Shulman, copying Kaplan and Defendants Drew Milburn, Jeff Silver, and
18  Robert Scott, Houghton said Ms. Shulman needed to sign the lease he attached
19  "for State licensing purposes," specifically, "to show evidence of the right to
20  occupy the land by the Licensee [the operator]." In subsequent communications,
21  Houghton assured the Shulmans that the lease was just a formality and was solely
22  for licensing purposes, that the parties would not follow the terms of the lease, and
23  that the parties were still operating pursuant to the Cultivation Agreement. Based
24  on these representations and assurances and relying on Kaplan's and Houghton's
25  professed "expertise" in the regulatory arena—and, critically, believing that
26  Houghton represented their interests—the Shulmans directed that the Iron Angel
27  landowners sign the lease for licensing purposes only. The lease purports to have
28  an initial 10-year term, with three five-year automatic renewals.

BAKER BOTTS L.L.P.

108.   Defendants, and Houghton in particular, lied to the Shulmans about the true purpose of the lease. In fact, the lease was not required for regulatory purposes; the Cultivation Agreement easily would have sufficed to show the operator's right to occupy the land. The County required only that the cultivation operator have evidence that the property owner is aware that it is cultivating cannabis on the property; the Cultivation Agreement expressly acknowledged the purpose of the agreement was for cannabis growth and cultivation. This was an unmistakable breach of Houghton's fiduciary obligations to Ms. Shulman, and Houghton made the foregoing representations and omissions about the necessity of the Iron Angel lease with the intent to defraud.

109.   Defendants never intended the lease to have any legal effect with respect to the parties' cultivation activities; indeed, Defendants never paid rent due under the lease. The lease instead gave Kaplan and his enterprise the freedom to breach the Cultivation Agreement with the assurance that, if Ms. Shulman fought back in any way, they could assert the lease as the basis for their right to continue operating a cannabis business on Iron Angel, to oust Ms. Shulman from the property, and to take 100 percent, rather than 50 percent, of the profits.

110.   Indeed, that is exactly what Defendants did. After suffering through months of significant breaches of the Cultivation Agreement, as described below, Ms. Shulman was finally convinced that Kaplan did not intend to make good on his promises—even on the most fundamental promise of paying Ms. Shulman her share of net income. She gave Kaplan and Defendants the opportunity to cure, and when they failed adequately to respond (and Kaplan failed to close escrow on the Wellsprings property), Ms. Shulman properly terminated the Cultivation Agreement. With the termination of the agreement, the parties' business arrangement on Iron Angel was concluded and Ms. Shulman should have been free to continue cultivation on Iron Angel. But Kaplan and Vertical, with the support of Houghton and other Defendants, revealed their fraud by suing

BAKER BOTTS L.L.P.

Ms. Shulman for possession of Iron Angel and claiming that they, not Ms. Shulman, had the exclusive right to operate a cannabis business on Iron Angel. They claimed that the lease gave them this right and that the terms of the Cultivation Agreement did not matter. In other words, they attempted to use the lease, which Houghton had represented to the Shulmans as unimportant and solely to obtain licenses, as the vehicle to oust Ms. Shulman from her property, steal her cannabis business, and take 100 percent, rather than just 50 percent, of all profits going forward.

111.   As described more fully below, Defendants' willingness to proceed on this fraudulent and malicious legal theory in court resulted in Ms. Shulman's ouster from the business on her property under the terms of a temporary restraining order. While back on the property, Defendants intentionally inflicted emotional distress on Ms. Shulman and wreaked havoc on the cannabis cultivation business, causing serious damage to the crops. During this process, Defendants lied repeatedly about conditions on the property to the court in order to effectuate their malicious prosecution of the theory that the lease somehow displaced the Cultivation Agreement.

112.   The lease was also unnecessary and made no practical sense, except to defraud Ms. Shulman, because Kaplan had a contractual right to purchase Iron Angel as a tenant in common. If Defendants wanted to protect some interest in the Iron Angel property, Kaplan could have exercised that purchase option.

**E.     Defendants Engage in Fraud to Exclude Ms. Shulman from Operator Licensing**

113.   The passage of the Adult Use of Marijuana Act set in motion the establishment of a new regulatory and permitting regime, which operates at both the county and state level. Santa Barbara County, unlike many other California counties, embraced cultivation of recreational cannabis. That Ms. Shulman had already been cultivating medical cannabis in Santa Barbara County under then-

BAKER BOTTS L.L.P.

1   existing laws and regulations gave her a huge advantage and head-start, because

2   the County allowed those who had been cultivating in the County prior to

3   January 19, 2016, to continue to do so while their state annual licenses were being

4   processed. (*See* Santa Barbara Code of Ordinances, Section 35-1003(c)(2).) As a

5   result, continuing cultivation on Iron Angel, Sisters, and Wellsprings was allowed

6   for purposes of applying for the requisite permits and licenses to operate those

7   sites for recreational cannabis cultivation. This greatly appealed to Kaplan, who

8   needed to latch onto someone in Ms. Shulman's position to take advantage of the

9   law to reap the enormous profits from cannabis cultivation in Santa Barbara

10   County.

11       114.   Once he had entered into the Cultivation Agreement with

12   Ms. Shulman, Kaplan fraudulently sought to replace her as the licensee. In

13   December 2017, Ms. Shulman had initiated the process to obtain the necessary

14   "Small Outdoor" and "Processor" licenses to operate on Iron Angel, Sisters, and

15   Wellsprings as commercial cannabis sites. Because Ms. Shulman had been

16   operating prior to January 19, 2016, the County, on December 22, 2017, issued

17   letters to the State Licensing Authority on Ms. Shulman's behalf, grandfathering in

18   her nonconforming use on Iron Angel, Sisters, and Wellsprings pursuant to

19   Section 35-1003(c)(2).

20       115.   After taking this first step, Ms. Shulman looked to Kaplan, Houghton,

21   and, later, Elyse Kaplan for their alleged regulatory experience to assist with

22   navigating State and County licensing requirements. Ms. Shulman gave the letters

23   from the County to Houghton to process. Despite having agreed that Kaplan, on

24   the one hand, and Ms. Shulman, on the other, would "work together to get Santa

25   Barbara County and State Licenses" and that they would hold licenses 50-50,

26   Kaplan and Houghton changed the deal. Houghton applied for the State operator

27   licenses for Kaplan's LLC, Iron Angel II, only. Rather than use the County letters

28   Ms. Shulman obtained acknowledging her previous Legal Nonconforming Use,

1   Kaplan and Houghton submitted false affidavits stating that *they* had been

2   operating continuously in Santa Barbara County since prior to January 19, 2016, in

3   order to obtain temporary licenses in the name of Kaplan's LLC only.

4       116.   Houghton failed to identify Ms. Shulman as an owner at all, even

5   though California law requires that a person with an aggregate ownership interest

6   of 20 percent or more in the business applying for a license must be registered

7   with the State as an owner of the business interest. After Houghton left Vertical to

8   return to Colorado, Elyse Kaplan carried his torch. Ms. Kaplan, however, had no

9   regulatory experience. Kaplan had promised Ms. Shulman that an experienced

10  attorney would assist with regulatory issues, and that was a key reason she agreed

11  to do business with Kaplan. Despite numerous requests about the status of

12  licensing, Elyse failed to ensure that Ms. Shulman held a joint interest in the

13  operator licenses. When Ms. Shulman and Brandon sought clarification from Elyse

14  and information regarding the status, Elyse either ignored them completely or took

15  multiple weeks to respond.

16      117.   This breach of the parties' agreement and business objectives poses

17  many problems for Ms. Shulman. Houghton's and Elyse's refusal to include

18  Ms. Shulman as an owner on the applications for cultivation licenses has resulted

19  in Ms. Shulman's inability to access any information related to any current and

20  expired licenses related to Iron Angel. Without access, Ms. Shulman is prevented

21  from continuing the licensing process and, importantly, remedying any issues that

22  have arisen due to Kaplan's failure to timely renew the operator licenses, including

23  remedying Notices of Violation, completing County and State requirements

24  (including Fish & Wildlife and the Water Board), or ensuring all necessary permits

25  have been obtained. Without access and the ability to remedy the problems the

26  Kaplans created, Ms. Shulman's ability to cultivate cannabis on her farm is

27  threatened.

28

BAKER BOTTS L.L.P.

1

2

### F.   Defendants' Breaches of the Cultivation Agreement and Wellsprings Agreement Continue and Escalate

3   118.   Defendants breached the Cultivation Agreement and the Wellsprings

4   Agreement from the moment they were entered into, as set forth above. While

5   Ms. Shulman continued to perform all of her obligations under the agreements—

6   and, indeed, while both Ms. Shulman and Brandon Shulman were forced to take

7   on significant additional responsibilities to make up for Vertical's failures—

8   Defendants' breaches continued and escalated.

9   119.   Section 6 of the Cultivation Agreement required NCAMBA9 to share

10   equally the balance of the net income from the 2017 Iron Angel cultivation

11   activities (after deducting some revenue for a reserve and to make payments to

12   identified third parties). Section 6 also required NCAMBA9 to pay the collectives

13   50 percent of the net income from post-2017 crops on each of the properties. Net

14   Income is defined in the Cultivation Agreement as "gross revenue from the sale of

15   cannabis or cannabis derivatives cultivated at the Property less Operational

16   Expense actually incurred . . . ." Operational Expenses include "costs stemming

17   from or relating to the Cultivation Operation on the Properties and the

18   performance of [Vertical's cultivation] responsibilities," but Vertical was solely

19   responsible for "salaries, expenses and charges for Representatives, officer,

20   director, managers, agents, attorneys, advisors, consultants which [Vertical]

21   employs or retains to operate as [Vertical] (other than agriculture workers who are

22   members of the Collective and then, only to the extent they are actually providing

23   services on the Properties." Section 5.5 of the Cultivation Agreement required

24   Vertical "in the course of operations, [  ] provide financial documents to the

25   Collectives on a quarterly basis. The financial documents [were to] detail the

26   Operational Expenses that constitute the expenses of operation and revenue

27   received from operations." The Wellsprings Agreement included these same

28   requirements.

BAKER BOTTS L.L.P.

120.   Vertical breached these and other express obligations. With Jeff Silver's oversight, endorsement, and substantial assistance as CFO, Vertical violated virtually every term in the parties' agreements related to business finances. Mr. Silver failed timely to pay all Operational Expenses with respect to the Cultivation Operations on Iron Angel, Sisters and Wellsprings. He failed to provide to Ms. Shulman quarterly financial reports and intentionally misrepresented (and thus failed also to provide) the Operational Expenses that constitute the expenses of operation and revenue received from operations on the properties. When asked about inappropriately billed "operational expenses," Mr. Silver ignored Brandon and Ms. Shulman and made none of the necessary adjustments to expenses. The falsification of the financial statements was a breach of the express prohibition against untrue statements of material fact (or omissions of them) in financial reports prepared by Vertical.

121.   The Shulmans eventually learned why Mr. Silver was not making necessary adjustments or keeping her informed as required under the contract: Mr. Silver was keeping two sets of books for Vertical. Most, if not all, of the revenue generated in 2017 and early 2018 was received in cash. Ms. Shulman learned in early 2019 that Vertical had kept two sets of books in an effort to underreport taxes for sales in 2017. Vertical operated on a cash-only basis in order to avoid declaring revenue to the IRS. The Profit and Loss statement for 2017 showed revenue of $1,775,057. Kaplan reported to Ms. Shulman at the same time that gross revenue was $2,704,368 from Iron Angel and $300,325 from Sisters, for a total of $3,004,693. Brandon Shulman asked Mr. Silver to explain the discrepancy in the financials, and Mr. Silver stated that because Vertical's revenue was all cash, Kaplan decided not to declare it all. In order to hide the actual amount, Kaplan directed Silver to prepare two sets of financial records. Mr. Silver thus admitted to Brandon Shulman that his bookkeeping efforts were designed to defraud the tax authorities.

122.   In addition to manipulating and falsifying the company's financial records, Mr. Silver was the gatekeeper to Vertical's payment of funds. In that role, Mr. Silver failed timely to pay vendors, requiring Ms. Shulman or her son repeatedly, and unsuccessfully, to contact Mr. Silver. Ms. Shulman received countless phone calls and emails from these vendors about Vertical's refusal to pay them. On one occasion, a long-time vendor of Ms. Shulman's, who had been given the run-around by Vertical, felt compelled to show up at Vertical's Agoura Hills office to demand payment of $100,000 Vertical owed him. Ms. Shulman had spent years developing relationships with these vendors, and Mr. Silver's and other Defendants' actions were damaging those relationships. Mr. Silver also failed or refused to reimburse Ms. Shulman for the operational expenses she had covered after the Cultivation Agreement had been signed.

123.   One contractor, who Vertical owed $215,000, and who had not been paid for several months after his work was complete, took out a mechanics' lien on Ms. Shulman's property. Brandon Shulman frequently asked Kaplan, Mr. Milburn, and Mr. Silver to stay on top of payments in order not to destroy the goodwill Ms. Shulman had built up. Defendant Elyse Kaplan, as Vertical's counsel, knew or should have known that having a lien on the property would jeopardize the licenses to cultivate on Iron Angel and Wellsprings. Yet, she failed to take steps to ensure Vertical executives took actions to preserve the licenses.

124.   In connection with Mr. Silver's actions described above, Vertical failed to pay the collectives their full share of the 2017 harvest, because it had been recording impermissible expense deductions, such as compensation, transportation and professional services for non-agricultural personnel (which adversely affected the net income payable to the collectives). As a result of these breaches alone, Defendants have damaged Ms. Shulman in excess of $650,000. On January 24, 2019, Ms. Shulman's counsel put Vertical on notice that its payment of net profits for product sold was in arrears, adding that Vertical's failure to

1    timely compensate the collectives would result in default and potential termination

2    of the Cultivation Agreement.

3        125.   Vertical's breaches of the parties' agreements continued through

4    2018. Because Vertical was unable to fund the operational expenses it agreed to

5    pay, Ms. Shulman loaned the business her life savings to support operations.

6    Vertical failed to make Ms. Shulman whole, as it was required to do. In addition,

7    Vertical harvested 22,000 pounds of cannabis from Wellsprings and never

8    compensated Ms. Shulman or provided any accounting whatsoever.

9        126.   Vertical also failed to pay a variety of the operational expenses

10   "stemming from or relating to the Cultivation Operation on the Properties,"

11   including costs that Ms. Shulman incurred for "the mortgage, the real property

12   taxes and . . . rent and real property taxes [Ms. Shulman] incurred under its lease

13   for [the Sisters' Property]." These expenses also included payments to vendors

14   who provided valuable services to the business. As a result, on February 1, 2019,

15   Ms. Shulman's attorney sent an Additional Notice of Default to Kaplan's attorney.

16   Ms. Shulman demanded that Defendants' breaches be remedied within 10 days, as

17   required by the Cultivation Agreement. Vertical did not comply with the Notice of

18   Default and remedy any of the identified breaches.

19       127.   Despite the parties' obligation to keep "Frannie Shulman . . . actively

20   engaged in the Cultivation Operations" and to "use good faith efforts to coordinate

21   their respective activities to achieve the best agricultural results practicable,"

22   Drew Milburn (Vertical's Chief Operating Officer) and others at Vertical

23   eventually ceased communicating with Ms. Shulman. Though Mr. Milburn had at

24   all times coordinated product sales with Ms. Shulman, he abandoned that practice

25   without explanation or notice. On April 18, 2018, Mr. Milburn sought permission

26   to sell trim (essentially, the leaves from the cannabis plant) at $100 a pound to

27   Kaplan's affiliate in Needles, California, but then Mr. Milburn sold the trim for

28   just $30 a pound. Thereafter, Mr. Milburn sold flower (the bud) to Kaplan's

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

Needles affiliate from both the remaining 2017 and 2018 harvests for just $150 per pound (when market value was clearly $250 to $300 or more per pound) without involving Ms. Shulman, as he was obligated to do. Mr. Milburn also sold product to other distributors, without involving Ms. Shulman or disclosing the sales price.

128.   When Ms. Shulman raised questions about Mr. Milburn's failure to obtain market value for the product, Mr. Milburn invited Ms. Shulman to talk to distributors to determine what price she could get. Brandon Shulman then had two licensed distributors inspect the product, both of whom were surprised at the inefficient and apathetic manner in which Kaplan's team was harvesting and packaging product for sale. Both distributors said that Kaplan could have obtained at least twice the price at which product was being sold to Kaplan's Needles affiliate. The yield and price would have been even higher if Kaplan's team had harvested and packaged the product correctly.

129.   Kaplan's "inside sales" to an affiliate at prices well below market value and its failure to harvest and package correctly are a breach of the Cultivation Agreement and Wellsprings Agreement, which required Vertical to use its "Best Efforts" to manage operations in the most efficient and effective manner possible. Vertical had a duty to the collectives to use "good faith efforts to coordinate their respective activities to achieve the best agricultural results practicable."

130.   By early 2019, Kaplan refused to sell, despite a substantial market for licensed product, approximately 7,500 pounds of remaining Iron Angel packaged product. Kaplan and his team refused to sell the remaining product because they were waiting for Vertical's dysfunctional Needles facility to process what it already purchased so it could then buy more. Indeed, Kaplan's team informed Ms. Shulman that the product waiting at Iron Angel and Wellsprings was "assigned to or claimed by" Kaplan's affiliate specifically for projects at the Needles facility. When the time came, Kaplan sold cannabis harvested from Iron

1    Angel and Wellsprings at significantly reduced rates so that Kaplan's affiliates

2    could turn around and sell derivative products at a profit, thereby circumventing

3    his profit-sharing agreements with Ms. Shulman. All profits from these

4    transactions were diverted straight into Defendants' pocket.

5        131.   In fact, Defendants never intended to honor their obligations to

6    Ms. Shulman. Ms. Shulman (through the collectives) has never been paid a dime

7    for any harvested product since entering into the Cultivation Agreement and the

8    Wellsprings Agreement. Defendants never intended to maximize profits for

9    Ms. Shulman's benefit. Instead, part of their fraudulent scheme was to leverage

10   Ms. Shulman's assets and hard work to supply their own facility at Needles with

11   low-cost cannabis product, so they could turn around and make highly profitable

12   sales further down the chain of distribution that would never benefit Ms. Shulman.

13   Significantly, Defendants never provided the necessary manufacturing facilities,

14   which was key to the Cultivation Agreement and the Wellsprings Agreement and

15   would have substantially increased revenue and profits.

### G.    Defendants Attempt to Manipulate Ms. Shulman Into Voluntarily Forfeiting Her Rights

18       132.   By late fall 2018, Kaplan and his cohorts had almost completely

19   ceased communicating with Ms. Shulman despite their obligations under the

20   contracts in place. Ms. Shulman and Brandon Shulman made repeated requests to

21   various Defendants on multiple issues but were ignored. Ms. Shulman repeatedly

22   asked to meet with Kaplan, but her requests went unacknowledged for months.

23       133.   On November 28, 2018, Ms. Shulman managed to get Mr. Milburn's

24   attention, after which she began to understand why Kaplan was ignoring her.

25   Mr. Milburn called Ms. Shulman in preparation of her November 30th meeting

26   with Kaplan, and he told her that Kaplan intended to offer her equity in the

27   "mothership" in exchange for Wellsprings. He told her this was a "generous offer"

28   and she should accept it. Mr. Milburn told Ms. Shulman that he did not want

BAKER BOTTS L.L.P.

1 Brandon Shulman included in conversations about this "deal." Of course,

2 Ms. Shulman did talk to her son and told Mr. Milburn that any conversations

3 regarding the business must include Brandon (because Ms. Shulman felt

4 intimidated by the way Mr. Milburn had been speaking to her). In response, and

5 completely justifying her hesitation, Mr. Milburn screamed "fuck you" at them

6 and hung up the phone.

7     134.   Kaplan eventually summoned Ms. Shulman to his office in Agoura

8 Hills, allotting a single hour, to discuss the parties' "financial arrangement." On

9 November 30, 2018, Ms. Shulman and Brandon met Kaplan and Mr. Milburn in

10 the Agoura Hills office. Kaplan informed the Shulmans that Vertical needed to

11 raise more capital and thus Ms. Shulman would no longer be entitled to a 50-50

12 profit split. This conversation coincided with the beginning of a massive harvest

13 on Wellsprings that Defendants knew would yield millions of dollars in profits.

14 With the intent to defraud Ms. Shulman, Kaplan proposed that, in exchange for

15 him obtaining full title to Wellsprings, Kaplan would give Ms. Shulman a one

16 percent equity interest in Vertical. Kaplan told Ms. Shulman that he decided that

17 Wellsprings was "not going to be a profit center" because he would "make sure"

18 that the price of products matched expenses. Kaplan used this threat to manipulate

19 prices and expenses on Wellsprings to try to force Ms. Shulman to give up her

20 rights in exchange for his "generous offer" of a one percent interest in the

21 company. In other words, as he had done so often with others, Kaplan attempted to

22 use the false promise of a valuable investment in Vertical to avoid his contractual

23 and financial obligations. During this same conversation, Kaplan told

24 Ms. Shulman he would "bury" her in litigation if she did not go along with his

25 plan. This threat mirrored similar threats Kaplan has made against others,

26 including Mr. and Mrs. Lugli.

27     135.   On December 14, 2018, Kaplan attempted to bully Ms. Shulman with

28 a letter containing a "take it or leave it" proposition that bore no resemblance to

BAKER BOTTS L.L.P.

the parties' contractual relationship. Acknowledging and affirming his contractual obligations—including his obligations under the Wellsprings Agreement pursuant to which the parties had been performing but which had not been reduced to writing, Kaplan admitted that his offer was "a change in the deal." With the Shulmans' substantial contributions and hard work, the business had become wildly successful, but Kaplan nonetheless wrote that that his continued "investment would not make sense on [Wellsprings] if the Company had to split the proceeds on all the incremental grow." In other words, Kaplan wanted to keep all of the profits for his enterprise and cut Ms. Shulman out of the deal. Furthermore, his threats and assertions were made without providing Ms. Shulman any information regarding finances or operations on the properties. Nor did Kaplan explain why Defendants had abandoned Sisters, why Defendants had failed to install manufacturing facilities on the properties, or why Defendants had failed to utilize, or even prepare to utilize, the full cultivable acreage on the properties. Believing she had no alternatives, Ms. Shulman attempted to consider the options Kaplan purported to offer, even though none of them resembled the original deal.

136.   Even if Kaplan could not defraud Ms. Shulman into voluntarily giving up her substantial rights to the business and the properties, Defendants hoped to at least buy time—valuable time. The risk to Defendants was that their breaches would catch up with them, causing Ms. Shulman or Mr. Lugli to terminate Defendants' rights under the various contracts in place before Defendants could finish harvesting 16 acres of cannabis on Wellsprings. They were desperate to stay on the properties for at least three reasons. First, they needed occupancy and on-going operations to steer investors to Vertical. The properties were essential to their plan to strike it rich with an IPO. It was essential that they be able to bring investors to the properties and to use images of the properties in their printed and online marketing. And it was essential that they lie to investors that they owned the property and the business, when in fact they

owned none of the properties and were contractually bound to a 50-50 profit split with Ms. Shulman. Indeed, Defendants were not even leaseholders on the properties, but were instead subject to contractual termination provisions. Second, they needed to harvest the cannabis on Wellsprings, so they could sell it to their own affiliate and take all of the profits. Third, they needed to entrench themselves on Wellsprings to make it more likely that Mr. Lugli would sell Wellsprings to Kaplan after Kaplan failed to close on the deal that would have made Ms. Shulman an owner.

137.   Kaplan was not alone in executing on this plan. At the time Kaplan was making his "take it or leave it" offer, Robert Scott falsely assured Ms. Shulman that she need not worry because "there is enough money to go around." He assured Ms. Shulman that Vertical wished to reach an amicable resolution. In addition, after months of silence regarding branding Iron Angel, on November 26, 2018, Vertical's branding manager, Kevin Henry, reached out to Ms. Shulman to give her "a quick update." But, just as quickly, he stopped communicating. On February 2, 2019, a bewildered Ms. Shulman wrote: "It's strange to not be hearing anything back from you."

138.   Discussions directly with Kaplan ended on December 26, 2018. On December 27, 2018, Smoke Wallin (then Vertical's CEO) emailed Ms. Shulman telling her he was the person authorized to negotiate a resolution on Vertical's behalf. He claimed to be disinterested, saying he was not "emotionally attached" to anything that had already happened. In reality, he was working exclusively at Kaplan's direction. When nothing came of Mr. Wallin's contrived efforts, he sent Ms. Shulman the following text on January 4, 2019: "Ok, well I know substantially where we are. Bottom line we will simply honor the original deal as discussed. I'll have Charles [Houghton] draw up an addendum to the agreement to add Wellsprings and clarify some of the points we discussed. Keeping it simple and let's move on together." Thus, Mr. Wallin, on behalf of Vertical and Kaplan,

Baker Botts L.L.P.

1    also acknowledged and affirmed the parties' contractual agreements, including the

2    Wellsprings Agreement (*i.e.*, "the original deal").

3        139.   On January 6, 2019, while waiting for the "addendum" Mr. Wallin

4    had referenced, Ms. Shulman demanded a meeting with Defendants to clarify the

5    roles of all participants going forward. There was no response. And despite

6    Mr. Wallin's assurances that the parties would "move on together" under the

7    "original deal," Defendants never followed through on the promise. In fact,

8    Mr. Wallin never intended to have Vertical "honor the original deal." Instead, like

9    Kaplan and others, he used the "negotiations" to stall while Vertical continued to

10   harvest and sell more and more cannabis from Wellsprings. For example, in early

11   2019, Vertical sold 3,800 pounds of cannabis from Wellsprings. On January 19,

12   2019, Ms. Shulman's attorney requested an update from Houghton and

13   Defendants. Houghton delayed responding, and ultimately no answer was

14   provided.

15       **H.    Defendants' Actions Force Termination of Cultivation Agreement
              and Cause Loss of Wellsprings**
16

17       140.   Defendants' actions and their failures to cure significant breaches

18   ultimately forced Ms. Shulman to exercise her right to terminate the Cultivation

19   Agreement, which meant terminating the parties' business relationship on Iron

20   Angel. Defendants also forced Mr. Lugli to evict the parties from Wellsprings,

21   resulting in the loss to Ms. Shulman of cannabis operations on that property and

22   ownership of the property.

23       141.   On January 9, 2019, Courtney Dorne showed up at Iron Angel

24   unannounced and told Ms. Shulman and Brandon Shulman that Kaplan would

25   "drag them through litigation" if Ms. Shulman did not agree to his demands. By

26   late January 2019, the tone of Defendants' communications had changed even

27   more. On January 24, 2019, Vertical's new attorney, Fred Gartside, told

28   Ms. Shulman that she had no ownership interest in Wellsprings and that, if she

BAKER BOTTS L.L.P.

1   wanted any part of the business on Wellsprings, she was required to pay

2   $3,750,000 to "buy-in" to the "ownership group" for a 25 percent share in net

3   profits. This, of course, was completely divorced from the contractual obligations

4   already in place. Ms. Shulman's attorney reminded Mr. Gartside and Vertical that

5   it was Ms. Shulman who brought the Wellsprings opportunity to them and that she

6   was entitled to 50 percent ownership. He also reminded Defendants that Kaplan

7   and Vertical remained in default of the contracts in place, which would be

8   terminated if the breaches were not cured. Mr. Gartside continued to "negotiate"

9   over contract terms that were already settled, accomplishing precisely what Kaplan

10   wanted: further delay while the crops on Wellsprings were harvested and while he

11   prepared to make a separate offer to Mr. Lugli to eliminate Ms. Shulman from the

12   equation.

13   142.   In late January, Ms. Shulman obtained financial information that

14   confirmed many of the suspected problems with Vertical's bookkeeping. In

15   particular, Vertical had been maintaining two sets of financials (in order to avoid

16   tax consequences), had recorded improper deductions and expenses, and had

17   underreported net profit in order to deprive Ms. Shulman of her share in those

18   profits. Ms. Shulman's attorney, again, put Vertical on notice of default and, on

19   February 1, 2019, demanded that Vertical pay to Ms. Shulman the net income due

20   pursuant to the parties' agreements. Kaplan did not comply. Rather than remedy

21   the defaults, Kaplan refused to fund escrow on Wellsprings by the February 25,

22   2019 deadline, placing Ms. Shulman in default on the Wellsprings lease and

23   depriving her of ownership of the property.

24   143.   On February 25, 2019, Ms. Shulman terminated the Cultivation

25   Agreement, thereby extinguishing the parties' business relationship. On March 12,

26   2019, due to Kaplan's failure to close on the property, Mr. Lugli evicted the

27   parties from Wellsprings. Vertical, however, refused to leave the property until

28   they had completed the harvest and removed the cannabis product. Astonishingly,

BAKER BOTTS L.L.P.

1   Kaplan then approached Mr. Lugli—twice—to purchase Wellsprings directly from

2   him. Mr. Lugli rejected both offers, and his attorney noted that Kaplan's efforts to

3   subvert Ms. Shulman's offer in favor of his own was illegal.

**I.   Kaplan Retaliates and Maliciously Files Suit Against Ms. Shulman, Following Through on Promise to "Bury" Her in Litigation**

6   144.   After Defendants caused the loss of Wellsprings, Ms. Shulman

7   returned to her permanent residence on Iron Angel and continued her cannabis

8   operation on the property that she had begun years before meeting Kaplan. But

9   true to Kaplan's promise to "bury" Ms. Shulman in litigation, Kaplan quickly sued

10  Ms. Shulman in Superior Court in Santa Barbara. Through his entity, Iron Angel

11  II, LLC, Kaplan claimed—contrary to the express terms of the Cultivation

12  Agreement—that he and Defendants had the exclusive right to occupy all of Iron

13  Angel and to operate a cannabis business on the property, ousting Ms. Shulman

14  from the property and her home and taking all the proceeds for Defendants'

15  enterprise.

16  145.   Kaplan's basis for this outrageous and wholly implausible claim was

17  that the Cultivation Agreement had been superseded by the lease that Houghton

18  and Kaplan had fraudulently obtained from Ms. Shulman for the supposed purpose

19  of obtaining licenses for cannabis cultivation. Kaplan sought emergency relief

20  from the court, arguing that Ms. Shulman should be kicked out of her house and

21  removed from the property altogether and that he and Defendants should be given

22  possession and the exclusive right to operate the business that had been governed

23  by the Cultivation Agreement. Kaplan and his attorneys attempted to hide the

24  Cultivation Agreement from the court, failing to inform the court that the

25  Cultivation Agreement was the basis for the parties' business on Iron Angel and

26  governed the parties' performance and obligations. They also failed to provide the

27  court any of the written communications with the Shulmans in which Houghton

28  had represented that the lease was solely for the purpose of obtaining licenses.

BAKER BOTTS L.L.P.

1    Furthermore, in an attempt to cover up the fraud perpetrated with the lease, they

2    lied to the Court, saying that had always paid rent under the lease. In fact, they had

3    written only one check for "rent"—a check they tried to give Ms. Shulman on

4    March 7, 2019, immediately before suing her, knowing that if she accepted it, they

5    could at least claim to have paid rent once. She rejected the check, but they sued

6    anyway.

7        146.   Kaplan and Defendants Charles Houghton, Elyse Kaplan, and Matt

8    Kaplan all submitted statements to the court in support of the case against Ms.

9    Shulman. Ms. Kaplan's sworn statement misrepresents to the court the status and

10   efforts of Kaplan and Vertical regarding its licenses on Iron Angel and fails to

11   acknowledge the Cultivation Agreement or that Ms. Shulman is a rightful owner

12   of any and all licenses on the property. Ms. Kaplan also acknowledges that she

13   contacted regulators with false accusations about the Shulmans and thus she aided

14   Vertical in its efforts to strip Ms. Shulman of the licenses necessary to operate her

15   cannabis business. She also misrepresented to the court she understood that

16   Brandon Shulman and Drew Simons (his lawyer) were taking steps to remedy

17   violations raised by regulators in a Notice of Violation, when in fact Ms. Kaplan

18   was fully aware that Brandon did not have the requisite access to remedy any

19   issues with regard to the notices. Ms. Kaplan made all of the statements to assist

20   the enterprise in stealing Ms. Shulman's cannabis business. In aid of the

21   enterprise, Matt Kaplan told the court that he believed the Shulmans would use

22   physical force, including firearms, to keep him off the property after the

23   Cultivation Agreement was terminated, when in fact Mr. Kaplan knows that he

24   was politely handed the termination letter when he returned to Iron Angel and was

25   not threatened in any way. For his part, Todd Kaplan misrepresented the stated

26   purpose of the lease, omits any reference to the Cultivation Agreement, and

27   fabricated claims of "devastating" harm if he were not allowed to return to Iron

28   Angel.

147.   In early April 2019, the court gave Kaplan the right to enter Iron Angel on certain terms and the exclusive right to operate the cannabis business. Having received this temporary order from the court, Defendants immediately returned to Iron Angel and began harassing and intimidating Ms. Shulman at the doorstep of her house. For example, in violation of the court's order, which allowed only ingress and egress from the property, defendants parked a car on the property every night with two men in it. On the first night, they intimidatingly parked outside of Ms. Shulman's house. When Kaplan's lawyer told them to leave because they were violating the court's order, they refused to leave and moved even closer to the house. In order to continue this intimidation, they lied, claiming that the car was for security for their workers, even though the few workers assigned to the property were gone by 5:00 P.M. They repeated this lie not only to Ms. Shulman, but also to the court.

148.   Over time, Defendants increased the intimidation and harassment, playing loud music at night, urinating on the property, turning the engine of the car on and off to cause the dogs to bark repeatedly in the middle of the night. The sole purpose of the "security" vehicle was to harass Ms. Shulman and to harm her in whatever way they could.

149.   The court's order made Kaplan and Vertical solely responsible for the care of all plants to ensure successful 2019 harvests on Iron Angel. Under Kaplan's management, however, Vertical failed to properly manage the harvest and failed to obtain proper licenses to operate on Iron Angel. They also engaged in multiple regulatory violations, including employing an underaged worker. And they were cited, again, by the County of Santa Barbara for numerous violations on the property.

150.   Kaplan used the legal proceedings to cause damage to Ms. Shulman and to create substantial chaos and harm to Ms. Shulman's cannabis cultivation operation on Iron Angel. For instance, Vertical failed to pay the most basic

expenses on the property, such as comprehensive insurance and PG&E to ensure electricity ran to the greenhouses. Vertical received Notices of Violation from the California Water Board, which it ignored, which will result in substantial daily fines. Vertical allowed all of the temporary licenses to operate on Iron Angel to expire and otherwise failed to pursue licenses to ensure cultivation could continue on the property. Defendants failed to prep the fields for planting, and they failed to take care of young plants in the greenhouse; they also failed to make clones to ensure a successful future harvest. Vertical left significant cannabis waste in totes outside the greenhouses in violation of regulations associated with such waste. In short, they caused significant damage to the 2019 cultivation season, imperiling Ms. Shulman's efforts at mitigating damages Defendants had caused under the Cultivation Agreement, as well as her efforts to reestablish the business for successful harvests in future years.

151.   Defendants imposed substantial attorneys' fees and costs on Ms. Shulman, only to abandon the property, leaving the business in shambles. With no notice to Ms. Shulman, who had laid off a dozen or more workers when Kaplan took over the business again, Kaplan suddenly decided to abandon the property and voluntarily dissolve the court's order. Defendants then left the property, using the excuse that the business could not be salvaged because Ms. Shulman had damaged all the plants. This, of course, was another lie, easily disproven with photographic evidence.

152.   Kaplan's attorney then propounded extensive discovery on Ms. Shulman and demanded numerous depositions, imposing additional fees and costs on Ms. Shulman. Counsel for Ms. Shulman responded to discovery and prepared to take and defend multiple depositions, including protracted efforts to secure the deposition of Charles Houghton, who had successfully evaded service at his home in Colorado for weeks. But then, with no explanation whatsoever, Kaplan's attorney announced that Kaplan was voluntarily dismissing his case. This

announcement was coupled with a threat that Kaplan could bring his claims at another time in another forum—in other words, that Kaplan could at any time attempt once again to steal Ms. Shulman's business and property using the lease.

153.   On information and belief, Kaplan came to realize that by suing Ms. Shulman in superior court to re-gain control over the cultivation business that was established and governed by the Cultivation Agreement, he had made a serious miscalculation. He had waived the provision in the Cultivation Agreement requiring that disputes be mediated and arbitrated—which would allow Ms. Shulman to pursue her claims against him in court, where a jury would decide liability and damages. Kaplan was right about that.

## J.     Defendants' Conduct Caused Substantial Financial and Other Harm

154.   Defendants' conduct has resulted in substantial financial and other harm to Plaintiffs. For purely financial losses, Plaintiffs have been damaged in an amount not less than $67 million (an amount that does not include the substantial monetary damage Ms. Shulman sustained from the loss of her ownership interest in Wellsprings and Defendants' failure to develop and promote the Iron Angel brand). Plaintiffs are also entitled to treble damages and punitive damages for fraud, amounting to no less than $200 million.

155.   Defendants have failed to pay any amounts due under for the cultivation of cannabis on Iron Angel, Sisters, and Wellsprings. The few financial documents that have been made available to Ms. Shulman indicate that Defendants were improperly calculating profits from the 2017 Iron Angel and Sisters cannabis harvests and sales. Defendants thus intended to defraud Ms. Shulman, dramatically underestimating amounts due by making improper deductions from the gross revenue for non-agricultural staff compensation and travel expenses, as well as inflated costs for plants, soil, and landscape.

Baker Botts L.L.P.

156.   Defendants also deprived Plaintiffs of profits due to them from Iron Angel's 2018 harvest. Vertical sold, without compensating Ms. Shulman, at least 3,800 pounds of cannabis that year. Then, due to Defendants' breaches of the Cultivation Agreement, Ms. Shulman was forced to sell the remaining 6,200 pounds of cannabis at greatly reduced prices. This was due largely to Vertical's complete mismanagement and operation failures, including the failure to store and package the product correctly, causing it to mold. Defendants also harvested at least 22,000 pounds of cannabis from Wellsprings in 2018 and have paid Ms. Shulman nothing.

157.   The financial harm for the 2017 and 2018 harvests on all properties is multiplied due to Defendants' failure to meet the contractual requirement of providing on-site manufacturing, which would have allowed for sales at much higher prices. Defendants instead improperly sold product to their own affiliate at greatly reduced prices, so the affiliate could manufacture the product for final sale, fraudulently steering all profits to Defendants alone. For just the 2017 and 2018 harvests, Plaintiffs have been damages in an amount no less than $5 million.

158.   Defendants' actions described herein have also deprived Ms. Shulman of future profits for cultivation on all three properties—amounts that Defendants themselves have calculated for investors and thus are reasonably certain. These damages are no less than $60 million, based on Defendants' own plans and projections. Wellsprings, for example, was to be one of the largest cannabis grows in the world in 2019, and Ms. Shulman was entitled to 50 percent of those profits. Among other statements, Vertical told its investors that it had made sales in excess of $500,000 from Wellsprings in February 2019 and expected an additional $10 million in outdoor flower sales—all for the 2018 harvest.

159.   Defendants have caused other financial harm, including the failure to pay Ms. Shulman for a loan she made to Kaplan; for money owed for living expenses and other work done by Ms. Shulman; for money spent by Ms. Shulman

1   for living quarters; for 50 percent of infrastructure and equipment removed from

2   Sisters, taken to Wellsprings, and then ultimately removed from Wellsprings and

3   not returned; for unpaid vendors; for damage to Ms. Shulman's property on Iron

4   Angel; and for the damages caused to Ms. Shulman by Defendants' malicious

5   prosecution, as alleged herein.

6        160.   Defendants' fraudulent conduct also deprived Ms. Shulman of her

7   ownership interest in Wellsprings, a property that, by Defendants' own

8   admissions, was dramatically increasing in value.

9        161.   Defendants' failure to live up to their obligations to develop and

10   promote the Iron Angel brand has also resulted in monetary damages in the

11   millions of dollars.

12        162.   Defendants' infliction of emotional distress on Ms. Shulman also

13   resulted in substantial harm. After months of referring to Ms. Shulman as "family"

14   and expressing hope for a long-term relationship, Kaplan and other Defendants

15   embarked on a campaign of emotional torture. They screamed profanities at her,

16   told her to "stay behind the fence like the old lady she is," called her "stupid,"

17   "greedy" and a "loser," and told her she "had not worked hard enough," and did

18   "not deserve any of the business." Defendants made veiled threats to Ms. Shulman

19   by arriving on her property in black masks, parking close to her home in the

20   middle of the night, causing other disturbances outside her home in the night, and

21   intimidating her while driving on the freeway. Kaplan threatened to bury her in

22   litigation if she failed to comply with his demands to allow Vertical to take over

23   the business. Defendants also sought to ruin Ms. Shulman financially and to ruin

24   the reputation she had spent years developing in the community. Defendants

25   robbed her of her share of profits, destroyed her home, tarnished her reputation in

26   the community, took her life savings, and left her living in a destroyed "house" on

27   Iron Angel with little more than four walls. Kaplan then kept his promise and sued

28   Ms. Shulman to obtain possession of Iron Angel. Defendants also engaged in

BAKER BOTTS L.L.P.

1    vandalism of Ms. Shulman's property and violated the terms of temporary

2    restraining order to harass and intimidate her.

3          163.   Ms. Shulman's distress has manifested itself in a variety of physical

4    and emotional ways, as set forth below.

5          **K.    Ms. Shulman Is Not Defendants' Only Victim**

6          164.   As Defendants have sought to muscle their way into the California

7    cannabis industry at several levels simultaneously, they have been desperate to

8    portray Vertical as a company with significant assets and relationships. Their

9    misrepresentations in support of that goal have victimized not only Ms. Shulman,

10   but many other parties.

11                         **Dr. Donald Davidson**

12         165.   Dr. Davidson is a medical doctor who has been involved in the

13   medical cannabis field in California for many years. In 2017, Dr. Davidson met

14   Todd Kaplan at a meeting of a business networking organization known as the

15   Young Presidents Organization. Mr. Kaplan agreed, on behalf of Vertical, to be

16   part of a 50/50 joint venture into the "Dr. D" brand of cannabis products (CBD

17   oils, capsules, vape cartridges, etc.). Kaplan promised that Vertical could provide

18   state of the art manufacturing facilities, marketing/branding support, packaging, a

19   full-service sales team, and statewide distribution. Based on Kaplan's promises,

20   Dr. Davidson not only forewent other opportunities, but loaned hundreds of

21   thousands of dollars to Kaplan and Vertical. Vertical prominently displayed the

22   "Dr. D" brand in its promotional materials and listed Dr. Davidson as part of its

23   leadership team as a Medical Advisor. Kaplan and Vertical, however, did not

24   follow through on any of their promises to Dr. Davidson, badly mismanaged the

25   project, and refused to supply financial or operational records to him. When

26   Dr. Davidson sought repayment of the loans he had made, Kaplan grew angry,

27   verbally abusive, and refused to repay the loans or to abide by the terms of their

28   contractual arrangement. Kaplan forced Dr. Davidson, under economic duress, to

BAKER BOTTS L.L.P.

1  convert the loans into an equity investment in Vertical. In addition, on the morning

2  of the day this Complaint was filed, Kaplan called Dr. Davidson's mother and

3  threatened her. Kaplan told Dr. Davidson's 70-year-old mother that if she did not

4  make Dr. Davidson stop talking about Vertical, Kaplan would "bury" her in

5  litigation and "drain" Dr. Davidson's inheritance. Kaplan also made threats to her

6  amounting to blackmail. Dr. Davidson's parents had loaned approximately

7  $200,000 to Vertical, after which Kaplan bullied them, like so many others, into

8  signing a subscription agreement rather than repaying them.

9  ## Mr. and Mrs. Lugli

10  166.   As noted above, Rusty and Susan Lugli are the elderly owners of the

11  Wellsprings property. Defendants not only defrauded Ms. Shulman out of her

12  interest in Wellsprings, they also defrauded the Luglis. The Luglis have filed suit

13  in Santa Barbara Superior Court against Vertical and Kaplan, claiming fraud, elder

14  abuse, and other bases for relief. As the Luglis allege, Kaplan made material

15  misrepresentations and false promises to earn the Luglis' trust and confused them

16  in an effort to induce Rusty Lugli into investing $2,000,000 in Vertical through a

17  subscription agreement. Defendants made misrepresentations as to the financial

18  health of Vertical. Kaplan made statements that they were "family," that "he had

19  their best interest in mind," and that he was giving them a better deal under the

20  subscription agreement because they were "friends and family." The Luglis further

21  allege that Kaplan stated that the subscription agreement he wanted them to sign

22  was a mere formality and inconsequential. Kaplan led Mr. Lugli to believe that he

23  needed to sign the subscription agreement in order to receive the operating

24  agreement and financial disclosures that Kaplan had previously withheld. Kaplan

25  stated that after Mr. Lugli signed the subscription agreement the parties would

26  then be able to further negotiate a purchase price and enter into an "actual"

27  agreement.

28

BAKER BOTTS L.L.P.

**Calvin Frye**

167.   Calvin Frye is the owner of a cannabis dispensary in Studio City, California, called "Cloneville." Mr. Frye entered into an agreement with Kaplan for Kaplan to manage the dispensary. Mr. Frye filed a lawsuit against Kaplan in Los Angeles Superior Court claiming fraud, breach of contract, and other bases for relief. According to Mr. Frye, Kaplan's "ulterior motive in entering into the agreement was to take over plaintiff's valuable business." Kaplan had fraudulently concealed that he was a convicted felon, so he could not perform his obligations related to licensing and regulatory requirements under the contract. Frye alleges that after he learned of Kaplan's inability to comply with the obligations of the contract, he terminated the contract and soon learned of other breaches Kaplan committed while operating Frye's cannabis distribution business, including operating the business at illegal times and failing to pay Frye the portion of money he is due pursuant to the terms of the contract.

**Camie Cutter**

168.   Camie Cutter is trained as a commercial pilot. Rather than pursuing her career as a pilot, she entered the cannabis industry after cannabis became legal in Washington and Oregon. She developed expertise in all aspects of cannabis, especially in manufacturing of edible cannabis products and isolates of cannabis ingredients tetrahydrocannabinol (THC) and cannabidiol (CBD). She worked for Vertical from March 2018 to October 2018 as a cannabis consultant and sales person. Soon after joining, she realized that Vertical's executive team did not have nearly the expertise in cannabis that they had initially represented. She gave them a "Cannabis 101" presentation to help bring them up to speed on the various products that Vertical could bring to market. Eventually, she realized that Vertical was not interested in getting product on the shelves, that, in fact, it was a "massive fraud" based on "smoke and mirrors" and was solely interested in building up the appearance of a sophisticated cannabis company in order to lure investors. After

1   she left the company, Vertical refused to reimburse her for approximately $12,000

2   that it owed her for expenses she had incurred and approximately $10,000 that it

3   owed her in back pay unless she agreed to sign a non-disclosure and

4   non-disparagement agreement. She refused to sign and was never paid.

5   Representatives of Vertical threatened to bury her in litigation if she attempted to

6   legally seek repayment of the monies owed to her.

### Other Brand Affiliates

8   169.   Defendants have promoted Vertical's supposed expertise in brands

9   and distribution in appearances before potential investors and the media. At

10   various times, Defendants have touted the company's vast stable of brands (25-35

11   depending on the presentation) and its full distribution and sales capabilities. In

12   fact, however, when these representations were made the company was

13   distributing no brands. Indeed, most of its "brands" are nothing more than

14   concepts.

15   170.   To be sure, Defendants have entered into some arrangements with

16   companies that have existing cannabis brands. They secured those relationships,

17   however, through misrepresentation and have systematically taken advantage of

18   the founders of those brands. In these cases, the typical pattern was for Defendants

19   to invite the potential partner to the Vertical office which was designed to impart

20   an air of solidity and legitimacy. The office was curated with sports and music

21   memorabilia (which at least one former employee became convinced were fake).

22   To impart a sense of gravitas, prospective brand affiliates would invariably be

23   shown the office of former California State Senator Tony Strickland, who Vertical

24   lists as part of its leadership team, although according to former employees he

25   spent less than an hour each month at the offices. The office set aside for

26   Strickland was adorned with large U.S. and California flags and photos with

27   Strickland and prominent Republican politicians. Meanwhile, in the part of the

28   office that was not publicly facing, employees had to work on dirty folding tables

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1   and were given cheap computers that lacked even basic word processing or

2   spreadsheet software (if they were provided a computer at all).

3       171.   Defendants would pitch themselves to potential brand affiliates as

4   established, experienced, sophisticated, well-staffed, well-financed vertically

5   integrated cannabis organization with significant assets and a significant track

6   record. They would then seek to dazzle the potential partner with an array of

7   promises including resources (which often didn't exist), ambitious sales and

8   marketing plans, packaging ideas, events, expansion opportunities, etc. After

9   Defendants had lured the affiliate into signing up, things would then change. At

10  that point, Defendants had what they needed: a brand to add to the list, a logo to

11  add to their materials. The affiliate was then left to fend for themselves. Phone

12  calls would not be returned, and the promised plans, funds, and support would not

13  materialize or would be severely "slow-rolled." The affiliate's dream of building a

14  thriving cannabis-related business would begin to die from starvation.

15      172.   One employee who worked at Vertical in the branding department

16  and who regularly attended weekly senior leadership meetings in 2017 and 2018

17  ended up quitting because he had been consistently tasked with reassuring

18  increasingly agitated brand affiliates that their projects were progressing and under

19  control even though he knew from discussions with Defendants that Defendants

20  were not going to live up to their promises.

21  **Investors**

22      173.   Defendants' misrepresentations as to their interest in Iron Angel and

23  Wellsprings, the state of their manufacturing operations, their brands, their other

24  affiliations, their expertise, their licenses, their distribution network, and their

25  financial resources, are all designed to lure in potential investors. Defendants have

26  relied on the rapidly changing and expanding cannabis industry and frenzied pace

27  of investment (which some have likened to the dot-com craze of the late 1990s) to

28  avoid the type of detailed scrutiny that might otherwise expose their deception.

1   Defendants care much more about padding to their investment presentation,

2   website, and press packet with purported assets, affiliations, and deals than putting

3   in the effort to actually advance the business or get products on shelves.

4   Defendants' ultimate goal, it appears, is to cash out before the house of cards

5   comes tumbling down.

## V.   CLAIMS FOR RELIEF

### COUNT I

**Violation of the Federal Racketeer Influenced and Corrupt Organizations Act
(18 U.S.C. §§ 1962(c) and 1964(c))
(All Plaintiffs Against Todd Kaplan, Charles Houghton, and Vertical)**

11   174.   Plaintiffs repeat and reallege each of the allegations set forth in the

12   preceding paragraphs and in Counts III, IV, and V.

### RICO Standing, Injury, and Proximate Cause

14   175.   Each Plaintiff is a "person" as defined in 18 U.S.C. §1961(3) of

15   RICO as they are entities and individuals capable of holding a legal or beneficial

16   interest in property.

17   176.   Each Defendant is a "person" as defined in 18 U.S.C. §1961(3) of

18   RICO as they are entities and individuals capable of holding a legal or beneficial

19   interest in property.

20   177.   Plaintiffs sustained injury to their business or property by reason of

21   the acts and conduct of Defendants alleged in this Complaint, including

22   Defendants' scheme to take over Ms. Shulman's cannabis business, divert profits

23   belonging to Plaintiffs, wrest control of the Wellsprings opportunity from

24   Plaintiffs, induce Plaintiffs to forego the Sisters opportunity, misappropriate

25   Plaintiffs' Iron Angel brand, and maliciously prosecute an unlawful detainer

26   action. Defendants knowingly and willfully excluded Plaintiffs from cannabis

27   operations and cut Plaintiffs off from profits and expected profits to which they

28   were rightfully entitled under the Cultivation Agreement and Wellsprings

BAKER BOTTS L.L.P.

Agreement. Through a series of fraudulent statements and promises, Defendants induced Plaintiffs to sign the Iron Angel lease that they alleged gave Defendants sole right of possession of Iron Angel and to take numerous other actions for Defendants' benefit and to Plaintiffs' detriment. As a result, Plaintiffs lost control over their cannabis cultivation operation for a time at the Iron Angel Property, lost the opportunity to purchase and cultivate cannabis on the Wellsprings Property, among numerous and significant other injuries to their business and property interests.

178. Plaintiffs suffered concrete financial and other damages, including in the form of lost profits.

179. But for the conduct of Defendants alleged in this Complaint, Plaintiffs would not have been injured.

180. The losses suffered by Plaintiffs was proximately caused by Defendants, as the fraudulent scheme and enterprise was a direct and substantial factor in causing their injuries. As in *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008), the injuries suffered by Plaintiffs was "a foreseeable and natural consequence of [Defendants'] scheme" to force Plaintiffs out of the cannabis cultivation operations at Iron Angel, Wellsprings, and Sisters, misappropriate Plaintiffs' brand, and cut Plaintiffs off from the resulting profits—all part of an ongoing pattern of mail and wire fraud. Moreover, while Defendants have engaged in similar fraudulent schemes against similarly situated individuals and small businesses, there are no victims beyond Plaintiffs who are more directly injured by Defendants' scheme and enterprise who can be counted on to seek remedies under RICO.

181. The harm suffered by Plaintiffs amounts to compensable injury caused by Defendants' conduct of an enterprise through a pattern of racketeering. *Sedima, S.P.R.I. v. Imrex Co.*, 473 U.S. 479 (1985).

182. Plaintiffs were the target of the RICO scheme.

Baker Botts L.L.P.

## The Associated-in-Fact RICO Enterprise

183.   The following persons associated in fact as an "enterprise" within the meaning of 18 U.S.C. §1961(4) to defraud and steal from Ms. Shulman: Todd Kaplan, Charles Houghton, Matt Kaplan, Drew Milburn, Courtney Dorne, Smoke Wallin, Robert Scott, Elyse Kaplan, Jeff Silver, Vertical, Vertical Wellness, Vertical CR (Costa Rica), Iron Angel II, LLC, and NCAMBA9. The associated-in-fact enterprise is referred to as the "Kaplan Enterprise" and its constituents are referred to as the "Enterprise Associates."

184.   The Kaplan Enterprise is separate and distinct from the persons that constitute the enterprise and it is separate and apart from the pattern of racketeering activity alleged.

185.   As alleged herein, the Enterprise Associates conducted the affairs of the Kaplan Enterprise through a pattern of racketeering activity.

186.   **The Purpose of the Kaplan Enterprise.** The Kaplan Enterprise is an ongoing and continuing organization, formed for the common and shared purpose of portraying to the world and potential investors what appears, through smoke and mirrors, to be an established, experienced, sophisticated, well-staffed, well-financed vertically integrated cannabis organization with significant assets and a significant track record which, in fact, did not exist. The ultimate goal of the Kaplan Enterprise is to dupe and take advantage of unsuspecting affiliates and investors, before ultimately cashing out to leave its victims to sift through the wreckage. The means and methods the Kaplan Enterprise used in pursuit of this purpose included defrauding and otherwise taking unfair advantage of individuals, land owners, potential investors, and existing small business owners in and out of the cannabis industry. The Kaplan Enterprise regularly relied on threats, intimidation, and duress to achieve its ends. The Kaplan Enterprise used fraudulent methods to induce its victims to sign contracts in circumstances where the victim was unaware of the Kaplan Enterprise's true intentions. The Kaplan Enterprise

1  relied on elder abuse and frequently targeted elderly and other vulnerable victims.

2  The Kaplan Enterprise also cut corners and violated laws and regulations in

3  numerous ways including by seeking to fraudulently conceal that cannabis product

4  that it claimed was safe actually contained ingredients not fit for human

5  consumption. The Kaplan Enterprise defrauded Ms. Shulman and other business

6  owners by luring them into business deals with misrepresentations, concealments,

7  and false promises, fraudulently inducing them to sign over property and rights to

8  profits, and converting the benefits arising out of the business operations for

9  Kaplan Enterprise's sole benefit.

10      187.   Instead of putting in the work to start its own cannabis cultivation

11  operation, the Kaplan Enterprise sought to take over Ms. Shulman's business by

12  defrauding her in order to gain the advantage she had in owning an

13  already-operating cannabis cultivation business, the contractual rights she had that

14  would allow for expansion, taking advantage of her skill, expertise, community

15  relationships, her priority position for licensing and regulatory requirements, and

16  avoiding the numerous and significant other start-up costs. The Kaplan Enterprise

17  sought to similarly advantage itself from defrauding other owners of

18  already-operating cannabis businesses at differing levels of the cannabis

19  distribution chain. In so doing, Defendants have defrauded Plaintiffs of tens of

20  millions of dollars that rightfully belong to Plaintiffs.

21      188.   **The Relationship Among, and Conspiracy Between, Separate and**

22  **Distinct Associates.** In order to effectuate the fraudulent scheme and wrongfully

23  convert the funds and property of Plaintiffs, Defendants had to create a

24  relationship between the Enterprise Associates. These relationships facilitated and

25  enabled the theft and fraud.

26      189.   Each associate of the Kaplan Enterprise has an existence separate and

27  distinct from its participation in the racketeering activities of the Kaplan

28  Enterprise.

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

190.   The Kaplan Enterprise has an existence and structure that is separate and distinct from the other affairs of its members.

191.   The Enterprise Associates engage in business operations separate and distinct form other affairs of its members and separate and apart from their activities on behalf of the Kaplan Enterprise.

192.   The Enterprise Associates nevertheless became associated with the Kaplan Enterprise and conducted or participated in the affairs of the Kaplan Enterprise in addition to their own affairs. The activities engaged in by the Enterprise Associates are not, however, ordinary legitimate business activities, and in fact were unlawful.

193.   Each of the Enterprise Associates had a different and clearly defined role in the conduct of Kaplan Enterprise. All of the Defendants intended to further the fraud against Plaintiffs and agreed to participate in it:

- Todd Kaplan, the leader of the Kaplan Enterprise, is the founder and chief executive officer of Vertical Companies, CEO of NCAMBA9, and Managing Member of Iron Angel II, LLC. Kaplan engaged in numerous misrepresentations and fraudulent acts, as detailed herein. These include Kaplan's participation in the fraud related to the Iron Angel lease and the attempts to foreclose Ms. Shulman from the Sisters and Wellsprings properties. Kaplan also persuaded Ms. Shulman to loan Vertical approximately $320,000—the remainder of her life savings—to pursue joint initiatives under the Cultivation Agreement, while at the same time diverting the funds to use for his own benefit and failing to meet obligations under the Cultivation Agreement. When he was unwilling or unable to repay the loan in full, Kaplan sought to persuade Ms. Shulman to convert the loan into an investment in Vertical, and when she

BAKER BOTTS L.L.P.

1   declined he grew verbally and emotionally abusive and refused

2   to abide by the terms of their contract. Kaplan similarly tried to

3   pressure several others into making investments in Vertical.

4   Kaplan presided over weekly Monday morning meetings of key

5   members of the Kaplan Enterprise, where, on information and

6   belief, such members discussed Vertical's strategy, including

7   methods for enticing unsuspecting investors into purchasing

8   company "units," related businesses into partnering with

9   Vertical, and otherwise unsophisticated persons and entities

10   into parting with their financial and real property interests.

11   • Vertical is a multistate limited liability corporation, with

12   operations in at least California, Kentucky, and Arizona, and

13   international operations in Costa Rica. Kaplan owns a majority

14   of Vertical, and Vertical is used to carry out the Kaplan

15   Enterprise's purpose and is a primary vehicle for defrauding

16   affiliates and investors.

17   • Vertical CR (Costa Rica) is an entity that sought to takeover

18   Costa Rica Alchemy, an association studying and lobbying for

19   medical cannabis in Costa Rica and providing cannabis oil to

20   patients. Upon information and belief Vertical CR facilitated

21   cash payments to affiliates in Costa Rica in a manner designed

22   to avoid Financial Crimes Enforcement Network (FinCEN)

23   Report of International Transportation of Currency or

24   Monetary Instruments.

25   • Vertical Wellness, Inc. is an affiliate of Vertical and is a

26   recipient of ill-gotten gains from the Kaplan Enterprise and acts

27   as a constructive trustee of funds that rightfully belong to

28   Plaintiffs.

- Charles Houghton was in-house counsel and now a regulatory advisor for Vertical. He assisted the Kaplan Enterprise by providing advice on legal and regulatory issues. He engaged in fraud by gaining Plaintiffs' trust by leading them to believe that he was their attorney and inducing them to sign a lease based on material misrepresentations of fact. Houghton specifically told Ms. Shulman that the lease for Iron Angel was for licensing requirements, leading her to believe that it would only be treated as a formality, but not enforced on its terms, when in fact the lease was not necessary for any county or state licensing requirements and was later used as a basis of the Kaplan Enterprise's attempt to force Ms. Shulman off of Iron Angel. Houghton also steered used his position to defraud Ms. Shulman by directing all licenses to Kaplan and otherwise manipulating the licensing process to Kaplan's benefit and Ms. Shulman's detriment. Houghton also directed that operations stop on Sisters even though there was no legitimate purpose for doing so, and he aided his manipulation of the Sisters property by taking over all discussions of Ms. Shulman's lease on the property. Houghton was also instrumental in implementing Kaplan's scheme to steal the Wellsprings property and cannabis business from Ms. Shulman. Houghton regularly attended the Monday morning meetings of the Kaplan Enterprise.
- Matt Kaplan is Todd Kaplan's son. Matt was instrumental in carrying out the Kaplan Enterprise's plans, following Todd Kaplan's lead and instructions. He is the director of operations of Vertical. He was brought in to the Iron Angel

BAKER BOTTS L.L.P.

property operations near the end of 2017 and acted as the director of operations for the cannabis cultivation operations at the Iron Angel and Wellsprings. Matt Kaplan participated in the fraudulent scheme against Ms. Shulman by helping to push Ms. Shulman out of the business operations. In 2018, Matt Kaplan stopped sharing financial information about the business with Ms. Shulman, as was required under the Cultivation Agreement. Matt Kaplan further directed employees not to share information with Ms. Shulman. Matt Kaplan frequently misrepresented to investors that Vertical owned the Wellsprings Property. Matt physically assaulted Ms. Shulman's son, Randall. Matt Kaplan shouted obscenities at Ms. Shulman and told her she was "stupid" and "greedy," and he hoped she rots in the house on Wellsprings. He also helped vandalize Ms. Shulman's property, including as recently as April 2019, destroying the fence around her home. Matt Kaplan, at least initially, regularly attended the Monday morning meetings of the Kaplan Enterprise.

- Drew Milburn, the chief operating officer of Vertical Companies, was the middle-man and gate-keeper between Ms. Shulman and Todd Kaplan. He managed the Kaplan Enterprise operations. During the negotiations of the Cultivation Agreement, Kaplan represented to Ms. Shulman that Drew Milburn would be brought in to the Iron Angel property to manage the operations there. Instead, Milburn brought in young workers, including Matt Kaplan, with little or no experience in the cannabis industry or agriculture. Milburn oversaw a 2018 harvest at Iron Angel that produced a high

BAKER BOTTS L.L.P.

volume of low-quality product with the goal of operating Iron Angel at the lowest possible cost to strip Ms. Shulman of any profits. Milburn was involved in the financial matters related to sales from Iron Angel. Kaplan also enlisted Milburn to help strong-arm Ms. Shulman into taking the "generous" November 2018 offer to exchange her 50 percent interest in Wellsprings for one percent in Vertical. Milburn regularly attended the Monday morning meetings of the Kaplan Enterprise.

- Courtney Dorne, the president of Vertical brands, introduced Ms. Shulman to Todd Kaplan. She was integral to inducing Ms. Shulman to enter into a business relationship with Vertical. From the very beginning, Ms. Dorne used the reminder of her childhood friendship with Ms. Shulman's daughter-in-law to lure Ms. Shulman into a deal with Kaplan. She misrepresented the status of Vertical and what it was capable of offering Ms. Shulman. When Kaplan was unhappy, it was Ms. Dorne who reached out to the Shulmans, under the guise of friendship and trust, and encouraged Ms. Shulman to comply with Kaplan's demands—or else. Ms. Dorne visited Iron Angel in January 2019, stating that she intended to help resolve the conflict that was then arising between the parties. Though she denied having any knowledge of the problems between Ms. Shulman and Kaplan and his employees, after she heard Ms. Shulman's account of the problems they were experiencing with Kaplan, Vertical, and Vertical employees, she stopped communicating with Ms. Shulman. Ms. Dorne, like Matt Kaplan, was tasked with providing tours to investors and misrepresenting ownership of the property as that of Vertical.

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

To this day, Ms. Dorne has pictures of Iron Angel and Wellsprings on her publicly-accessible social media accounts and claims to own them. Ms. Dorne regularly attended the Monday morning meetings of the Kaplan Enterprise.

- Smoke Wallin, the president of Vertical and the president and chief executive officer of Vertical Wellness, joined Vertical in January 2018. Wallin is the face of the Kaplan Enterprise and, in step with Kaplan's demands, runs the company. Wallin was and remains heavily involved in fundraising for Vertical. On multiple occasions, Wallin joined potential investors on the Iron Angel and Wellsprings properties and often represented to the investors that Vertical owned the properties. Wallin was also responsible for branding of Iron Angel products, but repeatedly delayed and obstructed working with Ms. Shulman, instead prioritizing Vertical's own brands and profit potential. Wallin regularly attended the Monday morning meetings of the Kaplan Enterprise.

- Robert Scott is the brother and close confidant of Todd Kaplan. He is the chief technology officer of Vertical and has been described as the "brains behind the brawn" at Vertical. Robert Scott was present during the June 23 visit to Iron Angel and Ms. Shulman's June 26 visit to the Agoura Hills office where Kaplan misrepresented the virtues of partnering with Vertical. Robert Scott was included in numerous communications between Todd Kaplan and Ms. Shulman, including fraudulent emails regarding the Iron Angel lease that Defendants claimed was necessary for licensing requirements and emails regarding the feigned attempts in late 2018 to negotiate a revised deal.

BAKER BOTTS L.L.P.

1  Robert Scott also offered Ms. Shulman false assurances that

2  she would be compensated and misled Ms. Shulman about the

3  status of the Needles facility. He regularly attended the

4  Monday morning meetings of the Kaplan Enterprise.

5  • Elyse Kaplan, Vertical's corporate counsel, assisted in the legal

6  aspects of the cannabis business. She worked to obtain the state

7  and county licenses but did not take the appropriate steps to

8  have the licenses split as required by the Cultivation

9  Agreement, despite repeated reminders from Brandon Shulman

10  to do so, nor did she do so in a timely or complete manner.

11  Elyse Kaplan was responsible for addressing and resolving

12  Notices of Violations on the Iron Angel and Wellsprings

13  properties but did not do so. Elyse Kaplan further set up

14  accounts with regulatory authorities but declined to give

15  Ms. Shulman the access to which she was entitled.

16  • Jeff Silver, formerly the Chief Financial Officer and now a

17  strategic advisor to Vertical, was the self-declared "sole person

18  to coordinate all the financial aspects," of the cannabis

19  cultivation operation at Iron Angel and Wellsprings. Silver

20  admitted to Brandon Shulman that Vertical keeps two sets of

21  books to avoid reporting all cash income. He furthered the

22  fraud by providing Plaintiffs with materially false financial

23  information.

24  • Iron Angel II, LLC, is a limited liability corporation established

25  by Kaplan and Houghton in order to carry out various of the

26  Kapan Enterprise's schemes, including the scheme to defraud

27  Ms. Shulman and oust her from Iron Angel.

28

---

COMPLAINT                                    79                        CASE NO. 2:19-CV-05413

- NCAMBA9 is a corporation established by Kaplan in order to help carry out various of the Kaplan Enterprise's schemes. NCAMBA9 served as the operator under the Cultivation Agreement until those duties were delegated to Kaplan and Vertical.

194.   In these ways and others, each Defendant directly or indirectly participated in, managed aspects of, facilitated, or otherwise took some part in directing the unlawful activities comprising Kaplan Enterprise's affairs.

195.   The cooperation exhibited by the Enterprise Associates of Kaplan Enterprise fell outside the bounds of Defendants' normal commercial relationships and was undertaken to advance the corrupt practices of Kaplan Enterprise.

196.   **Continuous Existence.** The Kaplan Enterprise has had an ongoing and continuous existence sufficient to permit the Enterprise Associates to follow its fraudulent pursuits. The Enterprise Associates associated in fact to engage in a pattern of fraud against the Plaintiffs while concealing the true nature of their intentions and purpose, on an ongoing rather than ad hoc basis. None of the Enterprise Associates acted independently or in competition with one another, or otherwise in a manner contrary to Kaplan Enterprise's purpose.

197.   The Kaplan Enterprise has displayed a continuity of membership during the times relevant to this Complaint, during which time the Enterprise Associates acted continuously in their respective roles in the Kaplan Enterprise.

198.   During the times relevant to this Complaint, each Enterprise Associate was aware of the scheme to defraud the Plaintiffs and was a knowing and willing participant in that scheme.

199.   **Interstate Commerce.** Kaplan Enterprise engages in and its activities affected interstate and foreign commerce as it conducts business in multiple states within the United States and with foreign countries.

**Pattern of Racketeering Activity and Predicate Acts**

200.   All of the Enterprise Associates' predicate acts of racketeering set forth herein were so continuous so as to form a pattern of racketeering activity as defined by 18 U.S.C. §1961(5) in that: (a) Enterprise Associates engaged in multiple predicate acts of racketeering activity, i.e. indictable violations of 18 U.S.C. § 1341 (mail fraud) and 18 U.S.C. § 1343 (wire fraud), from at least 2017 through the present; (b) the conduct has become the Enterprise Associates' and Kaplan Enterprise's regular way of conducting business; and (c) is continuing and threatens to continue in the future.

201.   Defendants used interstate mails and wires to defraud Plaintiffs and others through a scheme by which Defendants sought to portray to the world and potential investors and affiliates what appears to be an established, legitimate, credible, experienced, sophisticated, well-staffed, well-financed vertically integrated cannabis organization with significant assets, a proven track record, the financial means and ability to conduct a large-scale, leading-edge cannabis operation including cannabis cultivation. With this façade of credibility and through extreme emotional manipulation, Defendants induced Ms. Shulman to take various actions, including entering into the Cultivation Agreement and the Wellsprings Agreement, assigning rights to Wellsprings to Kaplan, signing a lease based on fraudulent statements, and loaning capital to the business that Defendants had no intention of fully repaying. Defendants later resorted to threats, bullying, intimidation tactics, and duress in order to pressure Plaintiffs into foregoing their rights. Ms. Shulman was injured by the fraudulent scheme that was furthered by Defendants' mail and wire fraud.

202.   Defendants engaged in a similar pattern with other affiliates of Vertical, as alleged herein.

203.   The Enterprise Associates and Kaplan Enterprise's scheme to defraud Plaintiffs was furthered by the Enterprise Associates' use of mail and private or

BAKER BOTTS L.L.P.

commercial interstate carriers. Among the many acts of mail fraud are the following representative examples:

| Sample of Use of the Interstate mail and private or commercial interstate carriers in Violation of 18 U.S.C. §1341 | | | |
|---|---|---|---|
| Date | Carrier | Description | From/to |
| On or before December 12, 2017 | Interstate Mail—USPS | Payroll checks for numerous employees | From Alan Bramson on behalf of MIH to the Iron Angel Property for several employees |
| On or before January 1, 2018 | Interstate Mail—USPS | Check for $63,366.88 to cover mortgage on Iron Angel Property | From Jeff Silver on behalf of MIH, to Zion Agricultural Bank on behalf of Ms. Shulman. |
| On or before January 12, 2018 | Interstate Mail—USPS, tracking number 947011020088163160403 | Check to cover rent payment on the Sisters' Property | From Alan Bramson on behalf of MIH, to [Devine Mercy] on behalf of [Ms. Shulman] |
| On or after February 16, 2018 | Interstate Mail—USPS | Checks for $1,159.30 and $986.84, totaling $2146.14 to pay invoice from contractor | From Alan Bramson on behalf of MIH, to Westcoast Industries on behalf of Ms. Shulman |
| On or after April 11, 2018 | Interstate Mail--USPS | Money Order for $11,507 to reimburse Brandon Shulman for operation expenses incurred on his credit card. | From Jeff Silver on behalf of MIH, to Brandon Shulman. |

Numerous other uses of interstate mail occurred, including the recurring use of the United States Postal Service and UPS for delivery of payroll checks to the Iron Angel Property for employees and Ms. Shulman and Brandon Shulman. Each use by Defendants of the United States mails, in furtherance of and to execute the scheme, constitutes a separate mail fraud offense and is thus an act of racketeering

pursuant to 18 U.S.C. §1961(1).

204.   The Enterprise Associates and Kaplan Enterprise's scheme to defraud the Plaintiffs was furthered by the Enterprise Associates' use of the Interstate Wires. Through the course of the parties' business relationship, Defendants wired approximately $111,000 into Rabobank debit account number XXXXXXX92, held in the name of Eddy Street Management, LLC (an LLC owned by Kaplan) and Francine Shulman, which was used by Ms. Shulman and Brandon Shulman for operational expenses incurred in the cannabis cultivation operation and to reimburse Ms. Shulman and Brandon Shulman for operational expense charges placed on their personal credit cards. Defendants wired approximately $284,790 into Rabobank account number XXXXXXX26, held in the name of Eddy Street Management, LLC, to which Ms. Shulman and Brandon Shulman accessed and used for payroll expenses. Among the many acts of wire fraud are the following representative examples:

| Sample of Use of the Interstate Wires in Violation of 18 U.S.C. § 1343 | | | |
|---|---|---|---|
| Date | Method | Description | From/to |
| 8/30/2017 | Interstate Wire | $10,000 for payroll to Vertical Employees. | From Alan Bramson on behalf of MIH, to Ms. Shulman's Bank of America account number *****27, held in the name Iron Angel Ranch and Retreat, LLC, |
| 10/5/2017 | Interstate Wire | $42,000 for seasonal funding, used to cover payroll. | From Alan Bramson on behalf of MIH into Rabobank account number *******26 |
| On or before 12/15/2017 | Interstate Wire | $10,000 for operational expenses and reimbursement to Ms. Shulman and Brandon Shulman. | From Alan Bramson on behalf of MIH, to Rabobank debit account number *******92 |

BAKER BOTTS L.L.P.

1   Each use by the Enterprise Associates of interstate wires was made in furtherance

2   of and to execute the scheme, constitutes a separate wire fraud offense, and is thus

3   an act of racketeering pursuant to 18 U.S.C. § 1961(1).

4       205.   Defendants have engaged in similar patterns of fraudulent conduct

5   against similarly situated, small business owners who conduct cannabis cultivation

6   operations, as alleged above. On information and belief, Defendants have engaged

7   in similar patterns of fraudulent conduct with respect to individuals and entities not

8   yet identified herein.

9       206.   Defendants are a group of individuals who operated the Kaplan

10  Enterprise.

11      207.   Defendants were associated with or employed by Vertical from at

12  least 2017 through the filing of this Complaint.

13      208.   Commencing in 2017 and continuing through the filing of this

14  Complaint, Defendants conducted and/or participated in the conduct of Kaplan

15  Enterprise's affairs through a pattern of criminal racketeering activity.

16      209.   Defendants have engaged in a pattern of repeated racketeering

17  activity.

18      210.   All of the Defendants' predicate acts of racketeering set forth herein

19  were so related as to establish a pattern of racketeering activity as that term is

20  defined in 18 U.S.C. § 1961(5), as they had the same or similar purposes; i.e., to

21  defraud Ms. Shulman, and to convert, steal, and divert the Shulman's property,

22  assets, and entitlement to profits to their own benefit and use. They also involved

23  the same or similar participants and methods of commission and had similar

24  results, impacting the same or similar victims, namely the Plaintiffs.

25      211.   As a direct and proximate result of Defendants' violations of

26  18 U.S.C. § 1962(c), Plaintiffs have been injured in their business and property,

27  because their moneys, profits, and property have been wrongly diverted to and

28  converted by Defendants.

BAKER BOTTS L.L.P.

212.   By reason of the violation of 18 U.S.C. § 1962(c), Plaintiffs are entitled to treble damages.

213.   In bringing this action, Plaintiffs have and will incur attorney' fees and are entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

### COUNT II
**Violation of the Federal Racketeer Influenced and Corrupt Organizations Act (18 U.S.C. §§ 1962(d) and 1964(c)) (All Plaintiffs Against All Defendants)**

214.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs and in Counts III, IV, and V.

215.   Each of the defendants conspired with one another within the meaning of 18 U.S.C. § 1962(d) to violate 18 U.S.C. § 1962(c); that is to conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1)(B), 1961(5), and 1962(c), as alleged more fully herein.

216.   Defendants agreed to participate in an endeavor which, if completed, would constitute a violation of 18 U.S.C. § 1962(c).

217.   Defendants have knowingly and willfully agreed and conspired among themselves to violate 18 U.S.C. § 1962(c) by engaging in the pattern of racketeering activity set forth herein, in violation of 18 U.S.C. § 1962(d).

218.   As a direct and proximate result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs have been injured in their business or property because their monies, profits, and property have been wrongfully diverted to and converted by Defendants.

219.   By reason of the violation of 18 U.S.C. § 1962(d), Plaintiffs are entitled to treble damages.

220.   In bringing this action, Plaintiffs have and will incur attorney' fees and are entitled to an award of reasonable attorneys' fees under 18 U.S.C. § 1964(c).

## COUNT III
### Fraud — Intentional Misrepresentation
### (All Plaintiffs Against Todd Kaplan, Charles Houghton, Courtney Dorne, and Vertical)

221.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

### *Intentional Misrepresentations by Todd Kaplan*

222.   During the negotiation of the Cultivation Agreement and the agreements regarding the Wellsprings Property, Kaplan, acting in his capacity as an agent and employees of Vertical or the Kaplan Enterprise, represented numerous material falsehoods to Ms. Shulman. For example:

a.   On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman and others that he was innocent of any charge of past criminal conduct;

b.   On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman that he and Vertical had extensive expertise in the cannabis industry, with particular expertise in cannabis licensing and regulatory schemes;

c.   On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman that he managed a dispensary in Studio City, California called Cloneville and that he would use this position to place product from Iron Angel Ranch there;

d.   On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman that Vertical already had significant investor funding so Vertical was able and ready to spend significant capital on the Iron Angel cannabis cultivation

BAKER BOTTS L.L.P.

operation.

    e.    On or about July 21, 2017, Kaplan told Ms. Shulman that he intended to and had the financial means available to close on the Wellsprings Property;

    f.    On or about June 3, 2018, Kaplan told Ms. Shulman that a group from Mexico City had agreed to a $150 million investment.

    g.    On or about June 3, 2018 Kaplan told Ms. Shulman that the money was stuck in the bank in Florida, that Kaplan could see the money in the account but that the bank would not release it.

    h.    On May 4, 2018, Kaplan wrote to Ms. Shulman that "everyone keeps saying [the money] is coming." This refers to the money that Kaplan had misrepresented was coming from investors in Mexico City.

223.   Kaplan's representations were false when he made them.

224.   Kaplan knew that the representations were false when he made them.

225.   Kaplan intended that Ms. Shulman rely on the representations to her detriment including inducing her to enter a business relationship with him, foregoing business opportunities with others, and signing agreements giving Kaplan rights to Ms. Shulman's property and assets.

226.   Ms. Shulman reasonably relied on Kaplan's representations. Ms. Shulman reasonably trusted Kaplan's statements, in part due to his extensive emotional manipulation of her.

227.   Plaintiffs were harmed by these misrepresentations, as set forth above. Ms. Shulman's reliance on Kaplan's representations was a substantial factor in causing such harm.

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

### *Intentional Misrepresentations by Charles Houghton*

228.   During the process of applying for licenses for cultivation of cannabis on Iron Angel, Houghton, acting in his capacity as an agent and/or employee of Vertical or the Kaplan Enterprise, intentionally made material misrepresentations to Ms. Shulman. For example, on or about January 14, 2018, Houghton represented in an email to Ms. Shulman that the Lease for the Iron Angel Property was necessary "for licensing purposes." Defendants Drew Milburn, Todd Kaplan, Jeff Silver, and Robert Scott were copied.

229.   This representation was false when he made it.

230.   Houghton knew that the representation was false when he made it.

231.   By misrepresenting the nature of the lease and purporting it to be an inconsequential document and merely a formality necessary for obtaining the requisite licensing for the cannabis cultivation operation on Iron Angel and for Kaplan to fulfill his obligations under the Cultivation Agreement, and by leaving Ms. Shulman with the impression that the Lease would not be performed or enforced by either party, Houghton intended to induce Ms. Shulman to rely on the misrepresentation by executing the lease, giving Kaplan's LLC, Iron Angel II, rights to Ms. Shulman's property.

232.   On or about January 18, 2018, Ms. Shulman, in reasonable reliance on Defendants' fraudulent affirmations and misrepresentations, and without intent to be bound in any way that deviated from the Cultivation Agreement, executed the lease.

233.   The parties did not discuss the key terms in the lease, which Houghton dismissed as unimportant since the parties would not actually perform under the lease, and Houghton did not send the lease to Ms. Shulman's separate attorney.

234.   At the time Defendants made the representations set forth in this Complaint, Ms. Shulman had no reason to believe that the representations were untrue or that Defendants had any intention of enforcing the lease.

235.   Ms. Shulman reasonably trusted Houghton's misrepresentations because of her reasonable belief that he was representing her interests in an attorney-client relationship.

236.   As a direct and proximate result of Houghton's intentional fraud and misrepresentations, Plaintiffs suffered damages as set forth above, including, but not limited to, Defendants' trespass and damage to Iron Angel.

237.   Ms. Shulman' reliance on Houghton's representations was a substantial factor in causing the harm.

***Intentional Misrepresentations by Courtney Dorne***

238.   Prior to and during the negotiation of the Cultivation Agreement and the agreements regarding Wellsprings, Ms. Dorne, acting in her capacity as an agent and employee of Vertical or the Kaplan Enterprise, represented numerous material falsehoods to Ms. Shulman. For example:

a) On or about June 6, 2017, in a telephone conversation, Ms. Dorne represented that she was working with a financially stable company with existing indoor cultivation, manufacturing, brand partners, and dispensaries.

b) On or about June 6, 2017, in a telephone conversation, Ms. Dorne represented that Vertical had significant experience in the cannabis industry and in-house counsel with regulatory expertise.

c) On or about June 29, 2017, in a telephone conversation, Ms. Dorne represented to Ms. Shulman that Vertical was in the process of purchasing a one million square foot indoor grow space in Monterey, California.

239.   Ms. Dorne's representations were false when she made them (alleged on information and belief with respect to the purchase of the Monterey facility).

240.   Ms. Dorne knew that the representations were false when she made them.

241.   Ms. Dorne intended that Ms. Shulman rely on the representations to her detriment, including inducing her to enter a business relationship with Kaplan, foregoing business opportunities with others, and signing agreements giving Kaplan rights to Ms. Shulman's property and assets.

242.   Ms. Shulman reasonably relied on Ms. Dorne's representations. Ms. Shulman reasonably trusted Ms. Dorne's misrepresentations because of the longstanding personal relationship between Ms. Dorne and Ms. Shulman's daughter-in-law and because of Ms. Dorne's extensive emotional manipulation of Ms. Shulman.

243.   Plaintiffs were harmed by Ms. Dorne's misrepresentations, as set forth above. Ms. Shulman's reliance on Ms. Dorne's representations was a substantial factor in causing such harm.

**COUNT IV**
**Fraud — Concealment**
**(All Plaintiffs Against Todd Kaplan, Charles Houghton, Courtney Dorne, and Vertical)**

244.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

***Todd Kaplan's Concealments***

245.   During the negotiations of the Cultivation Agreement and throughout the pendency of the Parties' business relationship, Kaplan, acting in his capacity as agent and/or employee of Vertical or the Kaplan Enterprise, intentionally failed to disclose certain facts to Ms. Shulman, including but not limited to:

a.     That he had sworn to a federal judge that he was guilty of attempted tax evasion and admitted in open court to each of the

BAKER BOTTS L.L.P.

elements of the crime, and that Mr. Kaplan's criminal attorney had, on behalf of Mr. Kaplan, praised the professionalism of the prosecutor;

b. That his "felony conviction involve[ed] fraud, deceit, or embezzlement," which the State of California considers "substantially related to the qualifications, functions, or duties" of cannabis cultivation and "may be a basis for denying [a] license." 3 Cal. Code Reg. sec. 8113.

c. That Vertical was a startup and dependent on investors, and that the represented "investors" were actually lenders;

d. That Kaplan had no significant cannabis industry or regulatory expertise;

e. That Kaplan lacked sufficient funds to operate the business at Iron Angel, Sisters, or Wellsprings;

f. That Kaplan lacked sufficient funds to meet his obligations under the Cultivation Agreement or any other agreements made by the parties;

g. That Kaplan was obtaining funds from Dr. Davidson and others to finance the business with Ms. Shulman.

h. That Kaplan lacked sufficient funds to close on the purchase of Wellsprings.

i. That Kaplan had been locked out of the Cloneville dispensary and had been sued by its owner for fraud and breach of contract and faced allegations that he had entered into the agreement with the owner of the dispensary with the ulterior motive of taking over his business.

j. That the Lease would be used to claim a right to the Iron Angel Property, notwithstanding the Cultivation Agreement.

k.   That Vertical intended to make inside sales at below market prices to deprive Ms. Shulman of profit and obtain the profit at other points in Vertical's distribution operation.

246.   Kaplan had a duty to disclose these facts, because (1) they materially qualify other facts that he did disclose, (2) they were accessible only to him and not reasonably accessible to Ms. Shulman, (3) he actively concealed the facts, and (4) he had a relationship with Ms. Shulman that Kaplan actively sought to foster through emotional manipulation.

247.   Ms. Shulman did not know of the concealed facts.

248.   Kaplan intended to deceive Ms. Shulman by concealing the facts.

249.   Had those facts been disclosed, Ms. Shulman reasonably would have behaved differently.

250.   Ms. Shulman and her companies were harmed as alleged above.

251.   Kaplan's concealment was a substantial factor in causing such harm.

***Charles Houghton's Concealments***

252.   Houghton, acting in his capacity as agent and/or employee of Vertical or the Kaplan Enterprise, concealed material facts from Ms. Shulman, not telling her that, rather than the lease on Iron Angel being used merely for purposes of the licensing process, it was the intent of Defendants to enforce the terms of the lease to deprive Ms. Shulman of access to her land.

253.   Houghton concealed this fact, intending to induce Ms. Shulman into executing the lease.

254.   Had Houghton disclosed the fact that the Iron Angel lease was not just for licensing purposes, but that Defendants intended to enforce its terms, Ms. Shulman would not have signed it.

255.   Houghton had a duty to disclose these facts because (1) he was acting as her attorney and had a fiduciary relationship or otherwise attempted to foster a relationship of trust, (2) the facts he concealed materially qualify other facts that

BAKER BOTTS L.L.P.

1   he disclosed, (3) the concealed facts were accessible only to him and not

2   reasonably accessible to Ms. Shulman, and (4) he actively concealed the facts.

3       256.   As a direct and proximate result of Houghton's concealment,

4   Ms. Shulman and her companies suffered damages, as alleged above.

5       257.   Ms. Shulman' reliance on Houghton's concealments was a substantial

6   factor in causing the harm.

7       ***Courtney Dorne's Concealments***

8       258.   Ms. Dorne, acting in her capacity as agent and/or employee of

9   Vertical or the Kaplan Enterprise, concealed material facts from Ms. Shulman. She

10  did not tell Ms. Shulman that Vertical was without the financial and business

11  resources and expertise necessary to run a successful cannabis business. She did

12  not tell Ms. Shulman that Vertical was misleading potential investors and brand

13  partners to believe that Vertical solely owned Iron Angel and Wellsprings and the

14  rights to the lucrative cannabis business on those properties.

15      259.   Ms. Dorne concealed these facts intending to induce Ms. Shulman

16  into trusting Defendants and assigning her property and financial interests to them.

17      260.   Had Ms. Dorne disclosed these facts to her, Ms. Shulman would not

18  have entered into any agreements with Kaplan or Vertical.

19      261.   Ms. Dorne had a duty to disclose these facts because (1) they

20  materially qualify other facts that she did disclose, (2) they were accessible only to

21  her and not reasonably accessible to Ms. Shulman, (3) she actively concealed the

22  facts, and (4) she had a relationship of trust with Ms. Shulman that Ms. Dorne

23  actively sought to foster through emotional manipulation.

24      262.   Ms. Shulman did not know of the concealed facts.

25      263.   Ms. Dorne intended to deceive Ms. Shulman by concealing the facts.

26      264.   Had those facts been disclosed, Ms. Shulman reasonably would have

27  behaved differently.

28      265.   Ms. Shulman and her companies were harmed as alleged above.

BAKER BOTTS L.L.P.

266.   Ms. Dorne's concealment was a substantial factor in causing such harm.

## COUNT V
### Negligent Misrepresentation
### (All Plaintiffs Against Todd Kaplan, Charles Houghton, Courtney Dorne, and Vertical)

267.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

### *Negligent Misrepresentations by Todd Kaplan*

268.   During the negotiation of the Cultivation Agreement and the agreements regarding the Wellsprings Property, Kaplan, acting in his capacity as an agent and employees of Vertical or the Kaplan Enterprise, represented numerous material falsehoods to Ms. Shulman. For example:

    a.    On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman and others that he was innocent of any charge of past criminal conduct.

    b.    On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman that he and Vertical had extensive expertise in the cannabis industry, with particular expertise in cannabis licensing and regulatory schemes.

    c.    On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman that he managed a dispensary in Studio City, California called Cloneville and that he would use this position to place product from Iron Angel Ranch there.

    d.    On or about June 23, 2017, in Vertical's Agoura Hills office, Kaplan told Ms. Shulman that Vertical already had significant investor funding so Vertical was able and ready to spend significant capital on the Iron Angel cannabis cultivation operation.

BAKER BOTTS L.L.P.

e.   On or about July 21, 2017, Kaplan told Ms. Shulman that he
intended to and had the financial means available to close on
the Wellsprings Property.

f.   On or about June 3, 2018, Kaplan told Ms. Shulman that a
group from Mexico City had agreed to a $150 million
investment.

g.   On or about June 3, 2018, Kaplan told Ms. Shulman that the
money was stuck in the bank in Florida, that Kaplan could see
the money in the account but that the bank would not release it.

h.   On May 4, 2018, Kaplan wrote to Ms. Shulman that "everyone
keeps saying [the money] is coming."

269.   Kaplan's representations were false when he made them.

270.   Kaplan had no reasonable grounds for believing the representations
were true when he made them.

271.   Kaplan intended that Ms. Shulman rely on these representations to her
detriment including inducing her to enter a business relationship with him,
foregoing business opportunities with others, and signing agreements giving
Kaplan rights to Ms. Shulman's property and assets.

272.   Ms. Shulman reasonably relied on Kaplan's representations.
Ms. Shulman reasonably trusted Kaplan's statements, in part due to his extensive
emotional manipulation of her.

273.   Plaintiffs were harmed by these misrepresentations, as set forth
above. Ms. Shulman's reliance on Kaplan's representations was a substantial
factor in causing their harm.

### Negligent Misrepresentations by Charles Houghton

274.   During the process of applying for licenses for cultivation of cannabis
on Iron Angel, Houghton, acting in his capacity as an agent and/or employee of
Vertical or the Kaplan Enterprise, intentionally made material misrepresentations

BAKER BOTTS L.L.P.

to Ms. Shulman. For example, on or about January 14, 2018, Houghton represented in an email to Ms. Shulman that the Lease for the Iron Angel Property was necessary "for licensing purposes." Defendants Drew Milburn, Todd Kaplan, Jeff Silver, and Robert Scott were copied.

275. This representation was false when he made it.

276. Houghton had no reasonable grounds for believing the representation when he made it.

277. By misrepresenting the nature of the Lease Agreement and purporting it to be an inconsequential document and merely a formality necessary for obtaining the requisite licensing for the cannabis cultivation operation on Iron Angel and for Kaplan to fulfill his obligations under the Cultivation Agreement, and by leaving Ms. Shulman with the impression that the Lease would not be performed or enforced by either party, Houghton reasonably induced Ms. Shulman to rely on the misrepresentation by executing the Lease Agreement giving Kaplan's LLC, Iron Angel II, rights to Ms. Shulman property.

278. On or about January 18, 2018, Ms. Shulman, in reasonable reliance on Defendants' fraudulent affirmations and misrepresentations, and without intent to be bound in any way that deviated from the parties existing Cultivation Agreement, executed the Lease Agreement.

279. The parties did not discuss the key terms in the lease, which Houghton dismissed as unimportant since the parties would not actually perform under the lease, and Houghton did not send the lease to Ms. Shulman's separate attorney.

280. At the time Houghton made the representations set forth in this Complaint, Ms. Shulman had no reason to believe that the representations were untrue or that Defendants had any intention of enforcing the lease.

281.   Ms. Shulman reasonably trusted Houghton's misrepresentations because of her reasonable belief that he was representing her interests in an attorney-client relationship.

282.   As a direct and proximate result of Houghton's misrepresentations, Plaintiffs suffered damages as set forth above, including, but not limited to, Defendants' trespass and damage to Iron Angel.

283.   Ms. Shulman's reliance on Houghton's representations was a substantial factor in causing the harm.

### Negligent Misrepresentations by Courtney Dorne

284.   Prior to and during the negotiation of the Cultivation Agreement and the agreements regarding Wellsprings, Ms. Dorne, acting in her capacity as an agent and employee of Vertical or the Kaplan Enterprise, represented numerous material falsehoods to Ms. Shulman. For example:

    d) On or about June 6, 2017, in a telephone conversation, Ms. Dorne represented that she was working with a financially stable company with existing indoor cultivation, manufacturing, brand partners, and dispensaries.

    e) On or about June 6, 2017, in a telephone conversation, Ms. Dorne represented that Vertical had significant experience in the cannabis industry and in-house counsel with regulatory expertise.

    f) On or about June 29, 2017, in a telephone conversation, Ms. Dorne represented to Ms. Shulman that Vertical was in the process of purchasing a one million square foot indoor grow space in Monterey, California.

285.   Ms. Dorne's representations were false when she made them (alleged on information and belief with respect to the purchase of the Monterey facility).

Baker Botts L.L.P.

286.   At the time Ms. Dorne made the representations set forth in this Complaint, Ms. Shulman had no reason to believe that the representations were untrue.

287.   Ms. Shulman reasonably trusted Ms. Dorne's misrepresentations because of her reasonable belief that Ms. Dorne valued her longstanding personal relationship with the Shulman family and had promised to "navigate the waters together" with the Shulmans.

288.   As a direct and proximate result of Ms. Dorne's misrepresentations, Plaintiffs suffered damages as set forth above.

289.   Ms. Shulman's reliance on Ms. Dorne's representations was a substantial factor in causing the harm.

**COUNT VI**
**Breach of Contract — Cultivation Agreement**
**(All Plaintiffs Against Todd Kaplan, NCAMBA9, and Vertical)**

290.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

291.   NCAMBA9, Inc., on the one hand, and Ms. Shulman as trustee for the Shulman Family Trust, 3F, Inc., and Emerald Sky on the other hand, entered into the Cultivation Agreement.

292.   Plaintiffs did all, or substantially all, of the significant things that the Cultivation Agreement required them to do.

293.   Vertical (as NCAMBA9's "management company") was required to: a) pay all Operational Expenses, as that term is defined in the Cultivation Agreement; b) keep and maintain detailed expense and accounting records of all expenses and revenue stemming from its activities so it could track and report revenue and Net Income; c) provide to the Collectives quarterly Profit and Loss statements and related financial information of NCAMBA9's operations; d) make payments to the Collectives quarterly; e) permit the Collectives to audit the books

BAKER BOTTS L.L.P.

and records of NCAMBA9 to confirm that all payments had been properly calculated and paid; f) use Best Efforts to manage the Cultivation Operations in the most efficient and effective manner possible under the circumstances; g) take all steps necessary or prudent on behalf of The Shulman Trust and the Collectives to ensure all Cultivation Operations on the properties were conducted in strict accordance with applicable California law and any County ordinance, rules or regulation; and h) obtain from The Shulman Trust pre-approval for actions requiring a building, zoning land use or other permit.

294.   Vertical failed to a) pay all Operational Expenses, as that term is defined in the Cultivation Agreement; b) keep and maintain detailed expense and accounting records of all expenses and revenue stemming from its activities so it can track and report revenue and Net Income; c) provide to the Collectives quarterly Profit and Loss statements and related financial information of Vertical's operations; d) make payments to the Collectives quarterly; e) permit the Collectives to audit the books and records of Vertical to confirm that all payments have been properly calculated and paid; improperly disclosed Confidential Information; f) use Best Efforts to manage the Cultivation Operations in the most efficient and effective manner possible under the circumstances; g) take all steps necessary or prudent on behalf of The Shulman Trust and the Collectives to ensure all Cultivation Operations on the properties are conducted in strict accordance with applicable California law and any County ordinance, rule or regulation; and h) obtain from The Shulman Trust pre-approval for actions requiring building, zoning land use or other permits.

295.   Ms. Shulman was harmed as alleged above.

296.   Vertical's breach of contract was a substantial factor in causing Ms. Shulman harm.

297.   As a direct and proximate result of Defendants' material breaches of the Cultivation Agreement, Ms. Shulman was harmed as alleged above.

**COUNT VII**
**Breach of Oral Contract — Wellsprings Agreement**
**(Ms. Shulman Against Todd Kaplan, NCAMBA9, and Vertical)**

298.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

299.   Iron Angel II, Kaplan, and Vertical entered into an oral contract with Ms. Shulman whereby Defendants agreed to: a) pay all Wellsprings operational expenses; b) keep and maintain detailed expense and accounting records of all Wellsprings expenses and revenue stemming from its activities so it can track and report revenue and Net Income; c) provide to Ms. Shulman quarterly Profit and Loss statements and related financial information of Wellsprings operations; d) make payments to Ms. Shulman quarterly; e) permit Ms. Shulman to audit the Wellsprings books and records to confirm that all payments had been properly calculated and paid; f) use Best Efforts to manage the Wellsprings Ranch Cultivation Operations in the most efficient and effective manner possible under the circumstances; g) take all steps necessary or prudent on Ms. Shulman's behalf to ensure all Cultivation Operations on Wellspring were conducted in strict accordance with applicable California law and any County ordinance, rules and regulations; and h) obtain from Ms. Shulman pre-approval for actions requiring a building, zoning land use or other permit on Wellspring.

300.   The oral agreement is supported by numerous communications among the parties, including messages describing cultivation efforts on Wellsprings, communications from Mr. Silver with Wellsprings expense detail, a December 14, 2018, letter from Kaplan describing his and Ms. Shulman's acquisition of rights to Wellsprings, and a January 4, 2019, message from Smoke Wallin confirming that Wellsprings was part of the "original deal." The Wellsprings Agreement also is evidenced by Kaplan's partial payments toward the purchase of Wellsprings, his and Houghton's communications regarding the

1   renegotiation of the original Wellsprings Purchase Agreement and lease, the

2   November 2017 profit sharing agreement with the Luglis, Vertical's attempt to

3   manage operations on the property, and its having cultivated and sold product

4   from Wellsprings.

5       301.   Defendants breached the oral contract with Ms. Shulman by failing to

6   a) pay all Operational Expenses; b) keep and maintain detailed expense and

7   accounting records of all expenses and revenue stemming from its activities so it

8   can track and report revenue and Net Income; c) provide to Ms. Shulman quarterly

9   Profit and Loss statements and related financial information of Vertical's

10  operations; d) make payments to Ms. Shulman quarterly; e) permit Ms. Shulman to

11  audit Vertical's books and records to confirm that all payments had been properly

12  calculated and paid; f) use Best Efforts to manage the Cultivation Operations in

13  the most efficient and effective manner possible under the circumstances; g) take

14  all steps necessary or prudent on Ms. Shulman's behalf to ensure all Cultivation

15  Operations on the properties are conducted in strict accordance with applicable

16  California law and any County ordinance, rule or regulation; and h) obtain from

17  Ms. Shulman pre-approval for actions requiring building, zoning land use or other

18  permits.

19      302.   As a direct and proximate cause of Defendants' breaches,

20  Ms. Shulman has been harmed 'as alleged above.

21              **COUNT VIII**
        **Breach of Oral Contract — Branding Agreement**
22  **(Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan, and Vertical)**

23

24      303.   Plaintiffs repeat and reallege each of the allegations set forth in the

25  preceding paragraphs.

26      304.   On or around July 19, 2017, Ms. Shulman and Iron Angel, on the one

27  hand, and Kaplan and Vertical, on the other, entered into an oral contract whereby

28  Defendants agreed to launch one or more brands, including specifically "Iron

BAKER BOTTS L.L.P.

---

COMPLAINT                           101                        CASE NO. 2:19-CV-05413

Angel," as well as other brands Ms. Shulman identified by a) "seeding" insertions about Iron Angel into new product reviews and podcasts focusing on women, seniors and wellness; b) creating a website, promotional, social media and a media kit focused on Iron Angel; c) creating packaging for single pre-roll and vape pen; d) creating promotional items, such as tee shirts, caps and stickers; and e) developing the Iron Angel logo.

305.   Defendants also agreed to fund the branding efforts of a designer and, to that end, hired two employees to help Ms. Shulman develop the Iron Angel brand.

306.   In exchange, Ms. Shulman agreed to a) be the "face" of the Iron Angel brand and b) permit the Iron Angel brand to be used in connection with the cultivation operations on Iron Angel and Wellsprings pursuant to the Cultivation Agreement and Wellsprings Agreement.

307.   On information and belief, Ms. Shulman signed a written branding agreement, but Defendants failed to provide her with a copy. Nonetheless, the agreement is evidenced by numerous communications between Ms. Shulman and various Vertical employees and agents, as alleged above.

308.   Ms. Shulman did all or substantially all of the significant things that the contract required her to do.

309.   Defendants breached the oral contract by failing to create for Ms. Shulman the branding elements described above, and by taking the brand trademark for Vertical's own use, thereby misappropriating Ms. Shulman's "Iron Angel" mark.

310.   As a direct and proximate result of Defendants' material breaches of the oral agreement, Plaintiffs have been damaged as alleged above.

BAKER BOTTS L.L.P.

**COUNT IX**
**Breach of Implied Covenant of Good Faith and**
**Fair Dealing — Cultivation Agreement**
**(Ms. Shulman Against NCAMBA9 and Vertical)**

311.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

312.   Ms. Shulman and Kaplan entered into a contract whereby the parties agreed to jointly operate a cannabis farm on the properties for medical and adult recreational use. Kaplan and Vertical agreed to manage cultivation operations, with Ms. Shulman's active engagement, pay operational expenses, and share all net profits with Ms. Shulman.

313.   The Cultivation Agreement contained, by operation of law, an implied covenant of good faith and fair dealing that neither party will do anything that will injure the rights of the other to receive the benefits of the agreement.

314.   Ms. Shulman did all or substantially all of the significant things that the contract required her to do.

315.   All conditions required for Defendants' performance had occurred. In fulfilling their duty to act in good faith under the Cultivation Agreement, Defendants were required to act in the venture's best interest by, at least, using best efforts to ensure product was sold at fair market value, that operator licenses were procured on behalf of the business, that Ms. Shulman's interest in the business, rights in real property and entitlement to profits were not hindered;

316.   Defendants unfairly interfered with Ms. Shulman's right to receive the benefits of the contract by engaging in self-dealing and intentionally selling product at below-market prices to Defendants' affiliate companies in order to generate greater profits and retain them for themselves while preventing Ms. Shulman from reaping the benefit of the bargain under the Cultivation Agreement.

317.   Ms. Shulman was harmed as alleged above.

**COUNT X**
**Breach of Implied Covenant of Good Faith and**
**Fair Dealing — Wellsprings Agreement**
**(Ms. Shulman Against Todd Kaplan, NCAMBA9, and Vertical)**

318.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

319.   Ms. Shulman, on the one hand; and Kaplan and Vertical, on the other; entered into a contract whereby the parties agreed to jointly operate a cannabis farm on Wellsprings Ranch for medical and adult recreational use. Defendants agreed to manage cultivation operations, with Ms. Shulman's active engagement, pay operational expenses, and share all net profits with Ms. Shulman;

320.   The Wellsprings agreement contained, by operation of law, an implied covenant of good faith and fair dealing, whereby each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

321.   Ms. Shulman did all, or substantially all of the significant things that the contract required her to do.

322.   All conditions required for Defendants' performance had occurred.

323.   Kaplan unfairly interfered with Ms. Shulman's right to receive the benefits of the contract by engaging in self-dealing and intentionally selling product at below-market prices to Defendants' affiliate companies in order to generate greater profits and retain them for himself while preventing Ms. Shulman from reaping the benefit of the bargain under the parties' agreement.

324.   Ms. Shulman was harmed as alleged above.

**COUNT XI**
**Breach of Implied Covenant of Good Faith and**
**Fair Dealing — Branding Agreement**
**(Ms. Shulman and Iron Angel, LLC Against Todd Kaplan and Vertical)**

325.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

326.   Ms. Shulman and Iron Angel, LLC, on the one hand, and Kaplan and Vertical, on the other hand, entered into a contract whereby Defendants agreed to provide branding services to Ms. Shulman and Iron Angel for purposes of promoting and marketing the Iron Angel brand.

327.   The branding agreement contained, by operation of law, an implied covenant of good faith and fair dealing, whereby each party will not do anything to unfairly interfere with the right of any other party to receive the benefits of the contract.

328.   Ms. Shulman and Iron Angel did all, or substantially all of the significant things that the contract required them to do.

329.   All conditions required for Kaplan's and Vertical's performance had occurred.

330.   Kaplan and Vertical unfairly interfered with Plaintiffs' right to receive the benefits of the contract by a) intentionally delaying efforts to develop branding and promotional materials for Ms. Shulman's and Iron Angel LLC's use, and b) misappropriating the Iron Angel brand for Vertical's own use in promotional and investor materials.

331.   Ms. Shulman and Iron Angel were harmed as alleged above.

### COUNT XII
### Unfair Competition — Bus. & Prof. Code § 17200
### (Ms. Shulman Against Todd Kaplan, Iron Angel II, LLC, and Vertical)

332.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

333.   California Business and Professions Code Section 17200 et seq. prohibits any unlawful, unfair, or fraudulent business acts or practices. Section 17200 imposes strict liability for violations and does not require proof that Defendants intended to injure anyone.

334.   *Defendants' Unlawful Practices*. Section 17200 borrows violations of other laws and treats those transgressions, when committed as business activity, as "unlawful" business practices. The unlawful practices prohibited by section 17200 are any practices forbidden by law, be it civil or criminal, federal, state, or municipal, statutory, regulatory, or court-made. Defendants have engaged in numerous unlawful business practices, as alleged herein, including submitting fraudulent affidavits to the County of Santa Barbara in order to procure operator licenses, infringing Ms. Shulman's rights in the Iron Angel trademark, breaching the parties' agreements related to cultivation on Iron Angel, Sisters, and Wellsprings; engaging in fraudulent behavior designed to mislead Ms. Shulman into believing the business venture was for everyone's benefit and concealing material facts from them about Kaplan's felony plea and their efforts to retain financial profits for the benefit of Kaplan's other business entities, such as Vertical and Iron Angel II; coaxing Ms. Shulman into sharing proprietary and confidential information about cultivation processes and then misappropriating, without just compensation, the same for Defendants' own use; and for violations of Welfare & Institutions Code Section 15610.30 for financial elder abuse, violations of the Federal RICO Act, as alleged above.

335.   Defendants have falsely represented that Defendants' products and services are the same as Plaintiffs' products and services, which are familiar to many California consumers. By these misrepresentations, Defendants have deceived consumers into believing that Defendants or their products and services are, or are affiliated with, Plaintiffs and their products and services. In doing so, Defendants have traded on the goodwill of Plaintiffs' Iron Angel name and trademark to compete unfairly against Plaintiffs' goods and services.

336.   *Defendants' Unfair Practices*. At all times relevant, Defendants engaged in unfair business practices, as alleged herein. Their conduct offends established public policy and is immoral, unethical, oppressive, unscrupulous, and

1   substantially injurious. Defendants and Ms. Shulman were engaged in a business
2   founded on the idea that Kaplan and Ms. Shulman would benefit equally from its
3   operations. As business partners, Defendants owed Ms. Shulman a duty to act in
4   the best interests of the business venture. Instead, Defendants' efforts, throughout
5   the relationship, were aimed at separating Ms. Shulman from her pre-established
6   and ongoing financial and property rights in Iron Angel, Sisters, and Wellsprings.

7        337.   Taking advantage of Ms. Shulman's relative lack of sophistication
8   with regard to legal matters, Defendants routinely misled Ms. Shulman about
9   Kaplan and his business operations, including Vertical's lack of stability and
10  resources to carry out Kaplan's promises under the Cultivation and Wellsprings
11  Agreements, ownership of "state-of-the art" facilities that were little more than
12  unused buildings, business dealings with numerous partners that had zero backing
13  or substance, and the status of their own business (including keeping two sets of
14  financials so as to hide actual revenue and production numbers from
15  Ms. Shulman).

16       338.   Defendants also prepared legal instruments for Ms. Shulman and
17  induced her to sign them based on misrepresentations. Defendants regularly misled
18  Ms. Shulman as to the true meaning of such legal documents and hid from her the
19  intended consequences of those materials. For instance, Kaplan and Houghton
20  prepared the Iron Angel lease claiming it was necessary for regulatory approval,
21  when instead it purported to give Kaplan long-term rights to possess and use Iron
22  Angel. Houghton also had Ms. Shulman prepare a number of affidavits supporting
23  her legal nonconforming use of the properties, implying that he would obtain
24  licenses in her name when, in fact, Houghton pursued licenses only for Kaplan's
25  company, Iron Angel II, LLC. Houghton and Kaplan prepared, and instructed
26  Ms. Shulman to sign, an assignment of rights in Wellsprings, giving Kaplan an
27  undivided joint interest in the property, which Kaplan used to a) claim he was

28

1    rightfully in possession of Wellsprings and b) attempt to extract millions of dollars

2    from Ms. Shulman.

3        339.    Defendants encouraged Ms. Shulman to leave her home on Iron

4    Angel to take up residence at Wellsprings so they could convert her home to a

5    processing center. But Defendants failed to complete the processing center and, in

6    the process, completely disassembled the residence to the point that it is no more

7    than walls and a dilapidated roof. When Defendants subsequently defaulted on the

8    Wellsprings Agreement, Ms. Shulman was forced to return to the home that was

9    then in shambles. The home no longer had a kitchen or bathroom, and

10   Ms. Shulman was forced to rent a hotel room (so she could shower) and to place a

11   temporary toilet on Iron Angel.

12       340.    By engaging in these acts, and others alleged herein, Defendants

13   showed no regard for Ms. Shulman's business or for her welfare or dignity.

14   Defendants' behavior is particularly egregious because they have an established

15   practice of preying on the elderly to strip them of their property for Defendants'

16   own gain while suggesting they are "family" and wish to establish a long-term

17   relationship for their mutual benefit. Ms. Shulman has been engaged in the

18   cultivation business (whether produce or cannabis) for more than 20 years. Prior to

19   partnering with Defendants, Ms. Shulman was successful and in compliance with

20   all local and state laws, rules and regulations. She had cultivated important

21   relationships with local vendors, County employees, and clients. Defendants'

22   conduct has injured Ms. Shulman's reputation in the community and stripped her

23   of important and demonstrably lucrative property rights.

24       341.    *Defendants' Fraudulent Practices.* At all times relevant, Defendants

25   engaged in the fraudulent business activities described herein.

26       342.    After negotiating the Cultivation Agreement with Ms. Shulman,

27   Kaplan fraudulently induced Ms. Shulman to sign the Iron Angel lease and the

28   Amendment to the Purchase Sale Agreement regarding Wellsprings. Kaplan then

BAKER BOTTS L.L.P.

persuaded Ms. Shulman to loan approximately $320,000—the remainder of her life savings—to pursue joint initiatives under the Cultivation Agreement, while at the same time diverting the funds to use for his own benefit and failing to meet obligations under the Cultivation Agreement. When he was unwilling or unable to repay the loan in full, Kaplan sought to persuade Ms. Shulman to convert the loan into an investment in Vertical.

343.   In order to attract more investors and infuse more capital in Vertical, Defendants frequently misrepresented to investors that Vertical owns Iron Angel and Wellsprings. Vertical does not, and never has, owned these properties, but, on information and belief, misled third parties into believing Vertical has expansive farming land available in order to persuade third parties to invest in Vertical, thereby stripping profits from Ms. Shulman.

344.   Defendants misled Ms. Shulman into believing that the Iron Angel lease was required solely for licensing purposes and was merely a formality, when in fact the lease was not necessary for any county or state licensing requirements and was later used as a basis for Defendants to bar Ms. Shulman from her cannabis operation on Iron Angel.

345.   Defendants' former Chief Financial Officer admitted to Brandon Shulman that Vertical keeps two sets of books to avoid reporting all cash income. The CFO furthered Defendants' fraud by providing Plaintiffs with materially false financial information, in an effort to reduce the amount of profits payable under the parties' agreements and to divert profits to Kaplan's other business affiliates.

346.   Defendants' acts of unlawful, unfair, and fraudulent competition have proximately caused Ms. Shulman to suffer injury in fact and loss of money and property (including as a result of expenses that Ms. Shulman has incurred, and continue to incur, in their efforts to prevent and deter Defendants from engaging in unlawful conduct) in an amount to be proven at trial.

347.    As a result of Kaplan's unlawful, unfair, and fraudulent conduct performed in furtherance of the Defendants' concerted scheme, conspiracy, and enterprise, Defendants have been unjustly enriched in an amount that as yet is unascertained, which will be determined according to proof at trial, but which includes their ill-gotten receipt from Ms. Shulman.

348.    Ms. Shulman has suffered "injury in fact" within the meaning of Section 17204 of the UCL as a result of the Kaplan and Vertical's actions. Ms. Shulman has suffered distinct and palpable injury as a result of the misconduct that is (a) concrete and particularized, and (b) is actual and imminent, not conjectural or hypothetical, including but not limited to the loss of cultivation and processor operator's licenses and her 50 percent profit share as a result of Kaplan's below-market sales to his affiliates.

349.    Under Section 17203 of the UCL, Ms. Shulman is entitled to equitable relief in the form of an accounting, restitution, and disgorgement of all ill-gotten gains, earnings, profits, and benefits obtained by Kaplan and Vertical.

350.    Pursuant to California Business and Professions Code Section 17205, Ms. Shulman's remedies under Business and Professions Code Sections 17200 *et seq.* are cumulative with remedies under all other statutory and common law remedies available in California.

351.    Pursuant to Section 17206.1, Ms. Shulman, who was at least 65 at all relevant times, is entitled to additional penalties for each act of unfair competition perpetrated against her.

**COUNT XIII**
**False Advertising in Violation of California**
**Business & Professions Code § 17500, et seq.**
**(Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan,**
**Iron Angel II, LLC, and Vertical)**

352.    Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

BAKER BOTTS L.L.P.

353.   Defendants' marketing materials suggest that they own the Iron Angel mark and that they own the Wellsprings and Iron Angel properties. Defendants' marketing claims, which are distributed and presented to investors, are false and/or misleading statements of fact that Defendants know to be false and/or misleading.

354.   The representations are untrue, have actually deceived, have the tendency to deceive, and/or are likely to deceive consumers.

355.   Defendants' misrepresentations have been with the intent to usurp Plaintiffs' goodwill in an effort to compete unfairly against, among others, Plaintiffs.

356.   Defendants' aforesaid misrepresentations constitute false advertising in violation of California Business and Professions Code §§ 17500 and 17505.

357.   Defendants' acts greatly and irreparably damage and will continue to damage Plaintiffs unless restrained by this Court. Plaintiffs are without an adequate remedy at law.

## COUNT XIV
### Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a) Trademark Infringement
### (Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan, Iron Angel II, LLC, and Vertical)

358.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

359.   Defendants' aforesaid use of the Iron Angel name and mark, and deceptive marketing and advertising materials, falsely represent that Defendants are affiliated, connected, or associated with, or sponsored or approved by Plaintiffs in violation of Section 42(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

360.   Defendants' aforesaid use of the Iron Angel name and mark, and deceptive marketing and advertising materials, falsely represent the nature, character, and/or qualities of their goods, services, and commercial activities in violation of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

BAKER BOTTS L.L.P.

361.   Defendants knew, or should have known, that the Iron Angel name and mark belong to Plaintiffs and that any suggestion that Defendants are affiliated, connected, or associated with, or sponsored or approved by Plaintiffs violates Section 42(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) and Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B).

362.   Defendants' acts greatly and irreparably damage and will continue to damage Plaintiffs unless restrained by the Court; wherefore, Plaintiffs are without an adequate remedy at law.

**COUNT XV**
**False Advertising in Violation of Section 43(a) of the Lanham Act,**
**15 U.S.C. § 1125(a)**
**(Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan,**
**Iron Angel II, and Vertical)**

363.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

364.   Defendants' claims in their marketing materials and communications with investors and brand partners that the Iron Angel and Wellsprings properties and the Iron Angel mark belong to Vertical are false and/or misleading statements of fact.

365.   These claims have actually deceived, have the tendency to deceive, and/or are likely to deceive consumers.

366.   The resulting deception caused by the claims is material, in that the claims are likely to influence the purchasing decisions of purchasers of the goods and services that are sold by Plaintiffs and Defendants.

367.   Defendants' claims are willful and have been made with the intent to usurp Plaintiffs' goodwill in an effort to compete unfairly against Plaintiffs.

368.   Defendants knew, or should have known, that the Iron Angel mark belongs to Plaintiffs and that any suggestion that Defendants own it is false and misleading.

369.   Defendants knew, or should have known, that the Iron Angel and Wellsprings properties belong to Plaintiffs and that any suggestion that Defendants own them violates Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

370.   Defendants' aforesaid claims constitute false advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a).

371.   Defendants' acts greatly and irreparably damage and will continue to damage Plaintiffs unless restrained by this Court. Plaintiffs are without an adequate remedy at law.

**COUNT XVI**
**Unfair Competition in Violation of California Common Law**
**(Ms. Shulman and Iron Angel, LLC, Against Todd Kaplan,**
**Iron Angel II, LLC, and Vertical)**

372.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

373.   Defendants' acts constitute unfair competition in violation of the common law of the State of California.

374.   Defendants intentionally have traded upon and unfairly benefited from Plaintiff's valuable goodwill, reputation, and marketing in order to compete unfairly with Plaintiffs and have been unjustly enriched thereby.

375.   Defendants have misappropriated for themselves the commercial value of the Iron Angel name and mark in conscious disregard of Plaintiffs' rights and have greatly impaired the value of Plaintiffs' goodwill in the name and mark among American consumers.

376.   Defendants knew, or should have known, that the Iron Angel name and mark belong to Plaintiffs and that any suggestion that Defendants own them is false and misleading.

377.   In conducting such acts, Defendants are guilty of oppression, fraud and/or malice, as defined in Cal. Civ. Code § 3294.

BAKER BOTTS L.L.P.

378.   Defendants' acts greatly and irreparably damage and will continue to damage Plaintiffs unless restrained by this Court. Plaintiffs are without an adequate remedy at law.

**COUNT XVII**
**Intentional Interference with Contractual Relations**
**(Ms. Shulman Against Todd Kaplan and Vertical)**

379.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

380.   The Wellsprings Purchase Agreement and its subsequent November 20, 2017, amendment together constituted a valid and enforceable contract between Francine Shulman and The Lugli Family Trust.

381.   Kaplan had knowledge of the existence and terms of the Wellsprings Purchase Agreement, as amended, as well as the parties' respective obligations thereunder.

382.   Kaplan intentionally interfered with the Wellsprings Purchase Agreement, as amended, between Ms. Shulman and the Lugli Family Trust.

383.   Kaplan engaged in an orchestrated series of intentional and bad faith acts, which were not privileged and were undertaken by improper means for illicit and even illegal motives, in order to induce a breach or disruption of the contractual relationship between Ms. Shulman and the Lugli Trust. Specifically, after the Wellsprings Purchase Agreement, and the November 2017 Amendment had been signed, Kaplan engaged in efforts to take title to the property and exclude Ms. Shulman. As part of the parties' Cultivation Agreement and Wellsprings Agreement, Kaplan and Vertical agreed to pay the venture's operational expenses, which included lease and mortgage payments. Kaplan made some payments but ultimately defaulted on the parties' agreement, rendering Ms. Shulman in default on the Wellsprings Purchase Agreement, as amended. The Luglis evicted Ms. Shulman and terminated the Wellsprings Purchase Agreement, stripping

BAKER BOTTS L.L.P.

1    Ms. Shulman of her right to purchase Wellsprings Ranch and to expand her

2    business.

3         384.   As a direct and proximate result of Kaplan's misconduct,

4    Ms. Shulman has suffered harm as alleged above.

### COUNT XVIII
### Intentional Interference with Prospective Economic Advantage
### (Ms. Shulman Against Todd Kaplan and Vertical)

8         385.   Plaintiffs repeat and reallege each of the allegations set forth in the

9    preceding paragraphs.

10        386.   Plaintiff and the Lugli Family Trust were in an economic relationship

11   that would have resulted in an economic benefit to Ms. Shulman. Prior to engaging

12   with Kaplan, Ms. Shulman had negotiated with the Luglis to purchase 402 acres of

13   real property on which Ms. Shulman could expand her cannabis cultivation farm.

14        387.   Kaplan and Vertical knew of the relationship, because Ms. Shulman

15   had, prior to executing the Wellsprings Purchase Agreement, invited Kaplan to

16   invest in Wellsprings with her.

17        388.   After the Wellsprings Purchase Agreement had been signed, Kaplan

18   engaged in efforts to take title to the property and exclude Ms. Shulman. As part of

19   the parties' Cultivation Agreement and Wellsprings Agreement, Kaplan and Iron

20   Angel II agreed to pay operational expenses, which included lease and mortgage

21   payments. Kaplan initially made payments to the Luglis but failed to pay the

22   balance due. By February 2019, Kaplan and Vertical defaulted on the parties'

23   agreement, rendering Ms. Shulman in default on the Wellsprings Purchase

24   Agreement, as amended. The Luglis evicted Ms. Shulman and terminated the

25   Wellsprings Purchase Agreement, stripping Ms. Shulman of her right to purchase

26   Wellsprings Ranch where she had been living and intended to expand her

27   business.

28

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

389. By engaging in this conduct, Kaplan and Vertical intended to disrupt the relationship or knew that disruption of the relationship was certain or substantially certain to occur.

390. The relationship was, in fact, disrupted.

391. Ms. Shulman was harmed as alleged above.

392. Kaplan and Vertical's conduct was a substantial factor in causing Ms. Shulman's harm.

## COUNT XIX
### Intentional Infliction of Emotional Distress
**(Ms. Shulman Against Todd Kaplan, Matt Kaplan, Drew Milburn, Robert Scott, Courtney Dorne, and Vertical)**

393. Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

394. Defendants' conduct caused Ms. Shulman to suffer severe emotional distress.

395. Defendants' conduct was outrageous, as alleged herein.

396. Defendants acted with reckless disregard of the probability that Ms. Shulman would suffer emotional distress, knowing that Ms. Shulman had dedicated her life (and invested her life savings) into making the cannabis cultivation business successful.

397. Ms. Shulman suffered severe emotional distress as a result of Defendants' actions. Ms. Shulman's distress has manifested itself in a variety of physical and emotional ways, including: 1) sleepless nights induced by Vertical's acts of aggression (*e.g*., threatening to "bury" her in litigation, screaming at her, and attempting to drive her off the road) and fraudulent activity described herein, as well as by the physical presence of Vertical employees sent to intimidate her around the clock by arriving on her property in masks, parking through the night by her house (where she lives alone), playing loud music in the middle of the night, and causing her dogs to bark in order to frighten her and prevent her from

sleeping; 2) severe anxiety brought on by uncertainty and fear instilled by Vertical and its executives' actions; 3) living in isolation and unable to visit her grandchildren, participate in significant family events, or to maintain relationships with friends and family; 4) days of nausea, migraines (where she never had headaches before), and uncharacteristic mood swings; and 5) humiliation and emotional suffering in and among her peers and community. Ms. Shulman, once a successful, gregarious businesswoman and now house-bound and reclusive, has overwhelming doubts of self-worth, which have left her living in deep despair.

398.   Defendants' conduct was a substantial factor in causing Ms. Shulman's severe emotional distress.

## COUNT XX
### Elder Financial Abuse Pursuant to Cal. Welf. & Inst. Code § 15610.30
### (Ms. Shulman Against Todd Kaplan, Iron Angel II, LLC, and Vertical)

399.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

400.   Kaplan and Iron Angel II have violated the Elder Abuse and Dependent Adult Protection Act by taking financial advantage of Ms. Shulman. The purpose of the Elder Abuse Act is to protect a particularly vulnerable portion of the population from gross mistreatment in various forms, including protecting the elderly from financial abuse. Ms. Shulman is entitled not to be abused or defrauded.

401.   Through the acts described herein, Kaplan took, misappropriated and maliciously retained possession of Ms. Shulman's property, including her 50 percent share in net income from the crops on the Ranches, prospective business opportunities flowing from the business arrangement, her real property interest in Wellsprings Ranch, and the goodwill she earned in the Iron Angel mark, and caused substantial damage to the Iron Angel and Wellsprings properties and the cannabis operations on those properties. Kaplan and others also induced

BAKER BOTTS L.L.P.

1    Ms. Shulman to sign the Iron Angel lease based on fraudulent misrepresentations.

2    Defendants also failed to uphold their end of the bargain with respect to

3    operational expenses, causing Ms. Shulman to invest her life savings in keeping

4    the business afloat, but not paying her back.

5        402.   The actions of Kaplan and others, as alleged herein and above, are an

6    unconscionable and despicable fraud upon Ms. Shulman. Kaplan took advantage

7    of Ms. Shulman's advanced age, health, and emotional vulnerability.

8        403.   Ms. Shulman was at least 65 years of age or older at the time she

9    signed the Iron Angel lease and the Amended Purchase and Sale Agreement for

10   the Wellsprings Ranch, as amended in November 2017.

11       404.   Defendants wrongfully have refused to surrender possession or the

12   right to possession of Iron Angel, have caused physical damage to the property and

13   cannabis plants, and have used the alleged lease agreement as their last effort to

14   continue to wrongfully retain alleged rights to Ms. Shulman's real property while

15   simultaneously damaging Iron Angel and the plants growing thereon.

16       405.   The conduct, as described and alleged herein, constitutes financial

17   abuse as defined in Welfare & Institutions Code Section 15610.30.

18       406.   Defendants are guilty of recklessness, oppression, fraud, and malice

19   in the commission of the financial abuse of Ms. Shulman, as described and alleged

20   herein.

21       407.   Under the Welfare & Institutions Code Section 15657.5, Defendants

22   are liable for Ms. Shulman's reasonable attorney fees and costs. Additionally,

23   under California Civil Code Section 3294, Ms. Shulman is entitled to punitive or

24   exemplary damages against Defendants.

25       408.   By committing the above acts, Defendants violated the California

26   Elder Abuse and Dependent Abuse Civil Protection Act by taking financial

27   advantage of Ms. Shulman with the intent to defraud and/or commit undue

28   influence against her in her vulnerable state.

409.   In doing the acts alleged herein, Defendants acted with oppression, fraud, and malice as set forth in Civil Code Section 3294. Ms. Shulman is entitled to an award of punitive damages to make an example of and to punish Defendants in addition to damages and other relief requested in this Complaint for an amount to be proven at the time of trial.

410.   Defendants' conduct was a substantial factor in causing Ms. Shulman's harm.

**COUNT XXI**
**Assistance of Elder Financial Abuse Pursuant to**
**Cal. Welf. & Inst. Code §15610.30**
**(Ms. Shulman Against Charles Houghton)**

411.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

412.   Houghton has violated the Elder Abuse and Dependent Adult Protection Act by assisting Kaplan's and Iron Angel II's taking financial advantage of Ms. Shulman. The purpose of the Elder Abuse Act is to protect a particularly vulnerable portion of the population from gross mistreatment in various forms, including protecting the elderly from financial abuse. Ms. Shulman is entitled not to be abused or defrauded.

413.   Through the acts described herein, Houghton assisted Kaplan and Iron Angel II in appropriating and retaining Ms. Shulman's property, including her 50 percent share in net income from the crops cultivated on the properties, prospective business opportunities flowing from the business venture, her real property interest in Wellsprings, and the goodwill she earned in the Iron Angel mark. Houghton also assisted Kaplan in inducing Ms. Shulman to sign the Iron Angel lease based on fraudulent misrepresentations.

414.   Houghton's actions, and that of others, as alleged herein, are an unconscionable and despicable fraud upon Ms. Shulman. Houghton assisted

BAKER BOTTS L.L.P.

Kaplan in taking advantage of Ms. Shulman's advanced age, health, and emotional vulnerability.

415. Ms. Shulman was at least 65 years of age at the time of Kaplan's and Iron Angel II's conduct.

416. Houghton assisted Kaplan and Iron Angel II in appropriating Ms. Shulman's property with the intent to defraud and by undue influence.

417. Ms. Shulman was harmed.

418. Houghton's conduct was a substantial factor in causing Ms. Shulman's harm.

419. The conduct, as described and alleged herein, constitutes financial abuse as defined in Welfare & Institutions Code Section 15610.30.

420. Under the Welfare & Institutions Code Section 15657.5, Houghton is liable for Ms. Shulman's reasonable attorneys' fees and costs. Houghton is guilty of recklessness, oppression, fraud, and malice in assisting the commission of the financial abuse of Ms. Shulman as described and alleged herein. Under California Civil Code Section 3294, Ms. Shulman is entitled to punitive or exemplary damages against Houghton.

## COUNT XXII
### Breach of Fiduciary Duty by Attorney
### (Ms. Shulman Against Charles Houghton)

421. Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

422. Houghton held himself out to third parties as Ms. Shulman's attorney and led Ms. Shulman to believe he would act in good faith on her behalf.

423. Houghton breached the duty of an attorney to maintain loyalty and zealous advocacy on their behalf and not to engage in activities that posed a conflict of interest to his clients.

424. Ms. Shulman was harmed by Houghton's conflicts of interest, wherein he induced reliance by Ms. Shulman on his professed regulatory expertise

BAKER BOTTS L.L.P.

BAKER BOTTS L.L.P.

1   and promises to assist the her when, in fact, he sought to assist the

2   misappropriation of Ms. Shulman's financial and property rights for Kaplan's

3   benefit. Houghton led Ms. Shulman to believe that he would obtain operator

4   licenses on behalf of Kaplan and Ms. Shulman jointly. He misled Ms. Shulman

5   about the types of information he needed to complete the application process,

6   including requesting (but failing to use) true and correct affidavits from

7   Ms. Shulman regarding the legal nonconforming use of Iron Angel in order to

8   expedite the permanent application process, and he misled them to believe the

9   application would be denied absent a long-term lease on Iron Angel. Houghton

10   took the lead, on Ms. Shulman's behalf, in drafting legal documents (such as the

11   Iron Angel lease) without consultation with her or her other attorney. Houghton

12   was instrumental in inducing Ms. Shulman to give up all of her rights on Sisters.

13   Ms. Shulman reasonably believed that Houghton was acting on her behalf, when at

14   all times he was acting for Kaplan, Vertical, and other Defendants. In the end,

15   Houghton's work on behalf of Kaplan and Ms. Shulman jointly resulted in

16   stripping Ms. Shulman of her licenses to operate on her property (and, instead,

17   putting them in Kaplan's name) and ousting Ms. Shulman from the cannabis

18   business on her own property by coercing her to sign a lease that was not needed.

19       425.   Ms. Shulman was harmed as alleged herein, and Houghton's conduct

20   was a substantial factor in causing Ms. Shulman's harm.

21   **COUNT XXIII**
**Malicious Prosecution/Wrongful Use of Civil Proceedings**
22   **(Ms. Shulman Against Todd Kaplan, Matt Kaplan, Elyse Kaplan,**
**Iron Angel II, LLC, and Vertical)**
23

24       426.   Plaintiffs repeat and reallege each of the allegations set forth in the

25   preceding paragraphs.

26       427.   Defendants were actively involved in bringing an unlawful detainer

27   and forcible entry proceeding on behalf of Iron Angel II, LLC, against

28   Ms. Shulman and other related individuals and entities. The lawsuit was brought in

---

COMPLAINT

121

CASE NO. 2:19-CV-05413

Santa Barbara Superior Court and was styled *Iron Angel II, LLC v. Francine Shulman, et al.*, No. 19CV01406. The Kaplans also pursued a temporary restraining order and a preliminary injunction at the outset of the proceedings.

428.   Defendants ultimately moved for a dismissal without prejudice (expressly reserving their rights to re-initiate the action at any time) as soon as the Kaplans, Charles Houghton, and other related individuals were scheduled to be deposed. The request for dismissal was made without any reasonable explanation and was not made pursuant to a settlement agreement or any other concession by Defendants. The Court granted Iron Angel II's request for dismissal, effective May 10, 2019.

429.   The Kaplans similarly pursued a temporary restraining order and a preliminary injunction, but reversed course and withdrew their requests for injunctive relief suddenly and without explanation or notice to Ms. Shulman.

430.   No reasonable person in Defendants' circumstances would have believed that there were reasonable grounds to bring the lawsuit against Ms. Shulman or the other defendants in that case. Defendants pursued the lawsuit and temporary injunctive relief in bad faith and engaged in sanctionable conduct.

431.   The dismissal without explanation and immediately before Todd Kaplan, Matt Kaplan, and Charles Houghton were set to be deposed demonstrates that there was no legitimate basis for the lawsuit. Defendants acted primarily for a purpose other than succeeding on the merits of the claim. Defendants pursued the lawsuit and the accompanying proceedings for a temporary restraining order to cause damage and harass Ms. Shulman, making good on Kaplan's promise to "bury" her in litigation.

432.   Ms. Shulman was harmed by Defendants' conduct. As a result of their unreasonable and baseless pursuit of litigation, Ms. Shulman incurred substantial costs and attorneys' fees, and the cannabis cultivation operation at Iron Angel Ranch incurred substantial damage.

1    433.   Defendants' conduct was a substantial factor in causing

2    Ms. Shulman's harm.

3

## COUNT XXIV
### Rescission of Iron Angel Lease Due to Fraud in the Inducement
### (Ms. Shulman Against Todd Kaplan and Iron Angel II, LLC)

6    434.   Plaintiffs repeat and reallege each of the allegations set forth in the

7    preceding paragraphs.

8    435.   Civil Code Sections 1688 and 1689 provide generally that a party to a

9    contract may rescind a contract.

10   436.   On or prior to January 14, 2018, in order to induce Ms. Shulman to

11   enter into the Iron Angel lease:

12           a.    Houghton represented to Ms. Shulman that the lease was a

13                 necessary formality in order for Defendants to obtain licenses

14                 on the Iron Angel property, as the Defendants were obligated to

15                 do under the Cultivation Agreement.

16           b.    Defendants represented that in executing the lease, neither

17                 party would be bound by the terms therein and that the

18                 Cultivation Agreement would continue to govern.

19           c.    Defendants represented that the lease was inconsequential and

20                 merely a means of obtaining the requisite licensing to enable

21                 the parties to cultivate cannabis on Iron Angel.

22   437.   Said statements were false and made with knowledge of their falsity.

23   438.   Houghton misused his position as an attorney to induce Ms. Shulman

24   to sign the lease and to believe the veracity of the Defendants' misrepresentations.

25   439.   The truth is that the lease was never needed for any county or state

26   licensing requirements, and Defendants knew that it was not needed for any such

27   purpose.

28

BAKER BOTTS L.L.P.

1    440.   These representations were made with the intent to induce

2    Ms. Shulman to sign the lease.

3    441.   In reasonable reliance on these statements, Ms. Shulman executed the

4    lease.

5    442.   Defendants fully intended to enforce the lease against Ms. Shulman in

6    an effort to force Ms. Shulman off of Iron Angel and out of the cannabis

7    cultivation operation at Iron Angel, stripping Ms. Shulman of any profits to which

8    she is entitled under the Cultivation Agreement.

9    443.   After the Defendants committed numerous breaches of the

10   Cultivation Agreement and shut Ms. Shulman out of any profit arising from the

11   cannabis cultivation operation on Iron Angel, Ms. Shulman threatened to terminate

12   the Cultivation Agreement. Only then, in March 2019, did Defendants attempt to

13   treat the lease as an enforceable contract by attempting to pay Ms. Shulman the

14   first ever rent check.

15   444.   After Ms. Shulman terminated the Cultivation Agreement, by letter

16   on February 25, 2019, Kaplan filed a lawsuit against Ms. Shulman in Santa

17   Barbara Superior Court seeking to enforce the lease.

18   445.   Ms. Shulman had no reason to suspect and did not discover the above

19   fraudulent statements and omissions until March 2019 when Kaplan intended to

20   try to enforce the lease in an unlawful detainer proceeding in California state court.

21   446.   Had the true facts been disclosed, Ms. Shulman would not have

22   executed the lease giving Defendants possession of Iron Angel. The failure to

23   disclose the fact that the Iron Angel lease was not, in fact, required for regulatory

24   purposes but was, instead, going to be used to oust Ms. Shulman from her own

25   property, is material pursuant to Cal. Corp. sections 25401 and 25110.

26   447.   Ms. Shulman is therefore entitled to rescind the Iron Angel lease

27   pursuant California Civil Code sections 1688, 1689, 1691, and 1692.

28

BAKER BOTTS L.L.P.

448.   Ms. Shulman is informed and believe and thereupon alleges that Defendants dispute her contention that she is entitled to rescind the Iron Angel lease.

## COUNT XXV
## Constructive Trust
### (Ms. Shulman Against Vertical Wellness)

449.   Plaintiffs repeat and reallege each of the allegations set forth in the preceding paragraphs.

450.   Vertical Wellness is an affiliate of Vertical and is a recipient of ill-gotten gains from the Kaplan Enterprise, as alleged above, and acts as a constructive trustee of funds that rightfully belong to Ms. Shulman.

451.   Pursuant to the Cultivation Agreement and the Wellsprings Agreement, Ms. Shulman is the rightful owner of 50 percent of the net income generated from cultivation operations on those properties.

452.   On information and belief, Kaplan and Vertical fraudulently siphoned the money owed to Ms. Shulman under the Cultivation and Wellsprings Agreements and diverted that money to Vertical Wellness for its use.

453.   At all times relevant hereto, Vertical Wellness had knowledge of Kaplan's and Vertical's breaches of the Cultivation and Wellsprings Agreements and fraudulent transfer of money to fund and build Vertical Wellness.

454.   Based on Vertical's fraudulent acts described above, and use of undue influence over Ms. Shulman, and Vertical Wellness's substantial assistance thereto, Vertical Wellness has profited from and has been unjustly enriched by the cash diverted to it, which rightfully belongs to Ms. Shulman.

455.   Vertical Wellness currently holds the profits in a constructive trust on behalf of the true owner, Ms. Shulman.

456.   Vertical Wellness is not entitled to the profits generated under the Cultivation and Wellsprings agreements, and those funds should be disgorged and returned to the true owner, Ms. Shulman.

BAKER BOTTS L.L.P.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request entry of judgment in their favor and against Defendants as follows:

    A.    Actual damages, statutory damages, exemplary damages, punitive damages, treble damages, and such other relief as provided by the statutes cited herein;

    B.    An accounting of money owed to Ms. Shulman;

    C.    Pre-judgment and post-judgment interest on such monetary relief;

    D.    The costs of bringing this suit, including reasonable attorneys' fees; and

    E.    All other relief to which Plaintiffs may be entitled at law or equity.

## JURY DEMAND

Plaintiffs demand a jury trial of all issues for which there is a right to trial by a jury.

Dated: June 20, 2019        Respectfully submitted,


                        /s/ Stuart C. Plunkett

                Stuart C. Plunkett
                Peter K. Huston
                Theresa A. Sutton
                Kathryn S. Christopherson
                BAKER BOTTS LLP
                101 California Street, Suite 3600
                San Francisco, California 94111
                Telephone: (415) 291-6200
                Facsimile: (415) 291-6300

                *Attorneys for Plaintiffs*
                *Francine Shulman, Iron Angel, LLC, and 3F, Inc.*

BAKER BOTTS L.L.P.