Exhibit B

## RECIPROCAL MEMBERSHIP AND CULTIVATION AGREEMENT

**THIS RECIPROCAL MEMBERSHIP AND CULTIVATION AGREEMENT** is made and entered into as of July __, 2017 (the "Effective Date") by and between **NCAMBA9, INC.**, a California Non-Profit Mutual Benefit Company, ("NCAMBA9, " which term includes any Management Company NCAMBA9 may use to manage its operations), FRANCINE SHULMAN TRUSTEES OF THE SHULMAN FAMILY TRUST DATED DECEMBER 24, 2001, KIM L. MARIENTHAL , TRUSTEES OF THE KIM L. MARIENTHAL AND BARBARA N. MARIENTHAL 2003 TRUST, (collectively the "Landowner"), THE SWEET AMBERGRIS COLLECTIVE, a California Not for Profit Medical Cannabis Collective, ("Sweet Ambergris") and **3F, INC.**, a California Mutual Benefit Corporation ("3F") as successor to BayLeaf, Inc., Sweet Ambergris and 3F are collectively referred to herein as, the "Collectives") and **EMERALD SKY, LLC,** a California limited liability company, ("Emerald Sky"). NCAMBA9 Landowner, Emerald Sky and the Collectives may be referred to individually as a "Party" and, collectively, as the "Parties."

### RECITALS

WHEREAS, Landowner owns the real estate located at 5930 Santa Rosa Road, Lompoc California (the "5930 Property"), and it or its affiliate leases another 20 acre parcel of real estate located at 5000 Santa Rosa Road, (the "5000 Property") and has the right to cultivate cannabis thereon (the 5930 Property and the 5000 Property are collectively referred to herein as the "Properties"):

WHEREAS, the Collectives are operating as medical marijuana collectives, organized for the mutual benefit of its members who are all medical marijuana qualified patients and cultivating medical marijuana with the consent of the Landowner;

WHEREAS, NCAMBA9 is operating as a medical marijuana collective, organized for the mutual benefit of its members who are all medical marijuana qualified patients and cultivating medical marijuana, and

WHEREAS, NCAMBA9 and Collectives desire to grants all of their respective members reciprocal membership in their respective collectives to help their members source cannabis to meet their medical needs,

WHEREAS, NCAMBA9 has cannabis cultivation expertise and is willing to assume control of the management of the cultivation on the Properties for reasonable consideration in accordance with the terms and conditions set forth herein.

WHEREAS, NCAMABA9 may transfer some or all of its rights and obligations for Cultivation Operations to a California limited liability company, (the "Manager"), owner or controlled by Todd S. Kaplan.

NOW, THEREFORE, in consideration of the mutual promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

1.      **DEFINED TERMS.** The following terms used herein shall have the meanings set forth below:

1

**1.1** "ADVISERS" shall mean the accountants, lawyers and other professional advisers advising either Party in relation to the transaction subject to this Agreement including (unless the context otherwise requires) Representatives of such Advisers.

**1.2** "AFFILIATE" shall mean, with respect to any Person, any other Person controlling, controlled by or under common control with the first Person. The term "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

**1.3** "AGREEMENT" shall mean this Agreement.

**1.4** "BEST EFFORTS" shall mean the efforts determined to be reasonably diligent by NCAMBA9. Such efforts do not require NCAMBA9 or its Manager, as the case may be, to enter into any litigation, arbitration or other legal or quasi-legal proceedings, nor do they require NCAMBA9 or its Manager, as the case may be, to advance or expend fees or sums of money in addition to those specifically set forth in this Agreement.

**1.5** "CULTIVATION OPERATIONS" shall mean the management of all activities relating to the cultivation of Cannabis on the Properties, the distribution of product to collective members and the manufacture of products therefrom including but not limited to site planning and preparation; construction of permanent or temporary structures of any sort and on-going maintenance thereof; provision for utilities and water to the fields and facilities used for cultivation; installation of utilities lines; retention and management of all workers and labor necessary for the cultivation; sourcing and maintaining all fixtures, equipment, vehicles, tools or other personal property; sourcing of all seeds, clones, soil, fertilizer, amendments and related items required or necessary for the cultivation; final processing and transportation of all cannabis flower or products to collective members; paying all taxes require as a result of cannabis sales to members; taking all steps or actions necessary or prudent on behalf of Landowner or the Collectives to ensure all Cultivation Operations on the Properties are conducted in strict accordance with applicable California law and any County ordinance, rule or regulation.

**1.6** "CONFIDENTIAL INFORMATION" shall mean with respect to each Party in its capacity as a discloser of Confidential Information ("Discloser") (a) all confidential and proprietary information of, or relating to, Discloser or its business, in oral, written or electronic form, including, without limitation, information relating to Discloser's business affairs, operations, intellectual property (including any patents, copyrights, trademarks or applications relating thereto, and any related technical information, specifications, drawings, trade secrets and know-how), proprietary methodologies, details of its products and services, as well as pricing policies, market analyses, product development plans or strategies, corporate structure, capitalization, tax information, and the identities and substance of agreements with investors, employees, consultants, suppliers, customers and business partners, as well as any other information, data or material of a nature that could reasonably be presumed confidential, whether previously, presently or subsequently disclosed to the other Party in its capacity as a recipient of Confidential Information ("Recipient") by Discloser or its Representatives or Advisers in connection with the Agreement and (b) the substance and content of the discussions or negotiations taking place or that have taken place between the parties concerning this Agreement including any of the terms, conditions or other facts with respect to this Agreement discussed between the Parties or their respective Representatives or Advisers. Notwithstanding the foregoing, Confidential Information shall not include information that the Recipient can show:

i). Is or becomes publicly available (other than, directly or indirectly, as a result of disclosure by the Recipient, its Affiliates or any of their respective Representatives or Advisers contrary to the obligations of confidentiality herein);

ii). Was already in the possession of the Recipient or an Affiliate thereof at the time of receiving the same from Discloser (as shown by Recipient's written records) free of any restriction as to its use or disclosure prior to its being so furnished;

iii). Becomes available to the Recipient or an Affiliate thereof from a source other than Discloser, its Representatives or Advisers, which source is not bound by any obligation of confidentiality to Discloser in relation to such information; or

iv). Is independently developed by the Recipient or an Affiliate thereof by personnel who have not had any access to any Confidential Information and without using or referring to the Confidential Information.

**1.7** **"FORCE MAJEURE EVENT"** shall mean shall mean an event beyond the control of the Parties, which prevents a Party from complying with any of its obligations under this Agreement notwithstanding the party using its best efforts to overcome the event, including but not limited to:

i). Fire, explosion, earthquake, drought, flood, and natural disaster;

ii). War, hostilities (whether declared or undeclared), invasion, act of foreign enemies, rebellion, revolution, insurrection, or civil war;

iii). Riot, commotion, strike, slow-down, lockout or disorder, unless solely restricted to employees, agents, representatives or other personnel of the Party claiming a Force Majeure Event; or

iv). Acts or threats of terrorism.

v). A change in the laws of the State of California or a change in Federal enforcement policy that makes Holding's responsibilities hereunder unreasonably risky to execute or if NCAMBA9 is threatened with criminal prosecution.

**1.8** **"NET INCOME"** shall mean gross revenue from the sale of cannabis or cannabis derivatives cultivated at the Property less Operational Expenses actually incurred by NCAMBA9; provided, however, that in no event shall Net Income include any expenses or costs that NCAMBA9 may incur for salaries, expenses and charges for its Representatives, officers, directors, managers, agents, attorneys, advisors, consultants which NCAMBA9 employs or retains to operate as NCAMBA9 (other than agriculture workers who are members of the Collective and then, only to the extent they are actually providing services on the Properties.

**1.9** **"OPERATIONAL EXPENSES"** shall mean all costs stemming from or relating to the Cultivation Operation on the Properties and the performance of NCAMBA9's responsibilities under Section 3 of this Agreement as well as, (i) all costs that Landowner incurs for the mortgage, real property taxes and assessments and insurance on the 5930 Property and rent and real property taxes Landowner or its Affiliates incur under its

lease for the 5000 Property, and (ii) costs of all risks insurance policies with an a mutually acceptable insurance carrier and coverage limits which policies name the Landowners and Collectives as additional insureds.

    **1.10**    **"PERSON"** shall mean any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock Collective, trust, unincorporated organization, governmental or regulatory body or other entity.

    **1.11**    **"PRE-APPROVAL REQUIREMENTS"** shall mean NCAMBA9 obligation to obtain Landlord's prior written consent before taking any of the following actions: any grading, soil replacement or soil removal that requires a governmental approval, ; the construction of any permanent or temporary structures of any nature that require a building permit to be issued by a governmental entity; allowing any third parties to have unsupervised access to the Properties (which are not direct employees or contractors of NCAMBA9 fully insured by NCAMBA9), any other action which requires a building, zoning land use or other permit, or exemption therefrom from the County of Santa Barbara or approval from an agricultural preserve or architectural review board. Notwithstanding the foregoing, NCAMBA9 or its Manager shall have complete control over Cultivation Operations.

    **1.12**    **"REPRESENTATIVES"** shall mean, in relation to any Person, the directors, officers, employees and consultants of, and individuals engaged to work for, that Person and any current or prospective shareholders, investors or lenders of that Person.

    **1.13**    **"TRIM PROCESSING"** shall mean the manufacturing and processing of trim from the flowers cultivated on the Property.

    **2.**    **RECIPROCAL RIGHTS.** Any member of the Collectives who has a valid medical recommendation for the therapeutic use of cannabis, a valid California State ID, and has completed all required membership agreements for membership shall be accepted as a member of NCAMBA9's collective. Conversely, any member of NCAMBA9's collective who has a valid medical recommendation for the therapeutic use of cannabis, a valid California State ID, and has completed all required membership agreements for membership shall be accepted as a member of the Collectives.

    **2.1**    Reciprocally affiliated members shall be entitled to regular member services and benefits; except that either collective may restrict the voting privileges of reciprocity affiliated members, according to the rules and practices of that organization. (See the Bylaws and other operating documents associated with each association for reference.)

    **2.2**    Each party shall ensure that their conduct complies with the Compassionate Use Act, the Medical Marijuana Program Act, and the Medical Marijuana Regulation and Safety Act and any regulations from the County in which they operate.

    **2.3**    Each party shall ensure that each member of its collective is at least one of the following:

        a.    A "qualified patient" as defined by Health and Safety Code §11362.5 as an individual who has obtained a medical recommendation for the therapeutic use of cannabis from a licensed physician;

        b.    A "person with an identification card" as defined by Health and Safety Code §11362.7(c), by being a "qualified patient" and holding a valid medical marijuana patient identification

card issued by the State Department of Health Services through the county health department or its designee under the Medical Marijuana Program Act; or,

        c.    A "primary care giver" as defined by Health and Safety Code §11362.7(d), by satisfying the following: (A) being designated in writing by a qualified patient or a person with an identification card as his or her primary caregiver, and that patient or person is a member of the collective in good standing, (B) consistently assuming responsibility for the housing, health, or safety of that patient or person, and (C) residing in the same county as every qualified patient or person with an identification card for whom he or she has been designated as a primary caregiver.

**2.4**    A member may be expelled from either collective and his or her membership may terminate by either collective on occurrence of any of the following events:

        a.    For violating any rule or policy adopted by the board, or for breaching any contract or agreement between the member and the collective;

        b.    For failing to maintain a valid medical recommendation for the therapeutic use of cannabis;

        c.    For acting in any way that is not in the best interest of the collective, acting in violation of the Compassionate Use Act, the Medical Marijuana Program Act, or the Medical Marijuana Regulation and Safety act or any applicable County ordinance or regulation. A criminal conviction that under State statute would prevent a member from being a member of a collective may be used in making this determination.

        d.    If either Party expels, terminates, or otherwise suspends a member, the expelling Party shall notify the other Party to this Agreement within 48 hours of the expulsion, termination, or suspension, and the grounds for such expulsion, termination and/or suspension.

**2.5**    Each party shall provide to the other party with the name of a reliable contact person within their organization responsible for maintaining membership records. Contact information for that person will be kept current.

**2.6**    The Bylaws, resolutions, and other rules of each party shall be incorporated herein by reference and each reciprocal member agrees to comply therewith.

**3.**    **MANAGEMENT OF CULTIVATION OPERATIONS.** As soon as practicable, but in less than five (5) business days from the date hereof, NCAMBA9 shall be responsible for managing the Cultivation Operations on the Properties in accordance with the terms set forth herein. NCAMBA9 shall use its Best Efforts to manage the Cultivation Operations in the most efficient and effective manner possible under the circumstances.

**3.1**    Subject to NCAMBA9 Compliance with the Pre-Approval Requirements, NCAMBA9 shall be solely responsible for the day-to-day operation of the Cultivation Operations at the 5930 Property and authorized to make all management decisions with respect thereto. The Landowner represents that there was 4 acres growing during the time period from January 18, 2016 until the present, that there is 3 acres planted now, allowing for one (1) acre to be planted in addition to what is planted as of the date of this Agreement. With respect to the 5000 Property, NCAMBA9 shall manage Cultivation Operations as an independent contractor for Landowner and its Affiliates with the same rights and obligations as for the 5930 Property, and shall coordinate all of its activities

5

with and through the Collectives. Landowner and its Affiliates represent that they will cause the lease for the 5000 Property to include NCAMBA9 or its Manager. Further, Landowner and/or Emerald Sky, LLC, as the Tenant represent that NCAMBA9 or its Manager is entitled to grow up to 18.89 acres under the current Santa Barbara County restrictions.

**3.2** NCAMBA9 shall be solely responsible for timely paying all Operational Expense with respect to the Cultivation Operations on the Properties. In that regard, , NCAMBA9 shall timely pay for the 5930 Property the mortgage expense, property taxes and assessments and insurance that Landowner pays, and for the 5000 Property, the monthly rent and property taxes due under the applicable lease therefor. In addition, NCAMBA9 shall reimburse the Collective or the Landowner for any utilities which it pays for the usage on the Properties for the prior month. At NCAMBA9 request, the Collective will provide invoices or other evidence of these expenses or payments. In no event shall Landowner or the Collectives be responsible for any Operational Expenses whatsoever and all such expenses shall be timely paid, reimbursed or advanced by NCAMBA9.

**3.3** Various individual members of the Collectives including Frannie Shulman, Ryan Cuvenee and Andrew Gurl will be actively engaged in the Cultivation Operations from time to time and NCAMBA9 and such individuals shall use good faith efforts to coordinate their respective activities to achieve the best agricultural results practicable. These individuals shall conform to instructions by NCAMBA9 as the manager of Cultivation Operations.

**3.4** NCAMBA9 shall at all times comply with the Pre-Approval Requirements and provide written notice of its need for approval from the Collective or Landowner along with the details thereof at least five (5) days prior to the date that NCAMBA9 requires such consent. Collective or the Landowner shall promptly respond to NCAMBA9 request. If the Collective and/or the Landowner do not respond to the request within five (5) days, consent to the request shall be deemed to have been given. NCAMBA9 shall only request consent for work or activities which it knows strictly comply with applicable law or County ordinances.

**3.5** NCAMBA9 shall obtain a resale permit for the Collectives and timely pay all sales tax that may be due and payable in connection with sales of cannabis or related products cultivated at the Properties and otherwise comply with all legal requirements associated with cultivating cannabis at the Properties.

**3.6** The Parties shall monitor and work together to comply with all registrations and requirements that the Parties must follow in order for the Properties to continue to be taxed as agriculture land in the County of Santa Barbara, if possible. The Parties shall also monitor and, on their own behalf, comply with all laws and regulations and obtain all permits required to legally cultivate, process and sell cannabis on the Properties.

**3.7** The parties acknowledge the 5930 Property is over 1000 acres and NCAMBA9 requires only a portion of it to conduct the Cultivation Operations. Landowner may use other portions of such Property for its own or other business purposes in its sole discretion provided that such use does unreasonably interfere with the Cultivation Operations on such property.

**3.8** NCAMBA9 will comply with all laws, ordinances, rules and regulations in conducting its activities on the Properties.

**3.9** Landowner and the Collectives have a separate arrangement for small quantities of Trim Processing on the Properties with Sprout which arrangement will continue independent of this Agreement unless and until Sprout, Landowner and NCAMBA9 agree to an alternative arrangement for Trim Processing.

6

4.      TERM. The term of this Agreement shall perpetual, unless terminated earlier in accordance with the provisions of this Agreement.

4.1      Either party may terminate this Agreement if one party is in breach of any term hereof and fails to cure such breach within ten (10) days of its receipt of written notice thereof in the case of a failure to pay money due or the greater of twenty (20) days for non-monetary defaults, if the default can reasonably be cured within said 20 day period, such time as it takes to cure the default using reasonable diligence. If the Event of Default is not cured within the aforementioned time periods, such uncured Event of Default shall provide cause for termination of this Agreement by the non-defaulting Party. In addition, either party shall have the right to terminate this Agreement immediately in the event that the other Party, or any of its principals, employees or contractors become the subject of a criminal prosecution by any government authority or an investigation is likely to result in a criminal indictment, that would make it illegal to continue as a member of the collectives or that would prevent a member from holding a State or local license or permit.

4.2      Each Party to this Agreement may waive any breach by the other Party in the performance of its obligations hereunder and its consequences. No such waiver shall be deemed to have been given by the waiving Party unless given in writing. Upon any such waiver of a past breach, such breach shall cease to exist, and any event of breach arising therefrom shall be deemed to have been cured and remedied for every purpose of this Agreement.

4.3      In addition to the provisions contained herein permitting termination for breach, this Agreement may be terminated at any time by mutual written and signed agreement of the Parties to this Agreement. Any such mutual termination must be in writing and signed by all Parties.

5.      REPRESENTATIONS AND WARRANTIES.

5.1      As an inducement for entering into this Agreement, the Collective and the Landowner, jointly, severally and individually, represent, warrant and certify to the NCAMBA9 that:

5.1.1      Neither the Collective or the Landowner have an outstanding partnership agreement or management agreement for Cultivation Operations at the Properties.

5.1.2      The Collective and the Landowner warrant that there are no judgments, liens, actions, or proceedings pending or threatened against the Collective, the Landowner, and/or the Properties other than the current grading and building code violations which have been disclosed to NCAMBA9 and Landowner is in the process of resolving.

5.1.3      The Collectives and the Landowner warrant that they have not used any other business name within three years of the date of this Agreement or made contracts incurring debt in this business or personally for the business other than those disclosed to NCAMBA9 or as otherwise referenced herein.

5.1.4      The Collectives and the Landowner warrant that there are no judgments, liens, actions, or proceedings pending or threatened against the Collectives, the Landowner, and/or the Properties other than the current grading and building code violations which have been disclosed to NCAMBA9 and Landowner is in the process of resolving.

7

**5.1.5** Neither the Collectives nor the Landowner have an outstanding partnership agreement or management agreement for Cultivation Operations at the Properties which conflict with the terms of this Agreement except for agreements related to Trim Processing as described above.

**5.1.6** No judgments, liens, or security interests will be outstanding as of the Effective Date against Collective and/or Landowner or against its business or any assets thereof, except for those previously disclosed, in writing, and approved by the Manager, in writing.

**5.2** As an inducement for entering into this Agreement, NCAMBA9 represents, warrants and certifies to the Collective and Landowner that:

**5.2.1** NCAMBA9 has substantial experience and expertise with the laws and requirements of cultivating cannabis in California and it can and will perform all of it duties and responsibilities under this Agreement in accordance with the laws of the State of California and the County of Santa Barbara.

**5.2.2** NCAMBA9 has sufficient capital reserves to timely pay all Operational Expenses.

**5.2.3** NCAMBA9 has all licenses, consents and authorizations it requires to perform its duties and obligations hereunder.

**5.2.4** NCAMBA9 is a duly incorporated and validly existing mutual benefit non-profit company formed and operating in accordance with California law.

**5.2.5** There are no judgments, liens, actions, or proceedings pending or threatened against NCAMBA9 which conflict with or prohibit NCAMBA9 from performing its obligations under this Agreement.

**5.3** Collective and Landowner shall indemnify and hold NCAMBA9 free and harmless from bills, claims, demands, indebtedness, liability, and taxes and any other claims of any nature incurred or rising out of and by reason of the conduct or operation of the business on the Properties prior to the Effective Date of this Agreement. NCAMBA9 shall indemnify and hold the Collectives and the Landowner free and harmless from bills, claims, demands, indebtedness, liability, and taxes and any other claims of any nature incurred or rising out of and by reason of the conduct or operation of the business or Cultivation Operations after the Effective Date of this Agreement.

**5.4** The Parties will cooperate in the filing of returns and payment of all Federal, State and local taxes required.

**5.5** Manager, in the course of operations, shall provide financial documents to the Collective on a quarterly basis. The financial documents will detail the Operational Expenses that constitute the expenses of operation and revenue received from operations.

**5.6** NCAMBA9 represents, warrants and covenants to the Collective and the Landowner as of the date of the Agreement, as of each relevant Effective Date and as of any date specifically provided herein:

a. NCAMBA9 does not believe, nor does it have any reason or cause to believe, it cannot perform each and every covenant contained herein;

8

b.      There are no actions or proceedings against or investigations of NCAMBA9 before any court, administrative or other tribunal to the best of its knowledge: (i) that might prohibit its entering into this Agreement; (ii) seeking to prevent the consummation of the transactions contemplated by the Agreement; or (iii) that might prohibit or materially and adversely affect the performance by NCAMBA9 of its obligations under, validity or enforceability of, this Agreement;

c.      No consent, approval, authorization or order of any court or governmental agency or body is required for the execution, delivery and performance by NCAMBA9 of, or compliance by NCAMBA9 with, this Agreement or the consummation of the transactions contemplated by this Agreement, except for such consents, approval, authorizations or order, if any, that have been obtained;

d.      The consummation of the transactions contemplated by this Agreement is in the ordinary course of business of Manager; and

e.      The financial reports and other documents to be prepared and furnished by NCAMBA9 pursuant to this Agreement or in connection with the transaction contemplated hereby taken in the aggregate will not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements contained therein not misleading.

**5.7**      Collective and Landowner, jointly, severally and individually represent, warrant and covenant to NCAMBA9 as of the date of the Agreement, as of each relevant Effective Date and as of any date specifically provided herein:

a.      Collective and/or Landowner have full power and authority to execute, deliver and perform, and to enter into and consummate, all transactions contemplated by this Agreement;

b.      Collective and/or Landlord do not believe, nor do they have any reason or cause to believe, that they cannot perform each and every covenant contained in this Agreement.

All representations, warranties and agreements contained herein shall not be discharged or dissolved upon closing, but shall survive same.

**6.      PAYMENTS AND COMPENSATION.**

**6.1**      Both NCAMBA9 and the Collectives shall be entitled to receive reasonable compensation for their respective roles in the Cultivation Operations.  The parties agree to provide the cannabis and derivate products to the members of the Collectives and NCAMBA9 at reasonable rates which are intended to reimburse the Collective and NCAMBA9 for their reasonable costs in cultivating cannabis on the Properties and not for either parties' profit. The parties agree that a reasonable split of the Net Income from the cultivation activities on the 5930 Property for the 2017 crop, fields 1, 2 and 3 is equal to establishing a reserve of 25% of sales for expenses, to be held by NCAMBA9, from what is remaining 30% will be paid to Ryan Cavenee and 15% will be paid to Andrew Gurl and the remaining balance will then be split on a  50/50 basis between the Collectives and .NCAMBA9.  After the 2017 crop, Collectives will receive 50%, and NCAMBA9 will receive 50% of Net Income.  The split of Net Income on the 5000 Property shall be 50% to the Collectives and 50% to NCAMBA9.

**6.2**      NCAMBA9 shall keep and maintain detailed expense and accounting records of all expenses and revenue stemming from it activities so it can track and report revenue and Net Income. NCAMBA9 shall provide the Collectives with a quarterly P&L and related financial information of Holding's operations and make payments to the

9

Collective quarterly, if there is any payment to be made in a particular quarter, taking into account harvest, curing and time-to-market for products produced on the Properties. At any time during the Term or one year thereafter, the Collective may audit the books and records of NCAMBA9 to confirm that all payments have been properly calculated and paid. In the event that any audit reveals that NCAMBA9 underpaid the Collective by five percent (5%) or more, then NCAMBA9 shall pay for all costs of the audit and an annual audit thereafter.

7.       **CONFIDENTIAL INFORMATION**. During the term of this Agreement and thereafter, the Recipient shall, and shall ensure that its Affiliates and Advisers shall keep confidential all Confidential Information of the Discloser and not disclose it to any Person other than those individuals (i) who are either Representatives or Advisers of the Recipient and/or an Affiliate thereof and (ii) who need to know such information for the purposes of considering, negotiating, advising in relation to or furthering this Agreement or the Parties thereto and who are aware of, and instructed to comply with, the Recipient's obligations contained herein, provided that the Recipient shall be responsible to Discloser for any breach of such obligations by any such Representatives or Advisers (Persons described in subclauses (i) and (ii), the "Permitted Persons") and, in so doing, Recipient agrees to use and to cause its Representatives and Affiliates to use, the same degree of care that it uses to protect its own confidential information of a like nature from unauthorized disclosure, but in no event less than a reasonable degree of care. Without limiting the generality of the foregoing, not modify, reverse engineer, decompile, create other works from or disassemble any software programs or proprietary products or devices or any similar items contained in the Confidential Information unless permitted in writing by the Discloser.

7.1       If the Recipient, its Affiliates or any of their Representatives or Advisers is requested or required to disclose any Confidential Information pursuant to any request of a governmental authority or self-regulatory organization, any law, rule or regulation or in any legal, administrative or regulatory proceeding or similar process (whether by deposition, interrogatory, request for documents, subpoena, civil investigation, demand, order or other legal process), then to the extent permitted by law, the Recipient shall give Discloser prompt written notice of such request or requirement so that Discloser may seek an appropriate protective order or other remedy and/or waive compliance with the provisions of this Agreement, and, to the extent permitted by law, Recipient shall cooperate with Discloser to obtain such protective order. If such protective order or other remedy or protection is not obtained, the Recipient shall be permitted to disclose such Confidential Information, but shall use reasonable efforts to disclose and only that portion of the Confidential Information that is legally requested or required to be disclosed.

7.2       This Agreement in no way constitutes an agreement by the Parties to exchange or make available any particular Confidential Information or other information, and the extent of such exchange or availability shall be entirely voluntary. Except as otherwise expressly provided in this Agreement, nothing in this Agreement shall be construed as granting either Party as Recipient, whether by implication, estoppel or otherwise, any license or any right to use any Confidential Information, or use any intellectual property now or hereafter owned or controlled by the Discloser.

7.3       Party shall not be considered in breach of or in default under this Agreement on account of, and shall not be liable to the other Party for, any delay or failure to perform its obligations hereunder due to a Force Majeure Event; provided, however, if a Force Majeure Event occurs, the affected Party shall, as soon as practicable:

a.       Notify the other Party of the Force Majeure Event and its impact on performance under this Agreement; and

10

If to NCAMBA9:

> Todd S. Kaplan
> Medical Investor Holdings, LLC for NCAMBA9, Inc.
> 29800 Agoura Road, Suite 100
> Agoura Hills, CA 91301
> Email: tkaplan@mih1.com

**7.6** Any part, provision, representation or warranty of this Agreement which is prohibited or unenforceable or is held to be void or unenforceable in any jurisdiction shall be ineffective, as to such jurisdiction, to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof. To the extent permitted by applicable law, the Parties hereto waive any provision of law that prohibits or renders void or unenforceable any provision hereof. If the invalidity of any part, provision representation or warranty of this Agreement shall deprive any economic benefit intended to be conferred by this Agreement, the Parties shall negotiate, in good-faith, to develop a structure the economic benefit of which is nearly as possible the same as the economic effect of this Agreement without regard to such invalidity.

**7.7** This Agreement may be executed simultaneously in any number of counterparts. Each counterpart shall be deemed to be an original, and all such counterparts shall constitute one and the same instrument.

**7.8** The construction, performance, and enforcement of this Agreement shall be governed by the laws of the State of California. All disputes and controversies of every kind and nature between the parties to this Agreement arising out of, as to the existence, construction, validity, interpretation or meaning, performance, nonperformance, enforcement, operation, breach, continuance or termination of the Agreement shall initially be mediated by the parties at a full day non-binding mandatory mediation in Santa Barbara, CA, presided over by a mutually agreed upon mediator, with the expenses of the mediation to be shared equally. In the event that the full day non-binding mediation is unsuccessful, then the parties agree that any such claim, including but not limited to questions as to whether a matter is governed by this arbitration clause, will be settled by binding arbitration in Santa Barbara, CA, presided over by a mutually agreed upon arbitrator, and judgment on the award may be entered in any court having jurisdiction. If the Parties are unable to agree upon a mediator or an arbitrator, each shall pick a mediator or arbitrator, as the case may be, and the mediators or arbitrators shall select a third mediator or arbitrator who shall hear the matter. The parties shall each have the right of discovery in connection with any arbitration proceeding in accordance with the *California Code of Civil Procedure*, Section 1283.05. The cost of mediation and arbitration shall be borne equally by the parties; however, the arbitrator shall have the discretion to order that the costs of arbitration, including the arbitrator fees, and reasonable attorneys' fees and costs shall be borne by the losing party. Absent such a ruling, each party shall share equally the burden of all arbitration expenses and bear their own costs and expenses.

**7.9** No party may assign, pledge or hypothecate their rights or obligations under this Agreement by operation of law or otherwise without the prior written consent of the other party, except as expressly set forth herein.

**7.10** No term or provision of this Agreement may be waived or modified unless such waiver or modification is in writing and signed by the party against whom such waiver or modification is to be enforced.

**7.11** NCAMBA9, its Manager or assigns shall have the right to purchase a Forty Two and one half percent (42.5%) tenant in common interest in the 5930 Property for a total of $3,000,000.00. NCAMBA9, its Manager or

12

assigns may exercise the Option to Purchase at any time between 12 and 24 months after the Effective Date of this Agreement but such option shall expire if not timely exercised.

      **7.12**    No Party shall have an obligation to indemnify or in any way compensate or reimburse any other Party for losses determined by an arbitrator or a court of competent jurisdiction to have been suffered by said Party due that Party's own conduct, negligence, inaction or failure to fulfill an obligation or covenant under this Agreement.

      **7.13**    The Parties agree that this is the entire and exclusive agreement and understanding among the Parties regarding the subject matter hereof, and that there are no representations, warranties, terms, covenants or conditions made by any other party, except as herein expressly contained. This Agreement shall not be altered, waived, modified, or canceled in any respect except in writing, duly executed by all of the Parties hereto, and no oral agreement or course of conduct to the contrary, shall be deemed an alteration, amendment, modification of cancellation.

      **7.14**    The Parties recognize and agree that the State of California and Santa Barbara County are in the process of creating a new licensing scheme, replacing the currently existing cooperative/collective system. The new regulatory scheme will require that the Parties cooperate with applying for and obtaining both State of California licenses and Santa Barbara County, California licenses and/or permits. The Parties agree, to the largest extent allowed under law, to cooperate with each other to seek and obtain the necessary State and local licenses, such that operations will continue under the control of the NCAMBA9 or its Manager, and revenues and expenses will continue to be split in accordance with the terms and spirit of this Agreement and such that operations will continue under the control of the NCAMBA9. The Parties further agree to execute such other documents and instruments reasonably necessary to effectuate the terms, spirit and intent of this Agreement and this Paragraph.

      **7.15**    The Parties agree that NCAMBA9 may choose to operate in connection with a Management Agreement with a California limited liability company, (the "Manager"), provided that the Manager is owned or controlled by Todd S. Kaplan. Assignment of management of Cultivation Operations to the Manager shall not require the consent of the Landowner or the Collectives. Landowners may assign their duties and obligations to a California limited liability company without consent of NCAMBA9 provided they also transfer title to the 5930 Property to such company, and such company agrees, in writing, to be bound by, and assume all the Landowners' rights, responsibilities and obligations contained herein.

*[Signatures begin on the following page.]*

b.  Use reasonable efforts to resolve any issues resulting from the Force Majeure Event and perform its obligations hereunder.

7.4  The Parties hereby acknowledge and agree that despite the fact that the cultivation, possession, and distribution of marijuana remains illegal under Federal law, it is legal at the State level.  Accordingly, the Parties jointly, severally and individually waive any defense as to the enforcement of this Agreement based upon an "illegality of purpose" theory or other related defense(s).  The Parties further acknowledge and agree that this Agreement shall be fully enforceable in the court of competent jurisdiction located in the State of California as specified herein, and/or by means of mediation or arbitration as may be more fully set forth herein

7.5  Any notice required or permitted under the Note shall be in writing (including facsimile communications and electronic mail) and shall be deemed to have been given *(i)* on the date of delivery, if personally delivered to the party to whom notice is to be given, *(ii)* the third day after mailing, if mailed to the party to whom notice is to be given, by certified mail, return receipt requested, postage prepaid or *(iii)* on the date of delivery, if delivered via confirmed facsimile or electronic mail and, in each case, addressed as follows or to the most recent address, specified by written notice, of Collective or Management given to the sender pursuant to this Section:

If to Collectives, to:

The Sweet Ambergris

Email: franniesr@gmail.com

3F, Inc.

Email: frannisr@gmail.com

If to the Landowner, to:

FRANCINE SHULMAN TRUSTEES OF THE SHULMAN FAMILY TRUST DATED DECEMBER 24, 2001

Email: franniesr@gmail.com

KIM L. MARIENTHAL , TRUSTEES OF THE KIM L. MARIENTHAL AND BARBARA N. MARIENTHAL 2003 TRUST
Kim Marienthal
E276BD990631408...

Email: kim@marienthal.com

11

IN WITNESS WHEREOF, the parties hereto have executed this Agreement effective as of the day and year last written below.

"NCAMBA9"

**NCAMBA9**, a California Non-Profit Mutual Benefit Company

By: _____
        Todd S. Kaplan, President

"LANDOWNER"

**SHULMAN FAMILY TRUST DATED DECEMBER 24, 2001,**

_____
**FRANCINE SHULMAN, TRUSTEE**

**KIM L. MARIENTHAL AND BARBARA N. MARIENTHAL 2008** DocuSigned by:
**TRUST** _____ Kim Marienthal _____
**KIM L. MARIENTHAL, TRUSTEE**

"COLLECTIVES"

**THE SWEET AMBERGRIS COLLECTIVE**, a California Not for Profit Medical Cannabis Collective

By: _____
Name: _Francine Shulman, President_

**3F, INC.**, a California Mutual Benefit Corporation

By: _____
Name: Francine Shulman, President

EMERALD SKY RANCH, LLC

By: _____
    Francine Shulman, Manager